## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

REWARDS NETWORK )
ESTABLISHMENT SERVICES INC., )
a Delaware Corporation, )
                               )
          Plaintiff, )
                               )
     v. )          Case No. 1:16 cv 09952
                               )
LA BOUCHERIE, INC., a New York )
Corporation; and PHILIP LAJAUNIE, an )
Individual, )
                               )
          Defendants. )

## <u>AFFIDAVIT OF PHILIP LAJAUNIE</u>

Philip Lajaunie, pursuant to 28 U.S.C. § 1746, hereby deposes and states for his affidavit the following.

1.     I am over the age of 21 years old and of sound mind. I have personal knowledge of the facts contained in this affidavit and could testify competently thereto if called upon to do so.

2.     I am a resident of Jackson, WY.

3.     Between 1990 and 2016, I was the principal of La Boucherie, Inc. ("La Boucherie").

4.     La Boucherie operated as a restaurant under the name "Les Halles," which was located at 411 Park Avenue South, New York, New York 10016 ("411 Park Ave.").

5.     Prior to December 2015, La Boucherie was a tenant at 411 Park Ave. for 25 years.

6.     In 2015, La Boucherie's landlord was 2727 Realty LLC ("Landlord").

7.     During 2015, La Boucherie's 10-year lease was nearing its end and was set to expire on November 30th, 2015.

8.     Given La Boucherie's success at the location and its 25-year history at 411 Park Ave., I wished to extend La Boucherie's lease for another 10 years.

9.     To assist with the lease extension, I hired Robert V. Ferrari ("Ferrari") to represent La Boucherie and me in the negotiations.

{00295062}

10. By and through Ferrari, we were engaged in extensive negotiations with Landlord throughout 2015.

11. During the negotiations, we encountered disagreements regarding certain potential lease terms.

12. Many of the disagreements over the terms were minor, and thus, La Boucherie and I were willing to agree to most of Landlord's terms. However, we did not readily agree to Landlord's demanded increase in La Boucherie's rent.

13. La Boucherie's rent during 2015 was $46,626.18 a month.

14. Landlord demanded that La Boucherie's rent be increased to $60,000 for the first year of the lease extension and incrementally increase to $79,941.80 in year ten (10) of the lease extension. *Exhibit A*, 2727 Realty LLC Proposed Lease Extension, Sec. 40.

15. At the time, La Boucherie was unwilling to financially commit to Landlord's demanded rent, given that the demand was significantly higher than the fair market rental value (appx. $50,000 per month) of similar restaurants in the area.

16. In response, La Boucherie offered $52,000 per month commencing December 1, 2015 with a 2.5% annual increase. *Exhibit B*, La Boucherie Redline Version of 2727 Realty LLC Proposed Lease Extension, ¶ 40.

17. Instead of rejecting La Boucherie's offer outright, Landlord stated that it "would consider" it. *Ex. B*, ¶ 40.

18. La Boucherie and I were confident that an agreement regarding the increase in rent would be reached.

19. Because La Boucherie and I were confident an agreement would be reached with Landlord, we started renovations on the interior of the building in mid-2015.

20. I would not have started the renovations had I not been completely confident that an agreement for the lease extension could be reached with Landlord.

21. By late November 2015, an agreement over the increase in rent had not yet been reached.

22. At the time, La Boucherie had $120,660.48 in its security deposit (the "Security"). *Ex. A*, Sec. 49.

23. In November 2015, I remained confident that we could reach an agreement regarding the increase in rent and informed Landlord that I wished to renovate La Boucherie's premises.

24.     Given the large amount of Security and the likelihood that an agreement would be reached, Landlord mutually agreed with La Boucherie and me to enter into an eviction proceeding to allow La Boucherie's rent and renovation costs to be drawn out of the Security.

25.     Landlord agreed with La Boucherie's and my proposal, and the mutually agreed upon eviction proceeding was filed in the Civil Court of the City of New York in December 2015.

26.     In early March 2016 Terrence Brennan ("Brennan"), a world-class chef, agreed to be my new business partner of La Boucherie.

27.     Due to La Boucherie's renovations and Brennan becoming a partner, I believed La Boucherie would be able to attract more customers and would therefore be able to afford Landlord's demanded rent.

28.     Immediately after Brennan became my new partner, I informed Ferrari that Brennan had become my new business partner and that La Boucherie and I would be able to afford Landlord's demanded rent.

29.     La Boucherie and I specifically instructed Ferrari to agree to Landlord's demanded rent and to get the extended lease signed.

30.     Ferrari informed La Boucherie and me that he would communicate our offer to Landlord.

31.     To my knowledge, Ferrari sent the March 8, 2016 letter (the "Letter") to Landlord as his attempt to communicate La Boucherie's and my offer to accept Landlord's demanded rent. *Exhibit C*, 3/8/2016 Letter from Ferrari to 2727 Realty LLC.

32.     Neither La Boucherie nor I reviewed the Letter before Ferrari sent it.

33.     In fact, I had never seen the March 8, 2016 before the commencement of this litigation.

34.     Because La Boucherie and I did not review the Letter before Ferrari sent it, we firmly believed that Ferrari agreed on our behalf to Landlord's demanded rent and expressed our interest to agree to the modified extended lease.

35.     The Letter contains statements that neither La Boucherie nor I authorized Ferrari to make. *Ex. C.*

36.     Specifically, La Boucherie and I did not authorize Ferrari to tell Landlord that our employees were leaving, that we decided to close the restaurant by March 31, 2016, or that we would only enter into a 10-year lease if Landlord could not find a new tenant. *Ex. C.*

37.     I know that La Boucherie and I did not authorize these statements, because employees were not leaving La Boucherie at the time the Letter was sent and there were no plans to close by March 31, 2016.

{00295062}                                    3

38.     After reviewing the Letter, it is clear that Ferrari ignored La Boucherie's and my instructions and made assertions to Landlord that were contrary to our interests.

39.     On March 10, 2016, La Boucherie and 15 John Corp. d/b/a Les Halles Downtown ("Les Halles Downtown") signed the Agreement with Rewards Network Entertainment LLC ("Rewards"). *Exhibit D*, Rewards Network Entertainment Agreement.

40.     I firmly believed on March 10, 2018 that the lease would be extended for 10 years, because La Boucherie and I instructed Ferrari to agree to the rent increase and lease extension, and La Boucherie had expended significant amounts of money on renovations to the building.

41.     At the time of signing the Agreement with Rewards on March 10, 2016, the fair market value of La Boucherie's assets, exceeded its labilities.

42.     On March 10, 2016, I signed the personal guaranty with Rewards. *Exhibit E*, Philip LaJaunie Personal Guaranty.

43.     Prior to signing the personal guaranty, I was informed by Yoko Iizuka, my agent at the time, that Craig Thompson, a representative at Rewards, informed Iizuka via email on March 9, 2016 that I would be liable under the Personal Guaranty only if I committed fraud. Thompson told Iizuka that I would not be liable if the restaurants went out of business. *Exhibit F*, March 8, 2016 Email from Craig Thompson to Yoko Iizuka.

44.     As such, when La Boucherie executed the Agreement with Rewards, La Boucherie and I had no doubt that La Boucherie would remain in business for the next year.

45.     Shortly after signing the Agreement, Landlord unexpectedly informed me that it had chosen a different tenant to rent 411 Park Ave.

46.     As such, La Boucherie was forced to close its doors on March 24, 2016.

47.     Due to its closure, La Boucherie was unable to remit its credit card receivables (the "Receivables") to Rewards to pay the remaining balance under the Agreement.

48.     It is untrue that La Boucherie and I were liable for over $100,000 in attorneys' fees as a result of the New York class action lawsuit against La Boucherie, Case No. 13-CV-6503. The relevant case was filed on August 21, 2012, by Ethan Murphy, a former employee, against 15 John Corp. and me in the Supreme Court of the State of New York, County of New York, Index No. 103550-2012 (the "Class Action").

49.     15 John Corp. is a restaurant of which I am also the principal owner, which operated under the name "Les Halles Downtown."

50.     Murphy alleged that he and other members of the certified class had been underpaid for a "spread of hours" over the course of their employment.

51.     It was my position that the claims were manufactured, and I filed a claim for coverage with my employer liability insurance company, HUB International.

52.     At the time, Les Halles Downtown had three employer liability insurance policies with HUB International.

53.     HUB International acknowledged that it would cover the claim and provide legal defense pursuant to my employer liability policies. *Exhibit G*, Emails between Ferrari and HUB International.

54.     HUB informed me that it had retained Kaufman Dolowich Voluck, LLP ("KDV") to defend Les Halles Downtown and me in the class action suit.  *Ex. G.*

55.     Because HUB's policy was contained a duty to defend provision, HUB was obligated and agreed to pay KDV's attorneys' fees.

56.     In early 2016, the class action suit remained in litigation. KDV claimed that its attorney's fees exceeded my employee liability insurance policies' coverage, and that I had become personally liable for KDV's attorneys' fees.

57.     KDV sought its attorneys' fees from Les Halles Downtown and I, after one of the HUB International policy providers disputed the payment pursuant to policy by claiming that the principals of the insured were not covered.

58.     I believed that Les Halles Downtown and I were both covered and that the position taken by HUB International was incorrect.

59.     Because HUB hired KDV, neither Les Halles Downtown nor I signed a retainer agreement, nor did we receive any invoices from KDV prior to May 31, 2016.

60.     Therefore, I believed I was not liable for KDV's outstanding fees, of over $100,000, that were owed in early 2016.

61.     KDV asked the trial judge in the class action suit to withdraw as a result of our refusal to pay the attorneys' fees. *Exhibit H*, May 25, 2016 KDV Letter to the Court.

62.     The trial judge granted KDV's request to withdraw as a result of my alleged failure to pay attorneys' fees and for the irreconcilable differences that had arisen between KDV attorney Jeffrey Meyer and me.

63.     After withdrawing from the case, KDV filed a complaint against me for $137,000 in fees, in the Supreme Court of the State of New York County of New York, Index No. 653154/2017. *Exhibit I*, Complaint.

64.     However, KDV's complaint was dismissed with prejudice on July 19, 2018, pursuant to an agreed stipulation of discontinuance. *Exhibit J*, 7/19/2018 Stipulation Order.

65.     Pursuant to the stipulation, there was no assessment of costs against me, nor was I required to make any payments to KDV.

66. Thus, I was never adjudicated liable for the over $100,000 in attorneys' fees requested by KDV in the May 25, 2016 letter.

67. As such, La Boucherie was meeting its obligations on all of its current liabilities when it signed the Agreement on March 10, 2016.

68. On March 7, 2016, I submitted a Merchant Application Form to Rewards. *Exhibit K*, Rewards Merchant Application Form.

69. My representations regarding La Boucherie's revenue and business information were truthful, based upon the facts available to me at the time the representations were made.

70. After La Boucherie close, Plaintiff sought to collect the entire amount of the Receivables from Les Halles Downtown.

71. Les Halles Downtown continued to remit its Receivables to Plaintiff for eighteen (18) months after La Boucherie's closure.

72. Les Halles Downtown regularly remitted its Receivables to Plaintiff from March 2016 through November 2016, totaling $119,208.15. *Exhibit L*, Rewards Network Usage Statement.

73. On October 18, 2016, Les Halles Downtown was forced to file for Chapter 11 Bankruptcy.

74. Throughout the Chapter 11 Bankruptcy proceeding, Les Halles Downtown continued to remit to Plaintiff its Receivables, totaling $ 33,569.20. *Exhibit M*, Debtor Overview Report.

75. On November 6, 2017, Les Halles Downtown's bankruptcy was converted to Chapter 7. *Exhibit N*, November 6, 2017 Conversion Order.

76. On January 19, 2018, an Order of Final Decree was entered closing Les Halles Downtown's bankruptcy. *Exhibit O*, Order of Final Decree.

Further Affiant Sayeth Not

Date: January 11, 2019

_____
Philip Lajaunie

## **VERIFICATION**

I, Philip Lajaunie, verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: January 11, 2019

_____
Philip Lajaunie

# Exhibit A

2/94-A

## STANDARD FORM OF STORE LEASE
### The Real Estate Board of New York, Inc.

**Agreement of Lease,** made as of this      day of    JULY, 2015         ,between

2727 REALTY LLC & 667 REALTY LLC as 50-50 TENANTS-IN-COMMON c/o 411-413 PARK AVE.
S MANAGEMENT LLC, 145 HUGUENOT STREET, 5TH FLOOR, NEW ROCHELLE, NY 10801
party of the first part, hereinafter referred to as OWNER, and

LA BOUCHERIE, INC.

party of the second part, hereinafter referred to as TENANT,

**Witnesseth:**     Owner hereby leases to Tenant and Tenant hereby hires from Owner

### GROUND FLOOR AND PARTIAL BASEMENT

in the building known as   (SEE EXHIBIT A) 411 PARK AVENUE SOUTH
in the Borough of   MANHATTAN   , City of New York, for the term of   TEN (10) YEARS

(or until such term shall sooner cease and expire as hereinafter provided) to commence on the
1st   day of   December, 2015                 , and to end on the
30th   day of   November, 2025
both dates inclusive, at an annual rental rate of

### SEE PARAGRAPH #40.

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any set off or deduction whatsoever, except that Tenant shall pay the first     monthly installment(s) on the execution hereof (unless this lease be a renewal).

In the event that, at the commencement of the term of this lease, or thereafter, Tenant shall be in default in the payment of rent to Owner pursuant to the terms of another lease with Owner or with Owner's predecessor in interest, Owner may at Owner's option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder and the same shall be payable to Owner as additional rent.

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows:

Rent:         1. Tenant shall pay the rent as above and as hereinafter provided.
Occupancy:     2. Tenant shall use and occupy demised premises for   RESTAURANT

and for no other purpose. Tenant shall at all times conduct its business in a high grade and reputable manner, shall not violate Article 37 hereof, and shall keep show windows and signs in a neat and clean condition.

**Alterations:**     3. Tenant shall make no changes in or to the demised premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, and to the provisions of this article, Tenant, at Tenant's expense, may make alterations, installations, additions or improvements which are non-structural and which do not affect utility services or plumbing and electrical lines, in or to the interior of the demised premises by using contractors or mechanics first approved in each instance by Owner. Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner and Tenant agrees to carry and will cause Tenant's contractors and sub-contractors to carry such workmen's compensation, general liability, personal and property damage insurance as Owner may require. If any mechanic's lien is filed against the demised premises, or the building of which the same forms a part, for work claimed to have done for, or materials furnished to, Tenant, whether or not done pursuant to this article, the same shall be discharged by Tenant within 30 days thereafter, at Tenant's expense, by payment or filing the bond required by law. All fixtures and all paneling, partitions, railings and like installations, installed in the premises at any time, either by Tenant or by Owner on Tenant's behalf, shall, upon installation, become the property of Owner and shall remain upon and be surrendered with the demised premises unless Owner, by notice to Tenant no later than twenty days prior to the date fixed as the termination of this lease, elects to relinquish Owner's rights thereto and to have them removed by Tenant, in which event, the same shall be removed from the premises by Tenant prior to the expiration of the lease, at Tenant's expense. Nothing in this article shall be construed to give Owner title to or to prevent Tenant's removal of trade fixtures, moveable office furniture and equipment, but upon removal of any such from the premises or upon removal of other installation as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the premises to the condition existing prior to installation and repair any damage to the demised premises or the building due to such removal. All property permitted or required to be removed by Tenant at the end of the term remaining in the premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, either be retained as Owner's property or may be removed from the premises by Owner at Tenant's expense.

**Repairs:**     4. Owner shall maintain and repair the public portions of the building, both exterior and interior, except that if Owner allows Tenant to erect on the outside of the building a sign or signs, or a hoist, lift or sidewalk elevator for the exclusive use of Tenant, Tenant shall maintain such exterior installations in good appearance and shall cause the same to be operated in a good and workmanlike manner and shall make all repairs necessary to keep same in good order and condition, at Tenant's own cost and expense, and shall cause the same to be covered by the insurance provided for hereafter in Article 8. Tenant

shall, throughout the term of this lease, take good care of the demised premises and the fixtures and appurtenances therein, and the sidewalks adjacent thereto, and at its sole cost and expense, make all non-structural repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty, excepted. If the demised premises be or becomes infested with vermin, Tenant shall, at Tenant's expense, cause the same to be exterminated from time to time to the satisfaction of Owner. Except as specifically provided in Article 9 or elsewhere in this lease, there shall be an allowance to the Tenant for the diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner, Tenant or others making or failing to make any repairs, alterations, additions or improvements in or to any portion of the building including the erection or operation of any crane, derrick or sidewalk shed, or in or to the demised premises or the fixtures, appurtenances or equipment thereof. It is specifically agreed that Tenant shall be not entitled to any set off or reduction of rent by reason of any failure of Owner to comply with the covenants of this or any other article of this lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract. The provisions of this Article 4 with respect to the making of repairs shall not apply in the case of fire or other casualty which are dealt with in Article 9 hereof.

**Window Cleaning:**     5. Tenant will not clean nor require, permit, suffer or allow any window in the demised premises to be cleaned from the outside in violation of Section 202 of the New York State Labor Law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

**Requirements of Law, Fire Insurance:**     6. Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and with any order, order, order, order, order or duty upon Owner or Tenant with respect to the demised premises, and with respect to the portion of the sidewalk adjacent to the premises, if the premises are on the street level, whether or not arising out of Tenant's use or manner of use thereof, or with respect to the building if arising out of Tenant's use or manner of use of the premises or the building (including the use permitted under the lease). Except as provided in Article 29 hereof, nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has by its manner of use of the demised premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect thereto. Tenant shall not do

or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner. Tenant shall pay all costs, expenses, fines, penalties or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article. If the fire insurance rate shall, at the beginning of the lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant, to comply with the terms of this article. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or demised premises issued by a body making fire insurance rates applicable to said premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate then applicable to said premises.

**Sub-ordination:** 7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which demised premises are a part and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall from time to time execute promptly any certificate that Owner may request.

**Tenant's Liability Insurance Property Loss, Damage, Indemnity:** 8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building or caused by operations in construction of any private, public or quasi public work. Tenant agrees, at Tenant's sole cost and expense, to maintain general public liability insurance in standard form in favor of Owner and Tenant against claims for bodily injury or death or property damage occurring in or upon the demised premises, effective from the date Tenant enters into possession and during the term of this lease. Such insurance shall be in an amount and with carriers acceptable to the Owner. Such policy or policies shall be delivered to the Owner. On Tenant's default in obtaining or delivering any such policy or policies or failure to pay the charges therefor, Owner may secure or pay the charges for any such policy or policies and charge the Tenant as additional rent therefor. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agent, contractors, employees, invitees, or licensees, of any covenant on condition of this lease, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire, and Other Casualty:** 9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner and the rent and other items of additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the premises which is usable. (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the premises shall have been repaired and restored by Owner (or sooner reoccupied in part by Tenant then rent shall be apportioned as provided in subsection (b) above), subject to Owner's right to elect not to restore the same as hereinafter provided. (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant given within 90 days after such fire or casualty or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner, specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the premises without prejudice however, to Owner's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, including Owner's obligation to restore under subparagraph (b) above, each party shall

☞ Rider to be added if necessary.

look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery with respect to subparagraphs (b), (d) and (e) above, against the other or any one claiming through or under each of them by way of subrogation or otherwise. The release and waiver herein referred to shall be deemed to include any loss or damage to the demised premises and/or to any personal property, equipment, trade fixtures, goods and merchandise located therein. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof.

**Eminent Domain:** 10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of said lease. Tenant shall have the right to make an independent claim to the condemning authority for the value of Tenant's moving expenses and personal property, trade fixtures and equipment, provided Tenant is entitled pursuant to the terms of the lease to remove such property, trade fixtures and equipment at the end of the term and provided further such claim does not reduce Owner's award.

**Assignment, Mortgage, Etc.:** 11. Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. Transfer of the majority of the stock of a corporate tenant or the majority partnership interest of a partnership tenant shall be deemed an assignment. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any wise be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting.

**Electric Current:** 12. Rates and conditions in respect to submetering or rent inclusion, as the case may be, to be added in RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation and Tenant may not use any electrical equipment which, in Owner's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain. See paragraph #50.

**Access to Premises:** 13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises at any emergency at any time, and, in other reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to any portion of the building or which Owner may elect to perform, in the premises, following Tenant's failure to make repairs or perform any work which Tenant is obligated to perform under this lease, or for the purpose of complying with laws, regulations and other directions of governmental authorities. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes and conduits therein, provided they are concealed within the walls, floors or ceiling, wherever practicable. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction nor shall the Tenant be entitled to any abatement of rent while such work is in progress nor to any damages by reason of loss or interruption of business or otherwise. Throughout the term hereof Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the same to prospective tenants and may, during said six months period, place upon the demised premises the usual notice "To Let" and "For Sale" which notices Tenant shall permit to remain thereon without molestation. If Tenant is not present to open and permit an entry into the demised premises, Owner or Owner's agents may enter the same whenever such entry may be necessary or permissible by master key or forcibly and provided reasonable care is exercised to safeguard Tenant's property, such entry shall not render Owner or its agents liable therefor, nor in any event shall the obligations of Tenant hereunder be affected. If during the last month of term Tenant shall have removed all or substantially all of Tenant's property therefrom, Owner may immediately enter, alter, renovate or redecorate the demised premises without limitation or abatement of rent, or incurring liability to Tenant for any compensation and such act shall have no effect on this lease or Tenant's obligations hereunder. Owner shall have the right at any time, without the same constituting an eviction and without incurring liability to Tenant therefor to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other public parts of the building and to change the name, number or designation by which the building may be known.

**Vault, Vault Space, Area:** 14. No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building is leased hereunder, anything contained in or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the

building. All vaults and vault space and all such areas not within the property line of the building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault or area shall be paid by Tenant.

**Occupancy:** 15. Tenant will not at any time use or occupy the demised premises in violation of Articles 2 or 37 hereof, or of the certificate of occupancy issued for the building of which the demised premises are a part. Tenant has inspected the premises and accepts them as is, subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation as to the condition of the premises and Tenant agrees to accept the same subject to violations whether or not of record.

**Bankruptcy:** 16. (a) Anything elsewhere in this lease to the contrary notwithstanding, this lease may be cancelled by Landlord by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant as the debtor; or (2) the making by Tenant of an assignment or any other arrangement for the benefit of creditors under any state statue. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the premises demised but shall forthwith quit and surrender the premises. If this lease shall be assigned in accordance with its terms, the provisions of this Article 16 shall be applicable only to the party then owning Tenant's interest in this lease.

(b) It is stipulated and agreed that in the event of the termination of this lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this lease to the contrary, be entitled to recover from Tenant as and for liquidated damages an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the fair and reasonable rental value of the demised premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the demised premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four percent (4%) per annum. If such premises or any part thereof be re-let by the Owner for the unexpired term of said lease, or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall be deemed to be the fair and reasonable rental value for the part or the whole of the premises so re-let during the term of the re-letting. Nothing herein contained shall limit or prejudice the right of the Owner to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceeding in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

**Default:** 17. (1) If Tenant defaults in fulfilling any of the covenants of this lease other than the covenants for the payment of rent or additional rent; or if the demised premises become vacant or deserted; or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the demised premises shall be taken or occupied by someone other than Tenant; or if this lease be rejected under Section 365 of Title II of the U.S. Code (Bankruptcy Code); or if Tenant shall fail to move into or take possession of the premises within thirty (30) days after the commencement of the term of this lease, of which fact Owner shall be the sole judge; then, in any one or more of such events, upon Owner serving a written fifteen (15) days notice upon Tenant specifying the nature of said default and upon the expiration of said fifteen (15) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within said fifteen (15) day period, and if Tenant shall not have diligently commenced curing such default within such fifteen (15) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written five (5) days notice of cancellation of this lease upon Tenant, and upon the expiration of said five (5) days, this lease and the term thereunder shall end and expire as fully and completely as if the expiration of such five (5) day period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner but Tenant shall remain liable as hereinafter provided.

(2) If the notice provided for in (1) hereof shall have been given, and the term shall expire as aforesaid; or if Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required; then and in any of such events Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effect and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

**Remedies of Owner and Waiver of Redemption:** 18. In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or other wise, (a) the rent, and additional rent, shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration. (b) Owner may re-let the premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent or charge a higher rental than that in this lease, and/or (c) Tenant or the legal representatives of Tenant shall also pay Owner as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of

the term of this lease. The failure of Owner to re-let the premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may incur in connection with re-letting, such as legal expenses, reasonable attorneys' fees, brokerage, advertising and for keeping the demised premises in good order or for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease. Owner, in putting the demised premises in good order or preparing the same for re-rental may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the demised premises as Owner, in Owner's sole judgment, considers advisable and necessary for the purpose of re-letting the demised premises, and the making of such alterations, repairs, replacements, and/or decorations shall not operate or be construed to release Tenant from liability hereunder. Owner shall in no event be liable in any way whatsoever for failure to re-let the demised premises, or in the event that the demised premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant or any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this lease of any particular remedy, shall not preclude Owner from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws.

**Fees and Expenses:** 19. If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any article of this lease, after notice if required and upon expiration of any applicable grace period if any, (except in an emergency), then, unless otherwise provided elsewhere in this lease, Owner may immediately or at any time thereafter and without notice perform the obligation of Tenant thereunder, and if Owner, in connection therewith or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to reasonable attorney's fees, in instituting, prosecuting or defending any action or proceeding and prevails in any such action or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within ten (10) days of rendition of any bill or statement to Tenant therefor, and if Tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Owner as damages.

**No Representation by Owner:** 20. Neither Owner nor Owner's agent have made any representation or promises with respect to the physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation, or any other matter or thing affecting or related to the premises except as herein expressly set forth and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this lease. Tenant has inspected the building and the demised premises and is thoroughly acquainted with their condition, and agrees to take the same "as is" and acknowledges that the taking of possession of the demised premises by Tenant shall be conclusive evidence that the said premises and the building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

**End of Term:** 21. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition, ordinary wear excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday unless it be a legal holiday in which case it shall expire at noon on the preceding business day.

**Quiet Enjoyment:** 22. Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 33 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to Give Possession:** 23. If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants, or if the premises are located in a building being constructed, because such building has not been sufficiently completed to make the premises ready for occupancy or because of the fact that a certificate of occupancy has not been procured or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for the inability to obtain possession or complete construction) until after Owner shall have given Tenant written notice that the premises are substantially ready for Tenant's occupancy. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified as the commencement of the term of this lease, Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease except the obligation to pay the fixed annual rent set forth in page

one of this lease. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

**No Waiver:** 24. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent and/or additional rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed an acceptance of a surrender of said premises and no agreement to accept such surrender shall be valid unless in writing signed by Owner. No employee of Owner or Owner's agent shall have any power to accept the keys of said premises prior to the termination of the lease and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the premises.

**Waiver of Trial by Jury:** 25. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commences any proceeding or action for possession including a summary proceeding for possession of the premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding, including a counterclaim under Article 4 except for statutory mandatory counterclaims.

**Inability to Perform:** 26. This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment, fixtures or other materials if Owner is prevented or delayed from so doing by reason of strike or labor troubles, government preemption or restrictions or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of which have been or are affected, either directly or indirectly, by war or other emergency, or when, in the judgment of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

**Bills and Notices:** 27. Except as otherwise in this lease provided, a bill, statement, notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the building of which the demised premises form a part or at the last known residence address or business address of Tenant or left at any of the aforesaid premises addressed to Tenant, and the time of the rendition of such bill or statement and of the giving of such notice or communication shall be deemed to be the time when the same is delivered to Tenant, mailed, or left in the premises as herein provided. Any notice by Tenant to Owner must be served by registered or certified mail addressed to Owner at the address first hereinabove given or at such other address as Owner shall designate by written notice.

**Water Charges:** 28. If Tenant requires, uses or consumes water for any purpose in addition to ordinary lavatory purposes (of which fact Tenant constitutes Owner to be the sole judge) Owner may install a water meter and thereby measure Tenant's water consumption for all purposes. Tenant shall pay Owner for the cost of the meter and the cost of the installation thereof and throughout the duration of Tenant's occupancy Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's own cost and expense. Tenant agrees to pay for water consumed, as shown on said meter as and when bills are rendered. Tenant covenants and agrees to pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or a lien upon the demised premises or the realty of which they are part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or sewage connection or system. The bill rendered by Owner shall be payable by Tenant as additional rent. If the building or the demised premises or any part thereof be supplied with water through a meter through which water is also supplied to other premises Tenant shall pay to Owner as additional rent, on the first day of each month, ___% ($___) of the total meter charges, as Tenant's portion, independently of and in addition to any of the remedies reserved to Owner hereinabove or elsewhere in this lease, Owner may sue for and collect any monies to be paid by Tenant or paid by Owner for any of the reasons or purposes hereinabove set forth. **See paragraph #51.**

**Sprinklers:** 29. Anything elsewhere in this lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office or any bureau, department or official of the federal, state or city government require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or for any other reason, or if any such sprinkler system installations, changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any said Exchange or by any fire insurance company, Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required whether the work involved shall be structural or non-structural in nature. Tenant shall pay to Owner as additional rent the sum of $___, on the first day of each month during the term of this lease, as Tenant's portion of the contract price for sprinkler supervisory service.

**Elevators, Heat, Cleaning:** 30. As long as Tenant is not in default under any of the covenants of this lease beyond the applicable grace period provided in this lease for the curing of such defaults, Owner shall, if and insofar as existing facilities permit furnish heat to the demised premises, when and as required by law, on business days from 8:00 a.m. to 6:00 p.m. and on Saturdays from 8:00 a.m. to 1:00 p.m. Tenant shall at Tenant's expense, keep demised premises clean and in order, to the satisfaction of Owner, and if demised premises are situated on the street floor, Tenant shall, at Tenant's own expense, make all repairs and replacements to the sidewalks and curbs adjacent thereto, and keep said sidewalks and curbs free from snow, ice, dirt and rubbish. Tenant shall pay to Owner the cost of removal of any of Tenant's refuse and rubbish from the building. Bills for the same shall be rendered by Owner to Tenant at such times as Owner may elect and shall be due and payable when rendered, and the amount of such bills shall be deemed to be, and be paid as, additional rent. Tenant shall, however, have the option of independently contracting for the removal of such rubbish and refuse in the event that Tenant does not wish to have same done by employees of Owner. Under such circumstances, however, the removal of such refuse and rubbish by others shall be subject to such rules and regulations as, in the judgment of Owner, are necessary for the proper operation of the building. **See paragraph #52.**

**Security:** 31. Tenant has deposited with Owner the sum of $___ as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this lease; it is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this lease, including, but not limited to, the payment of rent and additional rent, Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any rent and additional rent or any other sum as to which Tenant is in default or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this lease, including but not limited to, any damages or deficiency in the re-letting of the premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Owner. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this lease, the security shall be returned to Tenant after the date fixed as the end of the Lease and after delivery of entire possession of the demised premises to Owner. In the event of a sale of the land and building or leasing of the building, of which the demised premises form a part, Owner shall have the right to transfer the security to the vendee or lessee and Owner shall thereupon be released by Tenant from all liability for the return of such security, and Tenant agrees to look to the new Owner solely for the return of said security; and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the security to a new Owner. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that neither Owner nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. **See paragraph #49.**

**Captions:** 32. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision thereof.

**Definitions:** 33. The term "Owner" as used in this lease means only the Owner, or the mortgagee in possession, for the time being of the land and building (or the Owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties of their successors in interest, or between the parties and the purchaser, at any such sale, or the said lessee of the building, or of the land and building, that the purchaser or the lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays, Sundays and all days designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service. Wherever it is expressly provided in this lease that consent shall not be unreasonably withheld, such consent shall not be unreasonably delayed.

**Adjacent Excavation-Shoring:** 34. If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the demised premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which demised premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and Regulations:** 35. Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with the Rules and Regulations and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt. Notice of any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the

BLK☞ Space to be filled in or deleted.

parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing upon Owner within fifteen (15) days after the giving of notice thereof. Nothing in this lease contained shall be construed to impose upon Owner any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease, as against any other tenant and Owner shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

**Glass:** 36. Owner shall replace, at the expense of Tenant, any and all plate and other glass damaged or broken from any cause whatsoever in and about the demised premises. Owner may insure, and keep insured, at Tenant's expense, all plate and other glass in the demised premises for and in the name of Owner. Bills for the premiums therefor shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rent.

**Pornographic Uses Prohibited:** 37. Tenant agrees that the value of the demised premises and the reputation of the Owner will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so called rubber goods shops, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the premises. This Article

shall directly bind any successors in interest to the Tenant. Tenant agrees that if at any time Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of a substantial obligation of the terms of this lease and objectionable conduct. Pornographic material is defined for purposes of this Article as any written or pictorial manner with prurient appeal or any objects of instrument that are primarily concerned with lewd or prurient sexual activity. Obscene material is defined here as it is in Penal law §235.00.

**Estoppel Certificate:** 38. Tenant, at any time, and from time to time, upon at least 10 days prior notice by Owner, shall execute, acknowledge and deliver to Owner, and/or to any other person, firm or corporation specified by Owner, a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates which the rent and additional rent have been paid, and stating whether or not there exists any defaults by Owner under this lease, and, if so, specifying each such default.

**Successors and Assigns:** 39. The covenants, conditions and agreements contained in this lease shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this lease, their assigns. Tenant shall look only to Owner's estate and interest in the land and building for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) against Owner in the event of any default by Owner hereunder, and no other property or assets of such Owner (or any partner, member, officer or director thereof, disclosed or undisclosed), shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this lease, the relationship of Owner and Tenant hereunder, or Tenant's use and occupancy of the demised premises.

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

2727 REALTY LLC & 667 REALTY LLC as 50-50 Tenants-in-Common c/o 411-413 Park Ave. S Management LLC

Witness for Owner:

.................................................         ...............................................................................

.................................................         LA BOUCHERIE, INC.

Witness for Tenant:                                   ...............................................................................

.................................................         ...............................................................................

## ACKNOWLEDGEMENTS

**CORPORATE OWNER**
STATE OF NEW YORK,      ss.:
County of

On this        day of              , 19      ,
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in
that he is the                          of
the corporation described in and which executed the foregoing
instrument, as OWNER; that he knows the seal of said corporation;
the seal affixed to said instrument is such corporate seal; that it was
so affixed by order of the Board of Directors of said corporation,
and that he signed his name thereto by like order.

.................................................

**CORPORATE TENANT**
STATE OF NEW YORK,      ss.:
County of

On this        day of              , 19      ,
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in
that he is the                          of
the corporation described in and which executed the foregoing
instrument, as TENANT; that he knows the seal of said corporation;
the seal affixed to said instrument is such corporate seal; that it was
so affixed by order of the Board of Directors of said corporation,
and that he signed his name thereto by like order.

.................................................

**INDIVIDUAL OWNER**
STATE OF NEW YORK,      ss.:
County of

On this        day of              , 19      ,
before me personally came
to be known and known to me to be the individual
described in and who, as OWNER, executed the foregoing instrument and acknowledged to me that                          he
executed the same.

.................................................

**INDIVIDUAL TENANT**
STATE OF NEW YORK,      ss.:
County of

On this        day of              , 19      ,
before me personally came
to be known and known to me to be the individual
described in and who, as TENANT, executed the foregoing instrument and acknowledged to me that                          he
executed the same.

.................................................

411 PARK AVENUE SOUTH
NEW YORK, NEW YORK 10016

**Address**

Premises BASEMENT (SEE EXHIBIT A)
GROUND FLOOR AND PARTIAL

2727 REALTY LLC & 667 REALTY LLC
AS 50-50 Tenants in Common c/o
41-413 Park Ave. S Management LLC

**Address**

LA BOUCHERIE, INC.

STANDARD FORM OF

# Store Lease

The Real Estate Board of New York, Inc.
© Copyright 1994. All rights Reserved.
Reproduction in whole or in part prohibited.

Dated: JULY , 2015

Rent Per Year

Rent Per Month

Term Ten (10) Years
From December 1, 2015
To November 30, 2025

Drawn by

Checked by

Entered by

Approved by

---

## IMPORTANT – PLEASE READ

## RULES AND REGULATIONS ATTACHED TO AND MADE A PART OF THIS LEASE IN ACCORDANCE WITH ARTICLE 35.

## GUARANTY

## RIDER

Annexed to and forming part of Lease dated as of JULY   , 2015, between 2727 REALTY LLC & 667 REALTY LLC as Tenants-in-Common C/O 411-413 PARK AVE. S MANAGEMENT LLC, Owner/Landlord, c/o S.W. Management LLC, 145 Huguenot Street, 5th Floor, New Rochelle, New York 10801 and LA BOUCHERIE, INC., Tenant, covering GROUND/PARTIAL BASEMENT (SEE EXHIBIT A) ("Premises") in the building ("Building") located at 411 PARK AVENUE SOUTH, NEW YORK, NEW YORK 10016.

## 40. RENT

(a)  The annual base rate for the Premises which shall be paid in monthly installments, in advance on the first day of each month shall be as follows:

| DATES | ANNUAL RENT | MONTHLY RENT |
| --- | --- | --- |
| 12/1/2015-11/30/2016 | $720,000.00 | $60,000.00 |
| 12/1/2016-11/30/2017 | $750,000.00 | $62,500.00 |
| 12/1/2017-11/30/2018 | $780,000.00 | $65,000.00 |
| 12/1/2018-11/30/2019 | $803,400.00 | $66,950.00 |
| 12/1/2019-11/30/2020 | $827,502.00 | $68,958.50 |
| 12/1/2020-11/30/2021 | $852,327.12 | $71,027.26 |
| 12/1/2021-11/30/2022 | $877,896.84 | $73,158.07 |
| 12/1/2022-11/30/2023 | $904,233.72 | $75,352.81 |
| 12/1/2023-11/30/2024 | $931,360.80 | $77,613.40 |
| 12/1/2024-11/30/2025 | $959,301.60 | $79,941.80 |

The base rent is subject to adjustments as provided in this Rider.

(b)  Notwithstanding anything to the contrary contained in paragraphs 17 and 18, and the payment of the annual rental in equal monthly installments, in the event that the Tenant intends to vacate and/or abandon the Premises or does vacate and/or abandon the Premises, whether said Tenant is then in default of any rental installment or in default of any other obligation of this Lease due and owing, the Landlord has the right to declare without notice the total rent reserved for the full term of this Lease to be then due and owing and may bring any legal action to collect such amount.  This right is in addition to any other right and remedy which the Landlord may have in law or in equity, and an election of one remedy shall not constitute a bar to the pursuit of other remedies.

## 41. RENT ADJUSTMENT FOR REAL ESTATE TAXES

Tenant further agrees to pay as additional rent 75%  of any increase in the actual amount of real estate taxes above the actual amount of taxes charged, assessed or paid for the fiscal tax year 2015/2016 against the land, and Building known as 411 PARK AVENUE SOUTH, (BLOCK 884,

LOT 87), New York, New York, ("Real Estate Taxes") of which the Premises are part. Such amount shall be due and payable by the Tenant to the Landlord on the first day of the month succeeding the date on which the amount of such increase, if any, has been ascertained. Any unpaid Real Estate Taxes may be treated as additional rent and be the subject of an action or non-payment summary proceeding by the Landlord. In no event shall Tenant's base rent be reduced as a consequence of any reduction in Real Estate Taxes. In the event Landlord obtains any abatement of or credit against real estate taxes including but not limited to J-51, 421-a or Senior Citizen Rent Increase Exemptions, such abatements and credits shall be ignored in calculating any amount otherwise due from Tenant pursuant to this paragraph.

If this Lease should terminate on a date other than the last day of a calendar year month, any increase payable hereunder shall be prorated and immediately become due and payable.

The term "real estate taxes" shall mean all taxes and assessments levied, assessed or imposed at any time by any municipal, county or state government or any governmental authority upon or against the land and/or building of which the Premises form a part, and also any tax assessment levied, assessed or imposed at any time by any governmental authority in connection with the receipt of income or rents from said land and/or building to the extent that same shall be in lieu of all or a portion of any of the aforesaid taxes or assessments upon or against the said land and/or building.

Tax bills of the City of New York or it agencies shall be prima facie evidence of the amount of any assessment of real estate taxes as shown on such bill and admissible evidence as such in any legal action or proceeding.

## 42. DEFAULT IN THE PAYMENT OF RENT

Notwithstanding any provision contained herein to the contrary, and without waiving Owner's right to commence summary eviction proceedings for nonpayment of rent, the Owner, at Owner's sole discretion, shall have the option of exercising the provisions of this paragraph. In the event Tenant defaults in fulfilling the covenant to make timely payment of rent or additional rent in any month, it being understood that rent is due in advance on the first day of each month, the Owner may send the Tenant five (5) days notice in writing, specifying a default in the payment of rent and upon expiration of said five (5) days, if Tenant shall have failed to make payment of the rent and thereby remedy the default, then the Owner may send to the Tenant a written three (3) day notice of cancellation of this Lease, and upon expiration of said three (3) days, this Lease and the terms hereunder shall end and fully expire as completely as if the expiration of such three (3) day period were the day herein definitely fixed for the end and expiration of this Lease and the term thereof and Tenant shall then quit and surrender the Premises to the Owner and Tenant shall remain liable to Owner as elsewhere provided in this Lease.

## 43. DEMAND FOR RENT

Notwithstanding anything to the contrary contained in this Lease, the Landlord shall not be required to give any preliminary notice to the Tenant prior to initiating a nonpayment summary proceeding except such notice or notices as may be required by law. Any **DEMAND** for rent may be made orally or in writing at the option of the Landlord.

## 44. PARTIAL PAYMENT

No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the full rents due shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance, treat such partial payment as a default or pursue any other remedy provided in this Lease or at law or in equity.

## 45. LATE CHARGES

If Tenant shall fail to pay any installment of base rent or any amount of additional rent or other charges for more than ten (10) days after the same become due and payable, Tenant shall pay Landlord a late charge of one-hundred ($100.00) dollars or a sum equal to 3% of the then current monthly rent, whichever is greater. Such late charge shall be without prejudice to any of the Landlord's rights and remedies hereunder or at law for nonpayment of rent and shall be in addition thereto and shall be considered additional rent. In the event the Tenant fails to pay the above charge, Landlord shall, in addition to all other remedies, have the right to deduct such charge from Tenant's security deposit. Payment of the late charge shall not be an alternate means of performance and shall not excuse late payment.

## 46. RETURNED CHECKS

In the event that any check tendered on behalf of Tenant is returned for insufficient funds or for any other reason, Landlord shall, in addition to all other remedies be entitled to collect a charge of twenty-five ($25.00) dollars as additional rent. In the event the Tenant fails to pay the above charge, Landlord shall, in addition to all other remedies, have the right to deduct such charge from Tenant's security deposit.

## 47. NO RIGHT OF SET-OFF

It is agreed that the Tenant shall not be entitled to any abatement of rent or diminution of rent in any dispossess proceedings for the nonpayment of rent by reason of any breach by the Landlord of any covenants contained in this Lease on its part to be performed. In any dispossess proceeding the Tenant shall not have the right of set off by way of damages, recoupment or counterclaim for damages which the Tenant may have sustained by reason of the Landlord's failure to perform any of the terms, covenants, and conditions contained in this Lease on its part to be performed, but the Tenant shall be relegated to an independent action for damages and such

3

independent action shall not at any time be joined or consolidated with any proceeding to dispossess for nonpayment of rent.

## 48. RENT PAYMENTS BY OTHERS

All payments tendered to the Landlord as and for the rent of the Premises shall be deemed payments for the account of the Tenant. Acceptance by the Landlord of rent from anyone other than the Tenant shall not be deemed to operate as consent by the Landlord to an assignment or subletting by the Tenant of the Premises to such payor or as an attornment, or as a modification of the provisions of this Lease.

## 49. SECURITY DEPOSIT

Landlord acknowledges that Tenant currently has on deposit **$120,660.48** in security. Tenant shall deposit the additional sum of $74,339.52 upon signing this Lease by bank or certified check in order to bring the total security deposit hereunder to $195,000.00. Tenant agrees to pay as additional security the sum of $24,474.22 on or before December 1, 2018; and a further payment of $20,351.19 on or before December 1, 2022 all of which shall be held with the security deposit. These payments shall be deemed Additional Rent. No interest will be earned on the security deposit. If Tenant defaults in respect to any provisions of this Lease, Landlord may apply or retain the whole or any part of the security deposit to the extent required for the payment of any rents or additional rent as to which Tenant is in default or for any sum that Landlord may expend or may be required to expend by reason of Tenant's default under this Lease provided notification of default and opportunity to cure have been given to Tenant pursuant to this Lease. If Landlord applies or retains any part of the security deposit such amount shall be considered Additional Rent and upon demand Tenant shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full deposit on hand at all times during the Lease term. The failure of Tenant to at all times maintain the full amount of security deposit required shall permit the Landlord, at its option, to serve Tenant Notice of Default and thereafter terminate this Lease, or commence a summary proceeding for the deficiency of security deposit. If Tenant shall comply with all of the provisions of this Lease, the security deposit shall be returned to Tenant after the expiration of the Lease term and after delivery of possession of the entire Premises to Landlord in broom swept condition, normal wear and tear excepted. Tenant shall not assign or encumber or attempt to assign or encumber the security deposit, and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

## 50. ELECTRICITY AND GAS

Prior to the commencement date of this Lease Tenant is required to comply with the provisions of Rider Paragraph 60(j).

The Tenant shall arrange and pay for all gas and necessary electric current for lighting and any other purpose and the Landlord shall not be required to furnish same.

4

Tenant covenants and agrees that at all times its use of electric current shall never exceed the capacity of the risers or feeders or wiring installations thereof.

Landlord shall not be liable to the Tenant for any loss, damage, or expense that Tenant may sustain or incur if either the quantity or character of gas and/or electrical service is changed, interrupted or curtailed, is no longer available or it is unsuitable for Tenant's requirements. Any such change, if any, shall not constitute a constructive or partial eviction nor entitle Tenant to any abatement, compensation, rent reduction or set-off or relieve Tenant from performing any of its obligations under the Lease.

## 51. <u>WATER AND SEWER CHARGES AND METERS</u>

Prior to the commencement date of this Lease Tenant is required to comply with the provisions of Rider Paragraph 60(j).

The Tenant shall maintain any water meter or branch sub-meter at its own cost and expense and pay Landlord for all water and sewer charges immediately upon the Landlord billing Tenant for same, if such water meter is maintained in the name of Landlord or if, at the option of Landlord the meter is maintained in the name of Tenant, then Tenant shall punctually pay all charges as they come due directly to the appropriate agency. Without waiving Tenant's obligation to make timely payment, Tenant shall also pay any penalties, interest or other charges asserted as a consequence of late payment. At the Landlord's sole option the Landlord may retain an independent contractor to read the Tenant's water meter and/or to measure water consumption independent of the meter. The contractor's determination of water usage and the amount to be paid by Tenant shall be conclusive.

Bills and/or correspondence from the City of New York or its agencies or any other entity authorized to bill for water usage or any company retained by Landlord shall be prima facie evidence of the amount of any assessment of water and/or sewer charges as shown on such bill or correspondence and admissible as evidence as such in any legal action or proceeding.

Any and all sums due pursuant to this provision shall be additional rent which may be the subject of nonpayment summary proceedings or other remedies as provided for elsewhere in this document.

## 52. <u>HEAT AND HOT WATER</u>

Prior to the commencement date of this Lease Tenant is required to comply with the provisions of Rider Paragraph 60(j).

Landlord shall not be responsible for providing heat or hot water for any part of the Premises occupied by Tenant. Landlord may provide heat for the Building which could include the area occupied by Tenant. However, any heat provided is intended for the benefit of residential

5

tenants only and is a mere gratuity with respect to the Premises covered by this Lease. It is the Tenant's responsibility to adequately heat the Premises. Landlord shall not be responsible for the mechanical breakdown of the Building's heating equipment or Landlord's inability to secure fuel oil and damage to the Tenant therefrom.

## 53. NO WARRANTIES BY LANDLORD

Tenant is and has been in possession of the Premises and is fully familiar with their condition and that of the Building. The Tenant accepts the condition of the Premises and the Building improvements and personalty on the Premises in their present state and without representation or warranty by the Landlord as to the condition of such property or as to the use which may be made thereof. The Landlord rents only bare walls and floors. The Landlord shall not be responsible for any latent defect or change of condition in such Building, improvements, and personalty, any defect in such property, change in the condition thereof, any damage occurring thereto, or the existence with respect thereto of any violations of the laws or regulations of any governmental authority, unless the same is caused by the Landlord, its agent, servants or employees.

## 54. USE OF DEMISED PREMISES

Subject to and in accordance with all rules, regulations, laws, ordinances, statutes and requirements of all governmental and quasi-governmental authorities (the **"Laws"**), the certificate of occupancy for the Building and the Premises and the Fire Insurance Rating Organization and Board of Fire Insurance Underwriters, and any similar bodies having jurisdiction thereof, Tenant covenants and agrees that it shall use the Premises solely **AS A RESTAURANT**, and for no other purpose. Nothing contained in this section or elsewhere in this Lease shall be deemed to constitute a warranty or representation by Landlord that Tenant may lawfully occupy and operate the Premises for the purposes permitted pursuant to this Section.

## 55. LIMITATIONS ON USE

The Tenant understands and agrees that the business activity of the Tenant is confined to the Premises herein leased. The sale and/or display of merchandise by the Tenant outside of the confines of the Premises are prohibited. In addition, the Tenant agrees not to use any flashing lights, music, radio, television or other attention getting equipment which is visible from or audible to the street.

If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business in the Premises, or any part thereof, Tenant, at its sole cost and expense, shall procure and thereafter maintain such license or permit and submit same for inspection by Landlord. Tenant shall at all times comply with the terms and conditions of each such license or permit. Tenant shall obtain and pay for all approvals and permits for work done at the Premises or associated with its occupancy of the Premises, including but not limited to, any permits or

approvals required by such governmental or quasi-governmental departments, commissions, bureaus or agencies having authority over the status of the Building of which the Premises form a part. This is intended to include all Business Improvement District or similar fees. Tenant agrees to pay for all annual renewal fees associated with its use and occupancy of the Premises and the areas appurtenant thereto. In the event Tenant fails to timely pay for such fees or renewals, Landlord may make such payment and bill Tenant and Tenant shall pay same and such amounts shall be deemed additional rent.

## 56. **CONTINUOUS OPERATION**

Tenant agrees that, notwithstanding any other provision of this Lease, it will open the Premises for business to the public on or before the commencement date, conduct its business in the entire Premises subject, however, to all of the terms, covenants and conditions of this Lease, and in such manner consistent therewith and that it will be open for business not less than five (5) days per week and during all hours customary for a store conducting a business similar to Tenant's in the vicinity of the Premises.

## 57. **OBNOXIOUS ODORS, PEST CONTROL**

Tenant shall not suffer or permit any obnoxious odors, fumes, vibrations, pests, vermin, or noise to exist in or to emanate from the Premises. Tenant shall, within three (3) business days after written notice from Landlord, cause such obnoxious odors, fumes, vibrations, pests, vermin or noise to cease or install or commence to install, at its own cost and expense, reasonable and efficient control and/or extermination devises or procedures (first approved by Landlord, which approval shall not be unreasonably withheld or delayed) for the continuous and complete elimination of such odors, fumes, vibrations, pests, vermin or noise, if any, and will complete such installations and/or insure extermination as expeditiously as possible thereafter. Tenant hereby agrees that as a material inducement to Landlord's execution of this Lease it shall not be unreasonable for Landlord to withhold such approval if Tenant's control devices or procedures would in any way interfere with the peaceful occupancy, by the residential tenants, of any of the residential portions of the Building. In the case of pest or vermin, Tenant shall be required to provide regular and continuing extermination services and as needed. In the event such condition is not promptly remedied, Landlord may, at its discretion, cure such condition and thereafter add the cost and expense incurred by Landlord therefore to the next monthly rental to become due and Tenant shall pay said amount as additional rental, or treat the Tenant's failure to cure as a default under this Lease. Landlord shall have the right to enter the Premises at any reasonable time and from time to time on reasonable prior notice to Tenant, if feasible, (which notice may be verbal) to inspect the same and ascertain whether they are free of odors, fumes, vibrations, pests, vermin or noise emanating from the Premises.

## 58. **FIXTURES**

No fixtures of any kind are included in this Lease. If any fixtures, air conditioners, etc. are

left by previous tenant, then this Tenant is advised that said fixtures, air conditioners, etc. may be removed at any time by the Owner or by anyone claiming title. Any fixtures not removed by previous tenant are the property of the Landlord and may be used and maintained by the Tenant at its own cost and expense.

## 59. LIENS

(a)The Tenant shall not suffer nor permit, during the terms hereby granted, any mechanic's or other liens for work, labor services or materials rendered, furnished to or for the account of the Tenant upon or in connection with the Premises or to any portion thereof or to any improvements erected or to be erected upon the same, or any portion thereof. Tenant shall hold the Landlord and the Premises harmless from all liens or charges, of whatever nature or description, arising from, or in consequence of, any alterations or improvements that the Tenant shall make, or cause to be made, upon the Premises.

(b)Any mechanic's liens placed on the premises relating or pertaining to work performed or allegedly performed with respect to the Premises by Tenant must be removed by Tenant within thirty (30) days of Notice from Landlord. In the event of failure to timely remove such lien or liens the Landlord may do any or all of the following:

1.    Terminate the Lease on five (5) days written notice to Tenant; and/or

2.    Remove the lien at the cost of the Tenant. The cost of removal, including legal fees shall be additional rent and may be deducted from Tenant's security deposit and/or may be the subject of an action or nonpayment proceeding.

## 60. TENANT'S WORK

This paragraph is intended to be consistent with Article 3 and not in limitation of the requirement that Tenant request and obtain Owner's prior written consent to any and all changes to the Premises of any nature.

(a) Except for nonstructural changes or alterations not requiring a building permit, Tenant shall not, without Landlord's prior written approval, which approval shall not be unreasonably withheld or delayed, make (i) structural changes, improvements or alternations in or to the Premises of any nature, or (ii) changes, improvements or alterations which affect the Building's utility services, plumbing, ventilating, electrical, air-conditioning or heating systems. Prior to Tenant's

8

commencing any work in the Premises, Tenant shall submit to Landlord for Landlord's written approval, complete drawings, plans and specifications (herein collectively referred to as "Tenant's Plan") for the improvements, alterations, changes and installations to be made by Tenant (herein collectively referred to as "Tenant's Work") for which Landlord's approval is required, as aforesaid. Tenant's plan shall be fully detailed, shall show complete dimensions, shall not require any changes in the structure of the Building (except as expressly permitted pursuant hereto) and shall not be in violation of any laws, orders, rules or regulations of any governmental department, commission or bureau having jurisdiction of the premises including, but not limited to, those governmental or quasi-governmental bodies having authority or jurisdiction over the landmark status of the Building of which the Premises form a part.

(b)     Within ten (10) days after submission to Landlord of Tenant's Plan, Landlord shall either approve same or shall set forth in writing the particulars in which Landlord does not approve same, in which latter case Tenant shall, within ten (10) days after Landlord's notification return to Landlord appropriate corrections thereto.  Such corrections shall be subject to Landlord's approval.

(c)     Tenant further agrees that Tenant shall not make any changes in Tenant's Plan subsequent to approval by Landlord unless Landlord consents to such changes.  Landlord shall have the right to refuse to consent to any such changes if in the reasonable judgment of Landlord or Landlord's architect such changes materially deviate from Tenant's Plan theretofore approved by Landlord or violate any applicable laws, orders, rules, or regulations of any governmental department or bureau having jurisdiction of the Premises.

(d) Following compliance by Tenant with its obligations under the foregoing subparagraphs and approval of Tenant's Plan by Landlord, Tenant shall commence Tenant's Work and it shall proceed diligently with same in a good and workmanlike manner, using first class material in order to complete same within a reasonable period of time.

(e) Tenant agrees that in the performance of Tenant's Work, (i) neither Tenant nor its agents or employees shall interfere with any work being done by Landlord and its contractors, agents and employees, (ii) that Tenant shall comply with any reasonable rules and regulations proposed by Landlord, its agents, contractors or employees, (iii) that all personnel employed by Tenant shall be harmonious and compatible with the labor employed by Landlord in the Building, it being agreed that if in Landlord's judgment the labor is incompatible with the labor employed by Landlord or construction labor employed by other tenants in the Building, Tenant shall immediately resolve such incompatibility, or upon Landlord's demand withdraw such labor from the Premises, (iv) that prior to commencing Tenant's Work, Tenant shall procure and deliver to Landlord certificates of workmen's compensation, public liability, property damage and such other insurance policies, in such amounts as shall be reasonably acceptable to Landlord in connection with Tenant's Work, and shall upon Landlord's request cause Landlord and any mortgagee of the Building to be named as an insured thereunder, (v) that Tenant and all contractors shall execute and provide agreements holding Landlord and any mortgagee of the Building harmless from and against any and all claims arising from or in connection with any act or omission of Tenant or its agents, contractors and

9

employees, (vi) that Tenant's Work shall be performed in accordance with the approved Tenant's Plan in compliance with the laws, order, rules and regulations of any governmental departments or bureaus having jurisdiction of the Premises and Tenant shall immediately correct any non-conforming work, and (vii) that Tenant shall promptly pay for Tenant's Work in full and shall not permit any lien to attach to the Premises or the land and/or building, and (viii)  Tenant shall complete Tenant's work in accordance with the approved Tenant's plan and shall obtain and provide proof of all required filings and sign-offs with any governmental departments or bureaus having jurisdiction of the Premises.

(f)  Notice is hereby given that the Landlord shall not be liable for any labor or materials furnished or to be furnished to the Tenant upon credit, and that no mechanics or other lien for any such labor or materials shall attach to or effect the reversion of other estate or interest of the Landlord in and to the Premises or the Building.

(g)  Before commencing any work hereunder,  Tenant shall deliver to Landlord an originally executed indemnity and hold harmless agreements, in form and substance reasonably satisfactory to Landlord, signed by the General Contractor (the "Contractor") furnishing or to furnish any labor or materials in connection with Tenant's Work, which indemnity shall specifically state (i) that Landlord is not liable for any labor or materials furnished or to be furnished to the Tenant, and (ii) that Contractor shall not look toward Landlord for any payment whatsoever in connection with the furnishing of any labor or materials to Tenant.  The foregoing indemnity and hold harmless agreements shall not be required if Landlord acts as the Contractor in connection with Tenant's Work.

(h)  Landlord may, at any time and from time to time, in addition to any other right of access given to Landlord pursuant to the terms of this Lease, enter upon the Premises upon reasonable notice to Tenant with one or more engineers and/or architects of Landlord's selection to determine the course and degree of completion of Tenant's Work and its compliance with Tenant's Plan and the terms and conditions of this Lease.

(i)  Except as hereinafter provided, Tenant covenants and agrees not to execute any chattel mortgages, conditional bills of sale, leases or other title retention agreement or any modifications, extensions, replacements or amendments thereto in connection with the purchase of, or covering or affecting any fixtures or equipment annexed to the Premises (collectively) referred to as "Chattel Mortgages").

(j)  On or before November 30, 2015, which is before the commencement date of this Lease Tenant agrees that it shall complete the installation of and thereafter maintain a new hot water heater and maintain separate gas, electric and waters meters for providing such services to the Premises.  Tenant shall re-pipe its hot and cold water supply to the new water meter and hot water heater.  All of these costs and expenses shall be fully and solely paid for by Tenant except that Landlord shall install the new water meter at Landlord's expense.  Tenant shall undertake and complete these installations consistent with and in full compliance with this Lease and specifically

10

Article 3 and this Rider Paragraph 60 all on or before November 30, 2015. The purpose of the work required under this Paragraph 60(j) is to facilitate the requirement that all utilities utilized by in and for the Premises shall be the sole responsibility of Tenant and Tenant agrees to pay for all such utilities and services. This Lease is expressly conditioned on Tenant's full and timely compliance with the work requirements of this Paragraph 67(j).

## 61. INSTALLATION IN DEMISED PREMISES

All of Tenant's equipment, including, without limitation, heating, ventilating and air conditioning systems shall be installed within the Premises only.

## 62. ABANDONMENT OF TENANT'S PROPERTY

Landlord may consider items of Tenant's property that remain in the Premises after the expiration or earlier termination of the term of this Lease to have been abandoned. In that event, Landlord may, at its option, either (a) retain such items as its property or dispose of them without accountability in such manner as Landlord shall determine, all at Tenant's expense, or (b) remove and store such items for Tenant, at Tenant's expense.

## 63. NO HOLDING OVER

There shall be no holding over by Tenant after expiration or earlier termination of the term of the Lease and the failure by Tenant to deliver possession of the Premises to Landlord shall be an unlawful holdover. During any period in which Tenant so holds over the covenants and conditions of this Lease shall continue and, at Landlord's option, the rental value of the Premises, calculated as a monthly rental, payable from the date immediately following the date on which Tenant was to deliver the Premises through and including the last day of the calendar month in which Tenant so delivers the Premises, shall be deemed to be equal to two hundred percent (200%) of the Base Rent (the "Hold Over Rate") payable immediately preceding the expiration or earlier termination of the term of the Lease, together with all other items of Additional Rent that would have been otherwise payable hereunder had the Lease Term not expired or been terminated. Acceptance by Landlord of the Hold Over Rate and any Additional Rent during the period in which Tenant so holds over shall not cure or waive Tenant's default, nor prevent Landlord from exercising, before or after such acceptance, any of the remedies provided by this Lease or at law or in equity. Payment of the Holdover Rate and other sums during any period in which Tenant holds over shall not excuse Tenant's obligation to vacate and surrender the Premises on the date, and in the manner and condition, required under the Lease. Tenant shall not interpose any counterclaim and shall not interpose any set-off, right of recoupment or counterclaim for damages in a summary proceeding or other action based on such holdover. The foregoing provisions of this Article shall survive the expiration date or sooner termination of this Lease.

## 64. DEFINITION OF "OWNER"

11

Wherever the word "Owner" shall appear in this Lease it shall be understood to also mean Landlord.

## 65. NO PERSONAL LIABILITY OF LANDLORD

Wherever in this Lease there is reference to obligations and covenants of Landlord, it is understood that any tenant pursuant to this Lease will look solely to the Landlord's estate and property in the Building being let hereunder for enforcement thereof and that no other property or assets of Landlord and any of Landlord's principals, disclosed or undisclosed or their assigns shall be subject to levy, attachment, execution or other enforcement procedure in favor of the Tenant hereunder. The Tenant waives the right to seek any monetary damages or other legal relief against the Landlord except as provided for hereunder.

## 66. INTENTIONALLY OMITTED

## 67. ASSIGNMENT AND SUBLETTING

Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors, and assigns expressly covenants that it shall not assign or sublet this Lease without the prior written consent of the Landlord in each instance, such written consent not to be unreasonably withheld. If Tenant is a corporation, any dissolution, merger, consolidation or reorganization of Tenant, or any sale, assignment transfer, pledge, encumbrance or other disposition of any of the corporate stock of Tenant, or, if Tenant is a partnership, any sale, assignment, transfer, pledge, encumbrance or other disposition of any interest in such partnership, shall constitute an assignment of this Lease for purposes of this paragraph 67. Notwithstanding the foregoing, Tenant's right to assign or sublet shall be subject to the following restrictions and conditions:

    (a)    The proposed assignee or sublessee shall be, in the reasonable determination of the Landlord, financially reputable, responsible, and credit-worthy as demonstrated from the proposed assignee's financial statements and reports which shall be submitted to the Landlord prior to and as a precondition to the giving of any consent to any assignment or sublet;

    (b)    The use of the Premises shall be restricted as provided under the Lease;

    (c)    Any consent to any assignment or sublet shall not release Tenant from its obligations under this Lease, including but not limited to the obligation to pay rent and additional rent, except by an express written agreement by Landlord in its sole discretion;

(d)     Landlord's consent to any assignment or sublet shall not in any way relieve Tenant from obtaining the express consent in writing of the Landlord for any further assignment or sublet.

(e)     If this Lease shall be assigned, or if the Premises or any part thereof be sublet or occupied by any person or persons other than Tenant, Landlord may, collect rent from the assignee, subtenant or occupant and apply the amount collected, which may be treated by Landlord at Landlord's option, as rent or as use and occupancy, to the rent herein reserved under the Lease, but no such assignment, subletting, occupancy or collection of rent or use and occupancy shall be deemed a waiver of the covenants of this paragraph 67, nor shall it be deemed acceptance of the assignee, subtenant or occupant as a Tenant, or a release of Tenant from the full performance by Tenant of all the terms, conditions and covenants of this Lease.

(f)     Any assignment, sublease or agreement permitting the use and occupancy of the Premises to which Landlord shall not have expressly consented to in writing shall be deemed null and void and of no force or effect.

(g)     If Tenant shall desire to assign the Lease or to sublet all or a portion of the Premises, Tenant shall submit in advance to Landlord in writing (hereinafter referred to as **"Tenant's Notice"**): (i) the name of the proposed assignee or subtenant; (ii) the term of the proposed assignment or subletting; (iii) the nature of the proposed assignee or subtenant's business and the proposed use of the Premises or sublet space; (iv) current financial information with respect to the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the financial responsibility of the proposed assignee or subtenant, including without limitation a recent financial statement, banking and credit information and any other information deemed reasonably necessary by Landlord, including without limitation evidence of the legal existence of the proposed assignee or subtenant.   Tenant's Notice shall be accompanied by a copy of the proposed assignment or sublease the commencement date of which shall not be less than 30 or more than 60 days after the giving of such notice.

(1)     Tenant's Notice shall be deemed an offer from Tenant to Landlord whereby Landlord at its option may (i) terminate the Lease if the proposed transaction is an assignment of the Lease (unless the assignment is in connection with a bona fide sale of Tenant's business) or sublease of all or substantially all of

the Premises or (ii) terminate the Lease with respect to the space covered by the proposed sublease. Landlord's option shall be exercised by giving Tenant written notice within thirty (30) days of receipt of Tenant's Notice. During said thirty (30) day period Tenant shall not assign this Lease or sublet all or any part of the Premises.

(2)    If Landlord exercises its right to terminate this Lease in the case of an assignment of the Lease or the subletting of all or substantially all of the Premises, this Lease shall end and expire on the date that such assignment or subletting was to be effective or commenced with the same force and effect as if such date were the date originally provided herein as the expiration of the term hereof.

(3)    If Landlord exercises its right to terminate this Lease with respect to the space covered by Tenant's proposed sublease which is less than substantially all of the Premises, then, (a) this Lease shall end and expire with respect to such part of the Premises on the date that the proposed sublease was to commence or be effective with the same force and effect as if such date were the date originally provided herein as the expiration of the term hereof with respect to such space; and (b) from and after such date the fixed annual rent and additional rent shall be adjusted, based upon the proportion that the rentable area of the Premises remaining bears to the total rentable area of the Premises; and (c) Tenant shall pay to Landlord within thirty (30) days after notice, as additional rent, the costs incurred by Landlord in physically separating such part of the Premises from the balance of the Premises and in complying with any laws and requirements of any public authorities relating to such separation.

(h)    If Landlord shall not exercise any of its foregoing options, then, provided Tenant is not in default under any of the terms or conditions under the Lease, either at the time Landlord's consent is requested or at the commencement or effective date of the proposed assignment or subletting, Landlord's consent shall not be unreasonably withheld provided and conditioned upon the following:

(i) Tenant has complied with all of the terms of (g);

(ii) the proposed use of the Premises is appropriate for the Building;

(iii) the nature of the occupancy of the proposed assignee or subtenant will not cause excessive density of employees or traffic in the Building or street or make excessive demands on the Building's services or facilities;

14

(iv) the proposed assignment rate is not at a rental rate less than the rental rate under the Lease; and

(v) Tenant shall not have advertised or publicized in anyway the availability of the Premises without the prior approval of Landlord.

(vi) the sublease shall specifically state that each sublease is subject and subordinate to all of the terms, covenants and conditions of this Lease;

(vii) the assignment shall provide that the assignee assumes this Lease and shall be and remain liable jointly and severally with Tenant for the payment of the fixed rent, additional rent and all other charges and for the due performance of all the terms, covenants, conditions contained in the Lease to be performed by Tenant and that notwithstanding the assignment the Tenant shall remain liable for the performance of all Tenant's obligations under the Lease; and

(viii) an original or duplicate original of the instrument of assignment and assumption or of the sublease shall be delivered to Landlord within five (5) days following the making thereof;

(ix) that if the assignment of the Lease is to a partnership or corporate entity or any other recognized legal entity, (hereinafter referred to as the "Entity"), then, Tenant shall require under the assignment and assumption agreement that the assignee execute and deliver to Landlord on the commencement date of the assignment a personal guaranty of Lease furnished by Landlord and additional security of two (2) months of fixed annual rent at the rental rate charged for the last year of the original term or the renewal term.

(x) It is agreed that if Landlord shall not exercise any of its foregoing options to terminate the Lease and consents to a subletting or an assignment (other than an assignment in connection with a bona fide sale of Tenant's business) and Tenant shall thereupon assigns or sublets all or any portion of the Premises, then, in that event Tenant shall pay to Landlord, after deducting out-of-pocket costs actually incurred by Tenant in connection with making of such assignment or subletting, including brokerage fees and advertising costs (hereinafter collectively referred to as "Transfer Costs"), as additional rent, a sum equal to 50% of (i) any rent, additional rent or other consideration paid to Tenant by any subtenant which is in excess of the rent (or that percentage of the rent relative to the portion of the entire Premises being sublet) then required to be paid

by Tenant to Landlord pursuant to the terms of this Lease, and (ii) any other profit or gain realized by Tenant from any such assignment or subletting; and (iii) any consideration paid for fixtures, furnishings, and equipment. Such additional rent payments shall be made within ten (10) days after receipt of the same by the Tenant or within ten (10) days after Tenant is credited with the same by the assignee or sublessee, whichever is sooner. At the time of submitting Tenant's Notice, Tenant shall deliver to Landlord an itemized list of the Transfer Costs which list shall be updated by Tenant at the time Tenant is permitted to proceed with the sublet pursuant to the terms of this Paragraph. Upon Landlord's request Tenant shall deliver to Landlord paid invoices confirming payment for such Transfer Costs and any other evidence reasonably requested by Landlord.

(i)    Tenant upon requesting that Landlord consider and consent to any proposed assignment or subletting shall tender the sum of $2,500.00 by certified check or money order as an initial payment towards the attorney fees associated with the review of the request and preparation of documents. Thereafter, Tenant shall reimburse Landlord, on demand as Additional Rent, any costs incurred by Landlord in connection with the proposed assignment or subletting including without limitation any legal fees in connection with granting the Landlord's consent in an amount not to exceed $2,500.00 provided, however, if Landlord's attorney is required to expend more time than what would otherwise be spent on a straight assignment and subletting transaction, then, in such event Tenant would pay Landlord's reasonable costs above the $2,500.00.

(j)    Tenant pays an administrative fee to Landlord equal to but not greater than the equivalent of one months rent at the time of the proposed assignment.

(k)    Tenant agrees that notwithstanding any subletting or assignment permitted by Landlord, no other and further subletting of the Premises or assignment of the Lease by Tenant or any person or entity claiming through or under Tenant shall or will be made except upon compliance with and subject to the provisions of this paragraph 67.

(l)    In the event this Lease is assigned or sublet then the annual base rent due under Rider Paragraph 40(a) shall be increased by ten (10%) per

cent during the balance of the term of this Lease.

## 68. INSURANCE COVERAGE

Tenant shall simultaneously with the execution of this Lease furnish Landlord with and during the term of this Lease and any extension thereof, procure and continue to keep in effect on the Premises and any future improvements for the mutual benefit of Tenant and Owner and its agents the following insurance coverage by recognized carriers licensed to do business in New York. All policies required under this paragraph shall be written by good and solvent insurance companies satisfactory to the Landlord with current financial strength rating from A.M. Best & Co. of at least A minus and financial size category of at least IX.

(a) In addition to such obligations of the Tenant with respect hereto as otherwise provided in this Lease, and not in limitation thereof, the Tenant covenants to provide and keep in force during the term of this Lease for the benefit of the Landlord, commercial general liability policies of insurance in standard form, protecting the Landlord against any liability whatsoever, occasioned by accident or disaster on or about the demised premises, or any appurtenances thereto. Coverage is to be in amounts of $2,000,000.00 in the aggregate and in the amount of $1,000,000.00 for any one accident. Policies shall contain no deductible and no self-insurance retention. The policy shall be at least equal in coverage to ISO form # C G 00 01 12 07 with no exclusionary endorsements that limit coverage. If Tenant is in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages Tenant covenants to provide and keep in force during the term of this Lease for the benefit of Landlord and its agents, Liquor Liability Insurance at least equal to ISO form # C G 00 33 12 07 with no exclusionary endorsements that limit coverage. The policy shall endorse both the Owner and S.W. Management LLC as additional insured. The additional insureds must be on a Primary & Non-Contributory basis. The original policies thereof or certificates of insurance thereof, together with proof of payment of all premiums shall be deposited with the Landlord at the time of the execution of this Lease. In addition, Tenant shall provide Landlord with a Certificate of Insurance to that effect along with other documents required under this paragraph. The insurance policies shall provide at least thirty (30) days prior notice to Owner of any cancellation, modification, or non-renewal. Tenant shall also supply Landlord with original renewal polices or certificates of insurance thereof together with proof of payment in order to insure that such coverage shall remain in effect during the entire term of this Lease.

17

(b) Tenant further agrees to carry water damage insurance to protect itself and the Landlord from any possible water damage and Tenant shall pay the premiums for this insurance. The original policies thereof or certificates of insurance thereof, together with proof of payment of all premiums shall be deposited with the Landlord at the time of the execution of this Lease as well as subsequent renewals and extensions.

(c) Tenant further agrees to pay as additional rent any and all increases in Landlord's insurance premiums attributable to Tenant's occupancy of the Premises. Such additional insurance shall be payable within five (5) days of Landlord rendering to Tenant a copy of the current year's insurance bill for the premises along with the preceding year's insurance bill with an explanation from the insurer attributing the increase to Tenant's establishment.

(d) Tenant shall maintain Worker's Compensation Insurance covering its employees, if any.

(e) Tenant shall carry all risk property insurance in amounts adequate to cover the full replacement value of Tenant's improvements, trade fixtures and contents in the premises in the event of fire or other casualty. The Tenant and policy carrier waive any and all rights of subrogation against Owner and Managing Agent for loss or damage to any property required to be covered under the Lease.

(f) Tenant shall also pay premiums for and keep in full force and effect, plate glass insurance at the Premises, naming the Tenant and Landlord as insured. The original policies thereof or certificates of insurance thereof, together with proof of payment of all premiums shall be deposited with the Landlord at the time of the execution of this Lease as well as subsequent renewals and extensions.

(g) A default of these provisions regarding insurance policies shall be regarded as a material default of this Lease. If Tenant shall fail to furnish the aforesaid policies, or fail to abide by the provisions of paragraphs (a) through (f), then Landlord at its option may terminate the Lease pursuant to the termination provisions contained in paragraph 17 of this Lease. Bills, invoices, correspondence and notices from Landlord's insurer shall be prima face evidence of any sums due pursuant to this paragraph and admissible as evidence of same in any legal proceeding or action.

18

## 69. INDEMNIFICATION

Tenant shall indemnify, and save harmless, Landlord and its agents from and against any and all liabilities, obligations, damages, penalties, claims, costs, charges and expenses including reasonable attorney's fees, which may be imposed upon or incurred or asserted against the Landlord by reason of any of the following occurring during term of this Lease or while Tenant is in possession of the Premises and this provision shall survive the expiration or earlier termination of this Lease:

a.  Any work or thing done by Tenant, or any agent, employee, licensee or invitee of Tenant, in or about the Premises or any appurtenances thereto or any part thereof;

b.  any use, non-use, possession, occupation, operation, maintenance or management of the Premises or any appurtenances thereto or any part thereof;

c.  all fines, suits, proceedings, claims, demands and actions of any kind or nature whatsoever brought by anyone whomsoever arising out of Tenant's use and occupancy of the Premises or any appurtenances thereto or any part thereof;

d.  any negligence of Tenant or any agent, contractor, employee, licensee or invitee of Tenant;

e.  any accident, injury, or damage to any person or property occurring in, on or about the Premises or any appurtenances thereto or any part thereof, unless resulting from the negligence of Landlord;

f.  any failure on the part of Tenant to perform or comply with any of the agreements, terms or conditions contained in this Lease on its part to be performed or complied with. In the event that any action or proceeding shall be brought against Landlord by reason of any claim covered by this article, Tenant upon written notice from Landlord, will at Tenant's sole cost and expense resist or defend the same, by Counsel approved by the Landlord (Owner) in writing.

## 70. NOTICES

All notices to Landlord shall be delivered personally or sent certified mail and directed to Landlord at the address set forth on the face of this Lease. All Notices to Tenant shall be delivered to the Premises addressed to Tenant or sent certified mail addressed to the Premises and the time of rendition of such notice shall be deemed the time of mailing if mailed, or the time of delivery at the Premises, if delivered to the Premises. Notices to Tenant may be sent by either the Landlord or Landlord's attorney.

## 71. REPAIRS

19

(a) Tenant shall make all its own repairs to the interior and, if present, the storefront and entrance doors of the Premises including but not limited to any glass on the Premises, which, if broken, shall be replaced by Tenant, at its own expense, within 24 hours. If there shall be any apparatus for heat and/or hot water and or ventilation and/or air conditioning presently installed in the Premises, then it is agreed that Tenant may use the same on the understanding and agreement, however, that Landlord makes no representation as to the condition or state of repair or adequacy of the same, and if the Tenant shall decide to use the same, then prior to such use the Tenant shall have same inspected by a person or persons licensed and competent for that purpose and Tenant shall make all repairs and adjustments thereto which may be required and shall maintain, repair and replace same, all at Tenant's own cost and expense.

(b) If Tenant fails to comply with any notice given by Landlord concerning a condition which is not specifically provided for under the terms of this Lease within the time period set forth in Landlord's notice and if such condition is not remedied as required by Landlord affects or impairs the occupancy of other tenants in the Building, the physical condition of the Building and or its systems Landlord shall have the right, without notice to Tenant, to take any and all actions deemed necessary by Landlord or by law to remedy such condition. Any costs incurred by Landlord in connection with curing such condition shall be paid by Tenant as Additional Rent. Landlord shall use reasonable efforts to minimize interference with Tenant's business in the Premises during the performance of any of the foregoing work or repairs. If the Tenant is not present at the time of Landlord's entry, Landlord shall have the right to enter the Premises for purposes of effectuating repairs under this paragraph. The foregoing rights exercisable by Landlord shall not be deemed a constructive or actual or partial eviction from the Premises or a disturbance of Tenant's covenant of quiet enjoyment of the Premises. Tenant shall not be relieved from any of its obligations under the Lease, including but not limited to the payment of fixed annual rent and Additional Rent.

## 72. LANDLORD'S RIGHT TO CURE DEFAULTS

Landlord may, but shall not be obligated to, cure any default by Tenant under this Lease at any time after expiration of any applicable cure period, without notice. Whenever Landlord so elects, all costs and expenses incurred by Landlord in curing any such default, including attorneys' fees and disbursements shall be paid by Tenant to Landlord on demand, as Additional Rent.

## 73. PAYMENT OF LANDLORD'S EXPENSES

Any expense incurred by Landlord in connection with any performance by it for the account of Tenant and all costs and expenses, including reasonable attorneys' fees (whether or not legal proceedings are instituted), involved in collecting rents or enforcing the obligations of Tenant under this Lease, including the cost and expense of instituting and prosecuting legal proceedings or recovering possession of the Premises after default by Tenant or upon expiration or sooner termination of this Lease, shall be due and payable by Tenant, on demand, as Additional Rent.

20

## 74. SORTING AND SEPARATION OF REFUSE AND TRASH

(1) **Compliance by Tenant.** Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws orders, and regulations of all state, federal, municipal, and local governments, departments, commissions, and boards regarding the collection, sorting, separation, and recycling of waste products, garbage, refuse, and trash. Tenant shall sort and separate such waste products, garbage, refuse, and trash into such categories as provided by law. Each separately sorted category of waste products, garbage, refuse, and trash shall be placed in separate receptacles reasonably approved by Owner. Such separate receptacles may at Owner's option, be removed from the Premises in accordance with a collection schedule prescribed by law.

(2) **Owner's Rights in Event of Noncompliance.** Tenant shall arrange for refuse collection at Tenant's sole cost and expense, utilizing a contractor satisfactory to Owner. Tenant shall pay all costs, expenses, fines, penalties, or damages that may be imposed on Owner or Tenant by reason of Tenant's failure to comply with the provisions of this paragraph, and at Tenant's sole cost and expense, shall indemnify, defend, and hold Owner harmless (including legal fees and expenses) from and against any actions, claims, and suits arising from such noncompliance, utilizing counsel reasonably satisfactory to Owner. Owner, at its option, may treat any costs incurred by Owner pursuant to this paragraph as additional rent which may be the subject of a nonpayment proceeding, or in the alternative to treat noncompliance as a breach of Lease and grounds for termination.

## 75. GARBAGE REMOVAL AND JANITORIAL SERVICES

The Tenant shall furnish its own garbage removal and janitorial services in the Premises, at its own cost and expense, without any obligations by the Landlord.

## 76. FIRE EXTINGUISHER

Tenant shall install and maintain at its own cost and expense at least two (2) and more if required Board of Fire Underwriters approved fire extinguisher in the Premises. Extinguisher shall be an approved type and shall be maintained according to the rules and regulations of the New York Fire Department Rating Organization.

## 77. HAZARDOUS SUBSTANCES

(a)     **Hazardous Substances.** The term "Hazardous Substances", as referred to in this Lease, shall include, without limitation, flammables, explosives, radioactive materials, asbestos, polychlorinated biphenyl (PCB's),chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, toxic substances or related materials, petroleum and petroleum products, automotive lubricants and substances declared to be hazardous or toxic under any law or regulation now or hereafter enacted or promulgated by any governmental authority.

21

**(b)** **Tenant's Restrictions.** Tenant shall not cause or permit to occur:

    (1) Any violation of any federal, state, or local law, ordinance, or regulation now or hereafter enacted, related to environmental conditions on, under, or about the Premises, or arising from Tenant's use or occupancy of the Premises, including but not limited to, soil and ground water conditions; or

    (2) The use, generation, releases, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substances on, under, or about the Premises, or the transportation to or from the Premises of any Hazardous Substance.

**(c)** **Environmental Clean-up.**

    (1) Tenant shall, at Tenant's own expense, comply with all laws regulating the use, generation, storage, transportation, or disposal of Hazardous Substances.

    (2) Tenant shall, at Tenant's own expense, make all submissions to, provide all information required by, and comply with all requirements of all governmental authorities under Law.

    (3) Should any Authority or any third party demand that a clean-up plan be prepared and that a clean-up be undertaken because of any deposit, spill, discharge, or other releases of Hazardous Substances that occurs during the term of this Lease, at or from the Premises or which arises at any time from Tenant's use and occupancy of the Premises, then Tenant shall, at Tenant's own expense, prepare and submit the required plans and all related bonds and other financial assurances; and Tenant shall carry out all such clean-up plans.

    (4) Tenant shall promptly provide all information regarding the use, generation, storage, transportation, or disposal of Hazardous Substances that is requested by Owner. If Tenant fails to fulfill any duty imposed under this paragraph (77) within a reasonable time, Owner may do so; and in such case, Tenant shall cooperate with Owner in order to prepare all documents Owner deems necessary or appropriate to Tenant's use thereof, and for compliance therewith, and Tenant shall execute all documents promptly upon Owner's request. No such action by Owner and no attempt made by Owner to mitigate damages under any Law shall constitute a waiver of any of Tenant's obligations under this paragraph (77).

**(d) Tenant's Indemnity.**

(1)    Tenant shall indemnify, defend, and hold harmless Owner, its agent, the manager of the property, and their respective officers, directors, beneficiaries, shareholders, partners, agents and employees from all fines, suits, procedures, claims and actions of every kind, and all costs associated therewith (including attorneys' and consultants' fees) arising out of or in any way connected with any deposit, spill, discharge, or other release of Hazardous Substances that occurs during the term of this Lease, at or from the Premises, or which arises at any time from Tenant's use and occupancy of the Premises, or from Tenant's failure to provide all information, make all submissions, and take all steps required by all authorities under the Laws and all other environmental laws.

**(e) Tenant's Obligations.**

(1)    Tenant's obligations and liabilities under this paragraph (77) shall survive the expiration and/or sooner termination of this Lease.

## 78. EASEMENT FOR PIPES, CONDUITS, ELECTRICAL CLOSETS, EQUIPMENT, ETC.

Tenant shall permit Landlord to erect, use, maintain, replace and repair pipes, ducts, cables, conduits, electrical closets, equipment for the Building, plumbing, vents and wires in, to and through the Premises as and to the extent that the same may be necessary for the proper operation and maintenance of the Building or to the extent necessary to accommodate the requirements of the other tenants of the Building. Any work done will not entitle Tenant to a rent abatement and will not be considered either an actual or a constructive eviction.

## 79. DELIVERIES

Tenant agrees that deliveries to the Premises shall be subject to Landlord's reasonable rules and regulations as shall be promulgated from time to time throughout the term. At no time shall deliveries interfere with the operation, maintenance and appearance of the Building, nor with the use of other tenants at the Building.

## 80. SEWER TRAPS

Tenant shall be responsible to provide and maintain on the Premises sufficient equipment to trap any grease or food or waste of any kind and prevent it from entering into the Landlord's main sewer. Tenant shall bear the sole cost of installing and maintaining said equipment. In the event the Landlord is required to clean said sewer as a result of Tenant's failure to provide sufficient traps,

Landlord may charge Tenant the costs thereof as Additional Rent which may be the subject to a nonpayment summary proceeding.

Upon submission of paid or incurred bills to Tenant, Tenant shall pay the cost to clean or repair said sewer. Bills submitted to Tenant indicating cost of repairs shall be prima facie evidence of the amount owed under this paragraph and admissible evidence as such in any legal action or proceeding.

## 81. ANSUL SYSTEM

Tenant is responsible to install and maintain on the Premises an Ansul Fire Retardant System over all cooking grills and/or stoves. Said installation is to be performed in good workmanlike manner and maintained in safe condition and repair. Tenant shall provide Landlord with a certificate of installation acknowledging said system is in good working order. Tenant shall bear sole cost of maintaining Ansul System and provide for periodic inspection of Ansul System as required by law, the insurance carrier or Landlord.

## 82. AWNINGS/SIGNS/CANOPIES

If legal, Tenant may install a Building standard storefront awning (the "Storefront Awning") and/or a store sign above the storefront, at Tenant's cost and expense. Prior to installation Tenant must submit detailed plans and specifications to Landlord for approval which is not to be unreasonably withheld or delayed. Tenant shall maintain the Storefront Awning and/or store sign, at Tenant's sole cost and expense. At anytime during the term of this Lease, Landlord may require that the design of Tenant's signage and/or awning shall comply with a Building Standard, reasonably determined by Landlord. Tenant shall obtain and pay for all approvals and permits required therefore, if any, including but not limited to, any permits or approvals required by such governmental or quasi-governmental departments, commissions, bureaus or agencies having authority over the status of the Building of which the Premises form a part. Tenant agrees to pay all annual renewal fees pertaining to the Storefront Awning and/or storefront sign. In the event Tenant fails to timely pay for such fees or renewals, Landlord may make such payment and bill Tenant and Tenant shall pay same and such amounts shall be deemed Additional Rent. Tenant expressly agrees that Tenant shall not install any sign on the exterior of the Building, other than immediately above the storefront.

As used in this Article 82, the word "sign" shall be construed to include any placard, canopy, light or other advertising symbols or object irrespective of whether same be temporary or permanent but shall exclude menu boards.

In the event Landlord or Landlord's representatives shall deem it necessary to remove any sign in order to paint or to make any other repairs, alterations or improvements in or upon the Premises or the Building wherein same is located, or any part thereof, the Landlord shall have the right to do so, whenever the said repairs or improvements necessitate such removal. In any such

event the Landlord shall restore any such sign to its former position at its own expense following completion of repairs, alterations or improvements.

### 83. SURRENDER AGREEMENT

No agreement to accept a surrender for all or any part of the Premises or this Lease shall be valid unless in writing and signed by a person authorized by the Landlord. No delivery of keys shall operate as a termination of this Lease or a surrender of the Premises or this Lease.

### 84. NO RECORDING

Tenant shall not record this Lease or any memorandum thereof.

### 85. PRIOR LEASE

Upon execution of this Lease, and after expiration of Tenant's present Lease dated December 15, 2003 ("Present Lease"), any extensions under Tenant's Present Lease are hereby cancelled and declared null and void except that in the event that at the commencement of the term of this Lease, or thereafter, Tenant shall be in default of the payment of rent or additional rent pursuant to the terms of Tenant's Present Lease or another lease with Owner or Owner's predecessor in interest, Owner may, at its option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder and same shall be payable to Owners as Additional Rent.

### 86. COMPLIANCE WITH LAWS

Tenant agrees promptly to comply with any and all laws, ordinances, or orders of any and all municipal, state and federal authorities, boards, commissions, and other governmental agencies with respect to the Premises and any improvement thereto, and with respect to the sidewalks, roadways, streets or alleys thereabout. Tenant will at its own cost and expense, promptly comply with any such orders or ordinances involving and including all alterations or additions to the Premises except structural repairs, of whatever size or description. Tenant further agrees to comply with and immediately execute the rules, orders, regulations and recommendations, wherever issued, of the New York Board of Fire Underwriters or any other similar board or organization which may now or hereafter exercise similar power for the prevention of fires, or the orders or recommendations whenever made or given of any insurance company which insures or participates in insuring the Premises against loss by fire.

### 87. NEW YORK STATE LAWS

This Lease shall be interpreted under the laws of the State of New York.

## 88. CAPTION

The captions are intended only for convenience in finding the subject matter and do not constitute part of the text of this agreement and shall not be considered in the interpretation of this agreement or any of its provisions.

## 89. TERMS OF RIDER CONTROL/CONFLICT OF TERMS

In The event any term, covenant, condition or agreement contained in this Rider to the Lease shall conflict or be inconsistent with any term, covenant, condition or agreement contained in the printed portion of this Lease, then the parties agree that the Rider provision shall prevail.

## 90. BROKER

Tenant covenants, and represents that no broker was instrumental in bringing about or consummating this Lease and that Tenant had no conversations or negotiations with any broker concerning the leasing of the Premises. Tenant agrees to indemnify, defend and hold Landlord harmless against any claims for any brokerage commissions or finder's fees by any person or organization, and all costs, expenses and liabilities, incurred in connection with such claims, including attorney's fees and disbursements.

## 91. ENTIRE AGREEMENT

This Lease contains all of the agreements and understandings related to the leasing of the Premises and the respective obligations of Landlord and Tenant in connection therewith and Tenant agrees it is not relying on any agreements or representations other than those contained in this Lease. All prior agreements and understandings, if any, between the parties have merged into this Lease. This agreement shall not be amended, modified, changed or cancelled except in writing signed by all of the parties.

## 92. SAVING PROVISION

If any provision of this Lease, or its application to any situation shall be unenforceable to any extent, the remainder of this Lease, or the application thereof to situations other than that as to which it is invalid, or unenforceable, shall not be affected thereby and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

## 93. LEASE NOT BINDING UNLESS EXECUTED

Submission by Landlord of the within Lease for execution by Tenant, shall confer no rights nor impose any obligations on either party unless and until both Landlord and Tenant shall have executed this Lease and duplicate originals thereof shall have been delivered to the respective

parties.

**2727 REALTY LLC &**                                  **LA BOUCHERIE, INC.**
**667 REALTY LLC as**
**50-50 Tenants-in-Common**
**c/o 411-413 PARK AVE. S. MANAGEMENT LLC**


---

**LANDLORD**                                           **TENANT**

27

# Exhibit B

Landlord's Responses: "NO" or Will Consider ("WC") or "OK"
**Comments to Lease between 2727 Realty LLC etc ("Landlord") and La Boucherie Inc ("Tenant") for space at 411 Park Avenue South (the "Premises")**

Printed form

Tenant requests that the footnotes from the lease dated December 1, 2003 (the "Prior Lease") be incorporated in the new lease except for paragraph 12 which shall be changed as per paragraphs 50 and 60 (J). NO

Rider

40.     Tenant offers $52,500 per month commencing December 1, 2015 with 2 1/2% increases each year thereafter. WC

42.     Delete ominous clause of terminations of lease if rent is not paid in 5 days after notice and substitute 3 defaults in one year in its place. WC

45.     Change the late charge from the greater of 3% to a flat penalty of $400. WC

47.     Modify paragraph to permit mandatory counterclaims as a valid "set-off". OK

49.     Amount of security deposit is 3 months rent as agreed to by Landlord. NO

50 .    Presently Tenant has been paying for electricity to light the halls of the residential areas in the building and the common areas. It should be Landlord's responsibility to reconfigure the electric use in these areas so that Landlord can be billed directly by Con Edison (what about a credit to Tenant?). The last sentence in the last paragraph must be modified to protect Tenant in the event Landlord overloads the gas coming into the building to increase the amount to the residential Tenants at the expense of Tenant who needs the gas for the operation for the restaurant. Therefore the last sentence shall not apply to such a situation. WC

51.     It is the Landlord's responsibly to maintain the water meter from the City main in the street ("any water meter"). It is Tenant's responsibility to maintain the sub meter to the water consumed in the Premises. The last sentence of the second paragraph that the contraction's determination is "conclusive" shall not be applicable unless the contractor has at least 5 years experience as a meter reader. This shall apply to the third paragraph as well. WC

52.     Provide that email notice shall be given to Philip Lajaunie at email address pl@veeqgroup.com at least 48 hours in advance of any change. OK

55.     Business Improvement District fees should be limited to 75% of same (the same as real estate taxes). OK

59.     (b) Change 30 days to 45 days to bond the lien and 120 days to remove the lien. NO

(i)    change "annexed to the Premises" to "affixed to the Premises" OK

(j)    There must be a timeline for the contemplated work in this paragraph. Prior to November, 30, may not be enough time to do this work. WC

61.    I did not get an answer from Philip as to what if any installation may be outside the demised premises. I will follow up by email tomorrow. WC

63.    Change 200% to 150%. OK

67.    After "withheld" in first sentence add "delayed or conditioned". Change transfer of any interest to transfer of more than 49% of the interest of Tenant. OK

(h)    In first sentence after "Lease" add "Beyond notice and cure period" OK

(ix)    -Delete additional security of 2 months rent. Also modify to require an assumption of the lease by Assignee which will constitute a personal guaranty of the Assignee. WC

(x)    To be clear at end of paragraph add that "this paragraph shall not apply if there is a bona fide sale of Tenant's business" OK

(i)    Add "reasonable" before "cost" on line 6 OK

(j)    Payment of administrative fee should be made at the effective date of assignment if approved. OK

(l)    Delete increase in rent upon an assignment. NO

68.    Provide that present insurance companies insuring Landlord be deemed satisfactory to Landlord. WC

(a)    There is no insurance that protects the Landlord from "any liability whatsoever" (the rest of paragraph 68 is being reviewed by Tenant's insurance broker who will have comments shortly). Also "No Deductible" should be changed to reasonable deductible or premium will be too high. WC

(c)    Delete this subparagraph as paragraph 6 of the printed form covers an increase in Landlord's premiums WC

(e)    Add mutual waiver of subrogation for Tenant. WC

(g)    At end of second sentence add "after notice provided therein". WC

71(a)    Should be at least 3 business days to replace broken glass. OK

(b)    After word "condition" in first sentence add "at the Premises which is caused by Tenant". OK

78.    Add that any new "Plumbing, vents, and wires", "shall be placed within the ceiling, floor and walls of the Premises and that Landlord at its sole cost and expenses shall restore the Premises to the same condition as it was prior to Landlord's work. WC

80.    Add at end of second paragraph that the bill is prima fucia evidence of the cost of the repair and not Tenant's responsibility for the repair. WC

82.    Add at end that the present awning and signs on the exterior of the Premises are satisfactory to Landlord. WC

<u>Additional paragraphs to be added to Rider</u>

83.    Tenant shall have the right to continue the operation of its unenclosed sidewalk café on the sidewalk abutting the Premises in the same manner as it has been operated in the past provided Tenant obtains a renewal of its license from the NYC Department of Consumer Affairs ("DCA"). In that connection Landlord shall cooperate with Tenant in renewing such license by consenting to such sidewalk café on the forms provided by DCA, if any at no cost to Landlord. OK

84.    Add Paragraphs 56.01 and 56.02 from Prior Lease WC

86.    Tenant shall be authorized to install solar panels to the roof of the building to supplement its heat, hot water, electric and gas use, provided Tenant shall be responsible for any damage to the roof caused by such solar panels and further provided that Landlord approve the design and installation of same which approval shall not be unreasonably withheld, delayed or conditioned. NO

<u>Guaranty of Lease</u>

A.    At the end of paragraph add a sentence "This Guaranty does not include any accelerated rent under this Lease."-OK

G.    Add New Paragraph: Notwithstanding the foregoing upon a permitted assignment of this Lease the liability of Philip Lajaunie hereunder shall cease and terminate, provided that a principal of the permitted assignee reasonably acceptable to Landlord shall be substituted as Guarantor which principal shall execute a Guaranty upon the same terms as were executed by Philip Lajaunie. OK

# Exhibit C

## FERRARI & FERRARI LLP

Attorneys at Law
630 THIRD AVENUE, 18TH FLOOR, NEW YORK, N.Y. 10017
(212) 972-7040
TELECOPIER (212) 922-1939

ROBERT V. FERRARI
rvf@rvferrari.com
MICHAEL FERRARI
mf@rvferrari.com

March 8, 2016

Pollack & Sharan, LLP
15 Maiden Lane, Suite 1400
New York, NY 10038

Re:    2727 Realty LLC et, al v. La Boucherie Inc.

Dear Mr. Pollack,

Because the employees at the restaurant are aware that it will be closing soon they are leaving in large numbers and there will not be enough to operate the restaurant. Therefore, my client has decided to close the restaurant and move out by the end of March, 2016.

The security can be used to cover March rent and taxes instead of April, and the vacate date changed to March 31, 2016. Any amount left of the security shall be refunded to Tenant upon inspection on March 31, 2016.

After the vacate will be implemented and security returned, if the space has not been leased by landlord, my client is proposing to enter into a new 10 year lease on the terms previously negotiated except for the rental rate which they can try to resolve now that Philip has a new partner, Terrance Brenan who is considered a world class chef.

We would appreciate a response to the proposal at your earliest convenience.

Very truly yours,

Robert V. Ferrari

# Exhibit D

 **REWARDS** NETWORK.

Date of Agreement: 3/10/16

## REWARDS NETWORK RECEIVABLES PURCHASE AND MARKETING AGREEMENT

This Rewards Network Receivables Purchase and Marketing Agreement (the "Agreement") is between Rewards Network Establishment Services Inc., a Delaware corporation ("Rewards Network," "We" and/or "Us"), and each of the legal entities set forth below (collectively, "Merchant" and/or "You").

| La Boucherie Inc. | NY | $300,000 | 384,000 |
|---|---|---|---|
| Legal Name of Merchant | State of Formation | Allocation of Purchase Price (if any) | Allocation of Amount Sold (if any) |

| Les Halles | | 411 Park Avenue South | New York, NY 10016 |
|---|---|---|---|
| DBA (Location Name) | | Location Address (Number, Street) | (City, State, Zip) |

| 15 John Corp | NY | $ 300,000 | # 384,000 |
|---|---|---|---|
| Legal Name of Merchant | State of Formation | Allocation of Purchase Price (if any) | Allocation of Amount Sold (if any) |

| Les Halles Downtown | | 15 John St | New York, NY 10038 |
|---|---|---|---|
| DBA (Location Name) | | Location Address (Number, Street) | (City, State, Zip) |

### Primary Terms

In this Agreement, you are selling to us a percentage of the payments your customers make with credit, debit, and other types of payment cards ("Card Receivables"). You are selling Card Receivables from (check one):

**Premier Restaurant Funding:**

[✓] All of your customers

**Dining Credits:**

[ ] Rewards Network Members only

We agree to buy from you (and you agree to sell to us) the amount of future Card Receivables shown below (the "Amount Sold") in exchange for the "Purchase Price" shown below. In order to deliver to us the Amount Sold, you assign to us the share of your Receivables ("Specified Percentage") shown below, for the customers indicated above, every day from the date we deliver the Purchase Price until we have received the entire Amount Sold.

Purchase Price: $ 600,000

Amount Sold: $ 768,000

Specified Percentage: 7 %



We are buying Card Receivables from you, not loaning you money. One advantage to you of selling Card Receivables instead of borrowing money is that there are no minimum payments, payment schedules, or due dates. If your business is slow, you will not have to worry about having to make a loan payment by a due date, since this is not a loan.

We take some risks in this deal, like the possibility of not getting the Card Receivables we bought as quickly as we thought we would, or not getting them at all if you go out of business. However, you are not allowed to engage in "bad acts" that unfairly prevent us from receiving what we paid for. For example, you are not allowed to stop taking payment cards as a form of payment, change your payment card processor without our approval, or close your business and start up another similar business right away. The details on this are below.

We also will provide you with marketing services as part of this Agreement. Rewards Network currently has millions of diners who participate in our dining rewards programs ("Members"). When Members dine at participating restaurants, we provide them with rewards such as cash back or frequent flyer miles. This gives our Members an incentive to dine at participating restaurants, including yours. We promote participating restaurants through various media, including social media, digital advertising, and targeted emails to our Members. In addition to marketing, we also will provide you with Member data, and access to our Comment Management System, allowing you to read and respond to Member reviews. Every review we publish is verified as written by an actual diner at your establishment. The marketing services we provide will continue throughout your program participation and can be terminated upon 30 days' written notice after the Card Receivables we purchased have been reduced to zero.

<u>Detailed Terms and Conditions</u>

PURCHASE OF RECEIVABLES AND SERVICES

**1. Assignment of Receivables.** Upon your receipt of the Purchase Price, we will own all right, title and interest in the Card Receivables we bought. You will no longer have any rights in those Card Receivables. As long as there is no Event of Non-Performance as set out in Section 12 below, we will take delivery of the Card Receivables as they are generated in the ordinary course of your business, regardless of how long it may take for the Card Receivables to be generated and delivered. We expressly assume the risk that your restaurant(s) may not generate the entire Amount Sold, in which case we will not receive some or all of the Card Receivables we bought.

**2. Multiple Merchants/Locations.** If the Merchant consists of more than one legal entity or location, then you agree that each of those entities and/or locations will continue to remit to us the Specified Percentage of Card Receivables from that entity or location each day until we have received the entire Amount Sold. You will do this regardless of how you chose to allocate the Purchase Price among the entities or locations, and regardless of whether any of the entities or locations went out of business. However, when an entity or location goes out of business, that entity or location will have no obligation to continue to remit Card Receivables or make payments to us unless it breached this Agreement by committing any of the "bad acts" set forth below before going out of business. You acknowledge and agree that: (i) there is a direct and tangible benefit to each entity and location from entering into this Agreement, including from the marketing services described above; (ii) you are entering into this Agreement collectively in order to sell a larger amount of Card Receivables to us than we would buy from the entities or locations separately; (iii) each entity or location will benefit from our payment of the Purchase Price, regardless of how it is allocated (or not allocated) among you; and (iv) the fair saleable value of each of your assets exceeds its liabilities, and each of you is meeting your current liabilities as they mature. If the Merchant has allocated the Purchase Price and Amount Sold among multiple entities or locations comprising the Merchant on page 1 of this Agreement, Merchant is hereby requesting that Rewards Network provide separate account statements to each entity or location comprising the Merchant based on this allocation. Each entity or location comprising the Merchant acknowledges and agrees that (a) Rewards Network is providing separate account statements; and (b) notwithstanding our provision of such account statements or the fact that the Merchant has made an allocation for administrative convenience, each entity or location comprising the Merchant is obligated to continue to remit to us the Specified Percentage of Card Receivables from that entity or location each day until we have received the entire Amount Sold set forth at the bottom of page 1 of this Agreement.



**3. Payment.** We will pay the Purchase Price to you after we have accepted this Agreement. If the Merchant consists of more than one legal entity or location, we may deliver the Purchase Price to you by delivering the Purchase Price to the first legal entity listed on page 1 of this Agreement (the "Merchant Representative"). Upon our delivery of the Purchase Price to the Merchant Representative, the Merchant shall be deemed to have received the Purchase Price regardless of how the Merchant Representative distributes (or does not distribute) these funds among the entities or locations constituting the Merchant.

**4. Marketing and Other Services.** During your program participation, we will market each of your locations to Members who are enrolled in rewards programs operated by us or managed by us for "Partners" who offer our program to members of their own rewards programs. The marketing that we provide may include email, websites, or other marketing as determined by us. We will provide a reward to Members who have a Qualified Transaction (defined in the next sentence) at your locations identified above (each, a "Participating Location"). A "Qualified Transaction" is any transaction in which a Member uses a credit, debit or other payment card ("Payment Card") registered with us to purchase goods and services at a Participating Location and which meets our requirements to qualify for a Member reward. We will also provide you with operational insight and customer feedback services relating to the Qualified Transaction(s), as we determine, based on information that we receive or gather from your program participation. (All Member marketing provided hereunder, along with all operational insight and customer feedback services, is referred to as the "Marketing Services".)

## MERCHANT PAYMENT PROCESS

**5. Merchant Payment Amount.** After we pay you the Purchase Price, and beginning on a date determined in our sole discretion, you will deliver to us the Specified Percentage of Card Receivables generated by all of your Participating Locations (the "Merchant Payment") each day until you have delivered to us the Amount Sold. On days when banks are not open, the Specified Percentage will be delivered to us on the next banking day. If you have more than one Participating Location, you understand that some Participating Locations may remit more Card Receivables to us than others. If the amounts that result from the Specified Percentage include fractional cents, you authorize us to round the amounts up or down to the nearest penny.

**6. Authorized Processors; Disclosures to American Express; Processor Changes.**

(a) Use of Authorized Processors. You agree to accept Payment Cards for business transactions at all Participating Locations, to use only Payment Card processors authorized by us ("Authorized Processor(s)") to process all of your Payment Card transactions, and to provide us with information for all Payment Card transactions at such locations through the Authorized Processors. You authorize the Authorized Processor(s) and any other entity that provides Payment Card-related services and has access to information on Payment Card transactions at such locations (including a payment card network), to provide us any information we request concerning your Payment Card transactions, including, but not limited to, aggregate Payment Card transactions and transaction amounts, so that we can monitor your compliance with this Agreement and identify Qualified Transactions for the purpose of providing rewards to our Members. During the term of this Agreement, you agree not to use Payment Card processors that are not Authorized Processors, either in addition to or in lieu of Authorized Processors.

(b) American Express Authorization. During the term of this Agreement, you specifically authorize American Express to provide to us, on a daily basis, the following information at your American Express-designated SE number level: (i) % Payment Card spend by Members of the aggregate Payment Card spend at all Participating Locations; and (ii) % of Payment Card transactions by Members of the aggregate number of Payment Card transactions at all Participating Locations. We will treat the foregoing information in accordance with our Merchant Privacy Policy, available at www.rewardsnetwork.com/privacy. You may withdraw the foregoing authorization by exercising your rights as provided in Section 17.

(c) Processor Changes; Effect of Missed Transaction Data on Merchant Payments. You recognize that, if a change from an Authorized Processor is carried out without any advance notice to us, we will lose our ability to collect the Card Receivables through Merchant Payments and reward our Members for Qualified Transactions at your Participating Locations. For this reason, if you change to another Payment Card processor during your program participation, you must give us 15 days advance written notice of any such change. The notice must be directed to clientservices@rewardsnetwork.com. **If you do not give us the required notice, you must pay us a $500 administrative processor change fee.**

**7. Authorization to Initiate Electronic Debits to Bank Account ("Authorization").** You irrevocably authorize us (which includes for the purposes of this authorization, our agents, service providers, successors and assigns) to initiate electronic debit entries via the Automated Clearing House ("ACH") network or similar network to one or more bank accounts owned by you and designated by you or any substitute bank accounts you later specify (individually and collectively, "Bank Account") for any amounts due to us, including Merchant Payments and Substitute Merchant Payments (defined in Section 13(b) below), on or after the dates such amounts are created or come due. If you deliver on a daily basis, you authorize us to initiate a single debit for the combined amounts of different



days' Merchant Payments (e.g., initiate a single debit on Monday for Merchant Payments that were created on Friday, Saturday and Sunday) or to initiate individual debits for such Merchant Payments. You will not allow a Bank Account to be closed or replaced unless you provide us at least 10 days advance written notice and sufficient information and documentation for us to update our records relating to a replacement Bank Account. The notice must be directed to clientservices@rewardsnetwork.com. **If we are unable to withdraw amounts from a Bank Account for any reason, you agree to pay us a $25 returned transaction fee for each such occurrence in addition to all other remedies available to us.** You authorize us to initiate a separate debit to the Bank Account for this fee or to add this fee to a debit for a subsequent Merchant Payment. In the event that any debit is not successful, you authorize us to reinitiate the debit up to two additional times. In the event we make an error in initiating a debit or credit, you authorize us to initiate a credit or debit to correct the error. To the extent that we initiate debits over the ACH network, you agree to be bound by the rules governing the ACH network. You agree that you will not cancel this Authorization or instruct any depository holding Card Receivables we have purchased to reject our debits.

**8. Method of Payment to RN.** You will receive full payment for all Payment Card transactions from your Authorized Processor(s), but an amount equal to the Merchant Payment will be held by you in trust on our behalf and you will remit that amount to us. We may debit the amount of Merchant Payments or Substitute Merchant Payments, as defined below, from the Bank Account at any time.

**9. Collection of Card Receivables through Program Participation.** We will take delivery of Merchant Payments and Substitute Merchant Payments (if applicable) until we receive an amount equal to the Amount Sold. We will transmit statements to you indicating the amount of Merchant Payments due to us for the collection of Card Receivables during the statement period and the balance of undelivered Card Receivables at the end of the statement period after the application of the Merchant Payments. You agree to review each statement promptly after we send it to you and notify us if there is any discrepancy or error. If you do not notify us within thirty (30) days, you agree that the information in our statement is accurate. You agree to respond to reasonable inquiries regarding the current status of your business, and to notify us in writing if you cease operating your business.

**10. Continued Marketing Services and Program Fees Following Collection of Card Receivables.** When the Amount Sold has been fully delivered and the balance of Card Receivables we purchased has been reduced to zero, we will continue to provide our Marketing Services to you until this Agreement is terminated under Section 15. During that period, you agree to perform your obligations and to pay us a "<u>Program Fee</u>" for our Marketing Services in the amount of 20.0% ("<u>Program Fee Percentage</u>") of each Qualified Transaction.

## REPRESENTATIONS

**11. Representations.** You represent to us that: (a) you are the sole and lawful owner of the Card Receivables and you own the Card Receivables free and clear of any liens, encumbrances, and adverse claims of any other person or entity ("Person"); (b) you have the full right to sell to us the Card Receivables free and clear of any liens encumbrances, and adverse claims of any other Person; (c) you have not entered into any agreements or made any offers to any person or entity to (i) sell, transfer or otherwise encumber the Card Receivables or (ii) sell, transfer or otherwise encumber all, or substantially all, of your assets; (d) the fair market value of your assets exceeds your liabilities; (e) you are meeting your current liabilities as they mature; (f) execution of this Agreement and your participation in our Program does not constitute a breach of your obligations to another Person; (g) you have no reason to believe that your business will cease operations within the next year, and you have not considered or discussed with anyone the possibility of filing a bankruptcy petition; (h) your legal name(s), DBA name(s), location address(es) and state of incorporation or formation are accurately set forth above; (i) all of the information provided on your Application for participation in our Program is true and correct; (j) each Bank Account is used for business purposes and not for personal, family or household purposes and you are an authorized signor on each Bank Account, and (k) you will use the Purchase Price solely for business or commercial purposes, and not for personal/consumer, family, or household purposes. You agree that, in the event that your Participating Location goes out of business or is the subject of a voluntary or involuntary filing for protection under the United States Bankruptcy Code within forty-five (45) days of us delivering the Purchase Price to you, there shall be a rebuttable presumption that your representations in Sections 11(d), (e), (g) and (l) were materially untrue when they were made to us.

## NON-PERFORMANCE

**12. Events of Non-Performance.** You agree not to commit any of the following "bad acts," each of which is an event of non-performance under this Agreement ("<u>Event of Non-Performance</u>"), during the term of this Agreement: (a) you sell, transfer, or grant a security interest in Card Receivables to anyone other than us; (b) you allow any lien or other encumbrance to attach to our interest (or that of our transferee) in your Card Receivables; (c) you sell your business, any of the locations used by your business, or all or substantially all of your assets used by your business or any Participating Location to a third party before delivering to us all of the Card Receivables we purchased under this Agreement; (d) you materially change the operation of your business at any Participating Location (e.g., changes in concept, size, etc.); (e) you stop taking Payment Cards as an accepted method of payment for transactions,



or discourage the use of Payment Cards, at any Participating Location; (f) you change your legal name or jurisdiction of formation without giving us advance notice of the change; (g) we are unable to debit the Bank Account for the full amount of any Merchant Payment or Substitute Merchant Payment, as defined below; (h) you change Payment Card processors without giving us advance notice as provided in Section 6(c); (i) we revoke the authorization of an Authorized Processor and you do not obtain a replacement Authorized Processor within fifteen (15) days after receiving notice from us; (j) you utilize one or more Payment Card processors that is not an Authorized Processor to process any of your Payment Card transactions; and (k) any representation set forth in your Application, in Section 11 above and/or in Section 19 below shall be false or misleading in any material respect; provided, however, that none of the foregoing (except for subpart 12(k)) shall constitute an Event of Non-Performance if it occurred because a Participating Location went out of business in the ordinary course. These Events of Non-Performance are intended only to prevent you from interfering with our bargained-for right to collect the Card Receivables we purchased as they are created in the ordinary course of your business. They do not create any obligation for you to deliver Card Receivables to us if they are simply not generated by your business.

**13. Obligations Upon an Event of Non-Performance.**

(a)  Upon any Event of Non-Performance, and except as provided in subpart 13(b) below, we may exercise any and all rights and remedies available to us under applicable law, including without limitation all rights and remedies under this Agreement and the Uniform Commercial Code (UCC). You agree that each Event of Non-Performance has the effect of preventing us from obtaining the Card Receivables we purchased from you, and that the full undelivered Card Receivables therefore constitutes a reasonable amount of liquidated damages to which we shall be entitled if any Event of Non-Performance occurs. You further agree that we shall be entitled to recover all unpaid fees and other amounts due to us under this Agreement. All of these amounts are immediately due and payable if an Event of Non-Performance occurs, and you agree that we are authorized to withdraw these amounts from the Bank Account without further notice to you. In the event that a legal proceeding is brought to enforce or obtain a declaration of our rights under this Agreement, you agree to pay all reasonable attorneys' fees, costs, and expenses we incur in any and all such proceedings. All rights and remedies available to us are cumulative and not exclusive of any other remedies available to us in law or equity, or under other sections of this Agreement.

(b)  If an Event of Non-Performance under Section 12(h) occurs, and a Participating Location remains open for business, we may elect, at our sole discretion, and without waiving our right to pursue the remedies set forth in subpart 13(a) above, to pursue the remedy set forth in this subpart 13(b). If we do not receive Payment Card transaction information for three (3) or more consecutive days due to a change in Payment Card Processors without giving us advance notice, you authorize us, at our sole discretion, to initiate daily debits from your Bank Account equal to the average amount of the prior successful ten (10) Merchant Payment debits from your Bank Account until such time as we begin receiving Payment Card transaction data from an Authorized Processor or until we elect to proceed with our remedies under subpart 13(a) above. If the number of successful Merchant Payment debits from your Bank Account prior to our first missed Payment Card transaction fee resulting from your change of processors is less than ten, then the daily debits that you authorize us to initiate shall be equal to the average of all such prior successful Merchant Payments. Any debits successfully completed in accordance with the previous sentences will be treated as Merchant Payments and referred to as "Substitute Merchant Payments" under this Agreement. During the period that Substitute Merchant Payments are being made, we will stop our Marketing Services. If we are able to resume Merchant Payments using Payment Card transaction information from an Authorized Processor that you have selected, we will reinstate your program participation, at which time you will resume making Merchant Payments to us and we will resume our Marketing Services as if the Event of Non-Performance had not occurred.

**14. Discontinuation of Marketing Services.** Upon the occurrence of any Event of Non-Performance, we may discontinue providing any Marketing Services to you or on your behalf.

TERMINATION OF AGREEMENT

**15. Termination.** When the Amount Sold has been fully delivered and the balance of Card Receivables we purchased has been reduced to zero, you may terminate our Marketing Services by sending a written request via electronic mail to clientservices@rewardsnetwork.com. This Agreement will terminate and Rewards Network will have no further obligation to you at the close of your business on the 30th day after the written notice is received.

**16. Survival after Termination.** Notwithstanding the termination of this Agreement, Sections 20, 23, 24, 25 and 26 will survive termination and remain in full force and effect.

REPURCHASE OF CARD RECEIVABLES

**17. Repurchase of Card Receivables.** If there are Card Receivables sold to us but undelivered, and no Event of Non-Performance under Section 12 has occurred, you have the option to repurchase the undelivered Card Receivables ("Repurchase Option"). You can



repurchase the undelivered Card Receivables by paying to us an amount ("Repurchase Amount") equal to (i) the full undelivered Card Receivables balance, plus (ii) any other fees and other amounts due to us under this Agreement. You must provide at least seven (7) days' prior written notice to us of your intent to exercise your Repurchase Option ("Repurchase Notice") by sending a written request via electronic mail to clientservices@rewardsnetwork.com.

## SECURITY INTEREST PLEDGED IN COLLATERAL

**18. Security Interest and Collateral Pledged.** The security interest granted in this Section 18 will not become effective unless and until you commit a "bad act" as described in Section 12. If you commit a "bad act," the security interest will become effective immediately, without any notice to you and without any further action required. As security for, the prompt, full and timely performance and observance of the obligations and agreements set out in Sections 12 and 13 of this Agreement (the "Obligations"), you hereby grant to us a continuing security interest (the "Security Interest"), which, once it becomes effective, will remain in full force and effect until all of the Obligations have been paid, performed and observed, in the following: All of your personal property and fixtures, tangible and intangible, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (the "Collateral"), including without limitation: all equipment, furniture, artwork, inventory, instruments, investment property, documents, general intangibles, deposits, contract rights, tradenames, trademarks, patents, supporting obligations, payment intangibles, chattel paper, commercial tort claims, licenses, liquor licenses, permits, franchise agreements, payments due from credit card and bank card companies or processors, accounts receivable, accounts, leases, deposit accounts, refunds of bonds, monies due or to become due from the State Liquor Authority and/or State Division of Alcoholic Beverage Control and, to the extent not listed above as original collateral, all products and proceeds of all of the Collateral in whatever form, including, without limitation, all payments under insurance, whether or not we are the loss payee thereof, all proceeds of any governmental taking, and any indemnity, warranty, letter of credit (including the right to draw on such letter of credit), or guaranty payable by reason of any default under, loss of, damage to or otherwise with respect to, any of the foregoing. The Security Interest that you grant us is being given solely for the purpose of ensuring that you do not act to deprive us of our bargained-for ability to collect the Card Receivables as they are generated in the ordinary course of your business, as your business was described to us when we considered your Application to participate in our Program. The Security Interest does not secure repayment of a debt obligation and we have no right to demand payment of the balance of the Amount Sold in the absence of an Event of Non-Performance under Section 12.

**19. Financing Statements, Covenants and Remedies.** You authorize us (or any designee, nominee, transferee or servicer) to file UCC-1 or comparable statements as we deem necessary or appropriate to: (a) provide notice of our purchase of the Card Receivables under this Agreement, noting that the transaction is intended as a sale and not an assignment for security; and (b) perfect the security interest granted by you to us under this Agreement. You agree to promptly furnish upon our request written statements and schedules identifying and describing the Collateral in such detail as we may require. All of the Collateral is and will continue to be located at your place of business for so long as there remain outstanding Obligations unless we consent in writing prior to any removal. You represent/warrant that you are the legal and beneficial owner of the Collateral and have the sole right to grant a security interest therein or other encumbrance; and you will not permit anything to be done that may impair or lessen the value of any of the Collateral or the Security Interest granted herein. You will, at your own expense, maintain insurance covering the Collateral in an amount not less than the full replacement value of such Collateral and against such risks, in such form and with such insurers, as will be satisfactory to us. Upon the occurrence of an Event of Non-Performance, we may pursue any and all rights and remedies we may have under the law including, without limitation, the rights of a secured party under the Uniform Commercial Code. Upon demand, you will pay all costs and expenses and reimburse us for all costs and expenditures, including without limitation attorneys' fees and legal expenses, in connection with enforcing our rights under this Agreement; all our costs and expenses incurred will be fully secured hereby; and you will indemnify and hold us harmless from any and all such costs and expenses. After deducting all reasonable costs and expenses and all other charges (including attorneys' fees) due against the Collateral, any residue of the proceeds of any sale or other disposition will be applied to payment of the Obligations, except as otherwise provided by law or directed by any court of competent jurisdiction thereof. You will be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses and all other charges (including attorneys' fees) due against the Collateral.

 **REWARDS** NETWORK.

OTHER TERMS AND CONDITIONS

**20. Indemnification.** You agree to indemnify, defend and hold us and our affiliates harmless from and against all losses and expenses incurred by us or our affiliates in connection with (a) any Event of Non-Performance under the Agreement, and (b) any claim initiated by any third party in connection with any alleged act or failure to act by you.

**21. Intellectual Property and Data Rights.** We grant you no right to use, and you agree not to use, any intellectual property of ours or any third party (including, without limitation, any Partner). You grant permission to us, including our employees, agents, contractors and affiliates, to create ourselves or copy and modify from your or your franchisor's Website visual images, photographs, digital images, drawings, renderings, accompanying written descriptions, or any other materials that capture you, your property, signage, menus, and personnel and any intellectual property embodied therein. You represent and warrant that you have all rights to grant, and hereby grant to us, our Partners, our affiliates, and our third-party service providers and independent contractors a limited, non-exclusive, royalty-free license to publicly use (including but not limited to reproduce, display and distribute) all intellectual property embodied by materials that you provide or that we create or obtain or modify from your or your franchisor's Website (pursuant to the immediately preceding sentence) in connection with our marketing services, including but not limited to all of franchisor's materials, marks and trade dress if you are a franchisee. You grant us the right, subject to all applicable laws, to use and distribute in any manner the information that is created or collected through our program.

**22. Billing Disputes.** You will be responsible for all billing disputes relating to Payment Card transactions.

**23. Limitation on Liability.** We will not be liable for any loss of profits or special, consequential, incidental or punitive damages arising out of or relating to this Agreement to the maximum extent permitted under Illinois law.

**24. Governing Law.** This Agreement is governed by, and any dispute, claim or controversy arising out of or relating to this Agreement shall be resolved in accordance with the laws of the State of Illinois (to the exclusion of its conflict of laws rules).

**25. Arbitration Agreement.** Unless prohibited by federal law, you and we each shall have the option to require any claim or dispute relating in any way to this Agreement or the parties' dealings with one another ("Claim"), except for a Claim concerning the validity, scope or enforceability of this Arbitration Agreement, to be resolved through BINDING INDIVIDUAL ARBITRATION. This Arbitration Agreement involves interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), and not by state law.

In any claim or dispute to be resolved by arbitration, neither you nor we will be able to have a court or jury trial or participate in a class action or class arbitration. Other rights that you and we would have if you or we went to court will not be available or will be more limited in arbitration, including the right to appeal. You and we each understand and agree that by agreeing that either of us can require a claim or dispute to be resolved by individual arbitration, WE ARE EACH WAIVING THE RIGHT TO A COURT OR JURY TRIAL. ANY DISPUTE ONE OF US CHOOSES TO RESOLVE THROUGH ARBITRATION SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS, AND NOT AS A CLASS ACTION, REPRESENTATIVE ACTION, CLASS ARBITRATION OR ANY SIMILAR PROCEEDING. The arbitrator(s) may not consolidate the claims of multiple parties.

Arbitrations shall be administered by JAMS in accordance with its Streamlined Arbitration Rules and Procedures or comparable JAMS rules in effect at the time the arbitration is initiated. You may obtain information about arbitration, arbitration procedures and fees from JAMS by calling (800) 352-5267 or visiting www.jamsadr.com. If JAMS is unable or unwilling to arbitrate a dispute, then the dispute may be referred to any other arbitration organization or arbitrator you and we agree upon in writing or that is appointed pursuant to section 5 of the FAA. The arbitration shall take place in the federal judicial district where you are located. The arbitrator shall be authorized to award any relief that would have been available in court, provided that the arbitrator's authority is limited to you and us alone, except as otherwise specifically stated herein. No arbitration decision will have any preclusive effect as to non-parties. The arbitrator's decision shall be final and binding. The parties agree that this Arbitration Agreement extends to any other parties involved in any Claims, including but not limited to your and our employees, affiliated companies and vendors. This Arbitration Agreement shall take precedence over the rules of the arbitration organization or arbitrator in the event of any conflict.

We will be responsible for paying all arbitration fees other than the amount of filing fees you would have incurred in a state or federal court where you are located, whichever is less. Notwithstanding any other provision herein, you and we may not require arbitration of a Claim filed in a small claims court for Claims within its jurisdiction. In addition, notwithstanding an election to require arbitration of a Claim, you and we each may exercise any lawful rights to seek provisional remedies or self-help, without waiving the right to arbitrate by doing so. Notwithstanding any other provision of this Agreement, if the foregoing class action waiver and prohibition against class arbitration is determined to be invalid or unenforceable, then this



**REWARDS NETWORK**

entire Arbitration Agreement shall be void. If any portion of this Arbitration Agreement other than the class action waiver and prohibition against class arbitration is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this Arbitration Agreement. This Arbitration Agreement will survive the termination of this Agreement and/or your or our bankruptcy or insolvency (to the extent permitted by applicable law).

YOU HAVE THE RIGHT TO REJECT THIS ARBITRATION AGREEMENT, BUT YOU MUST EXERCISE THIS RIGHT PROMPTLY. If you do not wish to be bound by this arbitration agreement, you must notify us in writing within thirty (30) days after the date you sign this Agreement. You must send your request to: accountservices@rewardsnetwork.com. The request must include your full name, address, account number, and the statement "I reject the Arbitration Agreement contained in my Rewards Network Receivables Purchase and Marketing Agreement." If you exercise the right to reject arbitration, the other terms of this Agreement shall remain in full force and effect as if you had not rejected arbitration.

26. **Contacting You.** You authorize us and our affiliates, agents, representatives, assigns and service providers (collectively, the "Messaging Parties") to contact you using automatic telephone dialing systems, artificial or prerecorded voice message systems, text messaging systems and automated email systems in order to provide you with information about this Agreement and your program participation, including without limitation information about Merchant Payments. You authorize the Messaging Parties to make such contacts using any telephone numbers (including wireless, landline and VOIP numbers) or email addresses you supply to the Messaging Parties in connection with this Agreement, your program participation or any other matter. You understand that anyone with access to your telephone or email account may listen to or read the messages the Messaging Parties leave or send you, and you agree that the Messaging Parties will have no liability for anyone accessing such messages. You further understand that, when you receive a telephone call, text message or email, you may incur a charge from the company that provides you with telecommunications, wireless and/or Internet services, and you agree that the Messaging Parties will have no liability for such charges. You expressly authorize the Messaging Parties to monitor and record your calls with the Messaging Parties. You understand that, at any time, you may withdraw your consent to receive text messages and calls to your cell phone or to receive artificial or prerecorded voice message system calls by calling (800) 422-5155, emailing us at clientservices@rewardsnetwork.com, or writing to us at: Rewards Network, attn: Account Services, 2 N. Riverside Plaza, Suite 200, Chicago, IL 60606. To stop text messages, you can also simply reply "STOP" to any text message the Messaging Parties send you. To stop emails, you can follow the opt-out instructions included at the bottom of the Messaging Parties' emails.

## MISCELLANEOUS

27. **Transfer of Rights and Assignment of Agreement.** We may sell, pledge, assign or otherwise transfer (a) any or all of the Card Receivables, (b) the right to receive Merchant Payments or Substitute Merchant Payments, (c) this Agreement, and/or (d) any other rights under this Agreement to any person (each, a "Transferee") without your consent. Any Transferee will be entitled to exercise any and all of our rights and receive all benefits afforded us hereunder, including the collection of the Merchant Payments or Substitute Merchant Payments, the collection of Card Receivables and the collection of any amounts due under Section 13 arising from an Event of Non-Performance. We may also delegate any of our duties and engage any service providers to perform any of our obligations or exercise any of our rights under this Agreement. This Agreement and your obligations under this Agreement are not assignable or transferable by you without our express written consent. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

28. **Authority; Further Assurances; Operation of Business.** Each Party represents that it has the full power and authority to enter into this Agreement and to perform its obligations under this Agreement. You and each person whose signature appears on this Agreement represents and warrants that he or she is fully authorized to execute this Agreement on your behalf and that this Agreement has been duly executed and delivered by you and is your legal, valid and binding obligation enforceable against you in accordance with its terms. You will operate your business (i) in accordance with all applicable federal, state and local laws, including without limitation all laws relating to the collection and remittance of taxes to applicable taxing authorities, and all labor and employment laws, including those relating to withholding of taxes and payment of gratuities, and (ii) in a manner that is not reasonably likely to adversely impact our relationship with our Members and Partners.

29. **Privacy Policy.** You agree to our merchant privacy policy, which is available at www.rewardsnetwork.com/privacy, as updated by us from time to time.

30. **Notices.** All notices will be in writing and will be deemed given (i) to you when sent to your address, email address or fax number shown in our records, and (ii) to us when sent via electronic mail to: clientservices@rewardsnetwork.com.

31. **Entire Agreement; Amendments.** This Agreement contains the entire understanding between the parties and supersedes all prior agreements in any form between the parties; however, any of your outstanding obligations owing under any prior agreement and/or any



**REWARDS NETWORK.**

grant by you of any security interest to us under any prior agreement are not extinguished by this Agreement. The terms of this Agreement will not be modified except as agreed to in writing by both parties. You acknowledge and agree that you have executed this Agreement without any reliance on any or statement, warranty or representation by us or our agents or representatives for the consideration expressed herein.

**32. Partial Invalidity and Waiver.** If any provision herein other than the arbitration provision is held to be unenforceable, such provision will be ineffective only to the extent of such unenforceability without invalidating the remainder of the Agreement. Our failure to enforce at any time any part of this Agreement is not a waiver of rights nor in any way affects the validity of this Agreement.

**33. Third-Party Beneficiary; No Agent.** Except as otherwise specifically stated herein, nothing in this Agreement will operate to confer benefits on entities other than you, us, or our respective successors or assigns; except that American Express is the intended third party beneficiary with respect to the "Authorized Processors; Disclosures to American Express; Processor Changes" section of this Agreement and reserves all rights to assert any and all claims in connection with such section, as if it were a party to this Agreement. The parties hereby expressly agree that we are not your fiduciary or partner.

**34. Non-Disclosure Obligations.** You agree that you will not disclose the terms of this Agreement regarding the ratio of the Purchase Price to the Card Receivables, the Specified Percentage, and the Program Fee, except as may be required by applicable law.

**35. Counterparts and Facsimile Signature.** This Agreement need not be signed by us, and the delivery of the Purchase Price to you will constitute our agreement to the Agreement in the State of Illinois. A facsimile or electronic copy of this Agreement signed by you will be considered an original document.

This Agreement will be binding on the parties hereto as of the date we approve this Agreement and make the Payment.

BY SIGNING THIS AGREEMENT IN THE SPACE PROVIDED BELOW, YOU AGREE TO THE TERMS OF THE AGREEMENT AS OUTLINED ABOVE, INCLUDING THE ARBITRATION CLAUSE IN SECTION 25 AND ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THE AGREEMENT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS AGREEMENT, WE GAVE IT TO YOU AND YOU WERE FREE TO REVIEW IT.

La Boucherie Inc.
Legal Name of Merchant

By: X
Authorized Signature
Philip Lajaunie
Print Name
President
Title

15 John Corp
Legal Name of Merchant

By: X
Authorized Signature
Philip Lajaunie
Print Name
President
Title

# Exhibit E

 REWARDS

### PERSONAL LIABILITY AGREEMENT & CONSUMER REPORT AUTHORIZATION

In order to induce Rewards Network Establishment Services Inc. ("Rewards Network") to enter into the foregoing Rewards Network Receivables Purchase and Marketing Agreement (the "Agreement"), each person, whose name and signature appear below (individually, a "Signatory"), states that he/she has read the Agreement identified and dated below and personally agrees to be immediately liable to Rewards Network for any and all sums due by the Merchant under Section 13 of the Agreement occasioned by an Event of Non-Performance under Section 12 of the Agreement. Rewards Network is not required to first seek to collect any sums due from the Merchant(s) selling the Card Receivables. This responsibility is continuing, irrevocable, unconditional and joint and several among each person identified below. Sections 20, 23, 24, 25 **(which is an arbitration provision with a class action waiver)**, 26 and 29 of the Agreement are specifically incorporated into this Personal Liability Agreement.

By signing below, each Signatory expressly authorizes Rewards Network (which includes, for the purpose of this paragraph, Rewards Network's successors, assigns, agents and service providers) to obtain consumer reports about the Signatory in connection with the Agreement and any dealings between Rewards Network and Signatory. Any such reports may contain personal information about the Signatory, including, but not limited to, public record information and information about Signatory's credit-worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, criminal history, citizenship status or fraudulent activity. If adverse action is taken, based in whole or in part on the information contained in the consumer report, Signatory will be provided with the name, address, and telephone number of the consumer reporting agency as well as a summary of Signatory's rights under the Fair Credit Reporting Act. Signatory voluntarily and knowingly authorizes and requests any consumer reporting agency engaged by Rewards Network to furnish the above mentioned information to Rewards Network. Signatory understands that the above-mentioned information may be obtained from a variety of sources, including, but not limited to, public records, vendors credit bureaus and financial institutions. Signatory further authorizes Rewards Network to obtain the above-mentioned reports at any time during which the Agreement is in affect or Card Receivables remain undelivered.

In the event that we hold any Signatory personally liable, Signatory understands that Rewards Network may report information about Signatory's personal liability to consumer reporting agencies and such information may have a negative impact on Signatory's personal credit.

Rewards Network Receivables Purchase and Marketing Agreement dated _____ 3/10/16 _____

Phillip Lajaunie
Printed Name of Signatory                                    Printed Name of Signatory


Signature of Signatory                                       Signature of Signatory


03/10/16
Date                                                          Date

REWARDS

ADDITIONAL MERCHANT INFORMATION

LES NAILES

15 JOHN St. NEW YORK, NY 10038
Mailing Address (Number, City, State, Zip)

YOKO IIZUKA
Day-to-Day Contact Name

(646 831 6748
Alternate Phone/Cell Phone (Not Restaurant Phone)

YI@FIRSTADMININC.COM
Email Address

# Exhibit F

**pl@veeqgroup.com**

| | |
|---|---|
| **From:** | Yoko Iizuka |
| **Sent:** | Tuesday, April 03, 2018 11:37 AM |
| **To:** | pl@veeqgroup.com |
| **Subject:** | FW: Les Halles & Rewards Network meeting- Agreements attached for your review |
| **Attachments:** | Les Halles Downtown contract.pdf; Les Halles Downtown vendor payee.pdf; Les Halles contract.pdf; Les Halles vendor payee.pdf |
| **Importance:** | High |

**From:** Craig Thompson [mailto:thompsonc@rewardsnetwork.com]
**Sent:** Tuesday, March 08, 2016 8:23 PM
**To:** Yoko Iizuka <yi@FirstAdminInc.com>
**Subject:** RE: Les Halles & Rewards Network meeting- Agreements attached for your review

Hi Yoko,

I wanted to send you the agreements (for both locations) that will need to be signed if you and Philip decide to move forward with the approved funding so you can at least see the language in them before we meet tomorrow in case you have any questions. We can review them in person tomorrow but now you have a sneak peek. One is the standard agreement which we will fill in when you decide on which option to go with and the other attachment is the vendor payee form which will allow us to payoff Gibralter balance.

Keep in mind a "personal liability" is very different than the previous "personal guaranty". Personal liability means that the signor is responsible for any outstanding balance owed only if fraud takes place such as your business changing banking info or merchant credit card processors or some other means to purposefully stop us from being able to collect money owed us. However, if the business would ever be closed than the signor is not responsible. This means we have more risk on our end but this change I believe is for the better. Under the previous Personal Guaranty which doesn't exist anymore, the signor would have always been responsible for any outstanding balance no matter the reason, even if they close the business or go bankrupt etc. It is now much more friendly and less risky to Philip than it was in the past. Hope this helps and I can explain more tomorrow when we meet.

Have a great night! See you tomorrow afternoon.

Best,

Craig

Craig Thompson | Account Executive
Rewards Network
C: (917) 592-9166
F: (917) 591-9668
www.RewardsNetwork.com

60 E. 42nd St., Suite 2226
New York, NY 10165

1

# Exhibit G

**pl@veeqgroup.com**

| | |
|---|---|
| **From:** | Glavas, George <George.Gavalas@hubinternational.com> |
| **Sent:** | Tuesday, August 28, 2012 4:32 PM |
| **To:** | P.Lajaunie |
| **Subject:** | RE: Ethan Murphy v Lajaunie |

I just spoke to the carrier. They are picking up coverage. Call me so we could discuss further.


George T. Glavas, J.D.
Specialty Claims Director

**HUB International Northeast**
1065 Avenue of the Americas
New York, NY 10018
phone: 212-338-2217
george.glavas@hubinternational.com

**From:** P.Lajaunie [mailto:pl@veeqgroup.com]
**Sent:** Tuesday, August 28, 2012 3:14 PM
**To:** Glavas, George
**Subject:** RE: Ethan Murphy v Lajaunie

Ok, 4 pm

Sent from my Windows Phone

**From:** Glavas, George
**Sent:** 8/28/2012 15:12
**To:** P.Lajaunie
**Subject:** RE: Ethan Murphy v Lajaunie

I am available today from 4 to 5.

George T. Glavas, J.D.
Specialty Claims Director

**HUB International Northeast**
1065 Avenue of the Americas
New York, NY 10018
phone: 212-338-2217
george.glavas@hubinternational.com

**From:** P.Lajaunie [mailto:pl@veeqgroup.com]
**Sent:** Tuesday, August 28, 2012 3:11 PM
**To:** Tan, Min; Glavas, George
**Subject:** RE: Ethan Murphy v Lajaunie

Please give me a time when to call. Thx

Sent from my Windows Phone

1

**From:** Tan, Min
**Sent:** 8/28/2012 14:27
**To:** P.Lajaunie; Glavas, George
**Subject:** RE: Ethan Murphy v Lajaunie

Hi Philippe,

I think George tried calling you also but was not able to leave a message. He's out to lunch now I will make sure that he calls you when he returns.

Thanks,
Min


-----Original Message-----
From: P.Lajaunie [mailto:pl@veeqgroup.com]
Sent: Tuesday, August 28, 2012 2:20 PM
To: Glavas, George
Cc: Tan, Min
Subject: RE: Ethan Murphy v Lajaunie

George, I have called you twice.
Give me a precise time when to call you.
Thx

PL


-----Original Message-----
From: Glavas, George [mailto:George.Gavalas@hubinternational.com]
Sent: Tuesday, August 28, 2012 12:33 PM
To: P.Lajaunie
Subject: RE: Ethan Murphy v Lajaunie

Phillippe,

Are you available to talk now? I like to speak to you before we get the attorney on the call.


George T. Glavas, J.D.
Specialty Claims Director

HUB International Northeast
1065 Avenue of the Americas
New York, NY 10018
phone: 212-338-2217
george.glavas@hubinternational.com


-----Original Message-----
From: P.Lajaunie [mailto:pl@veeqgroup.com]
Sent: Tuesday, August 28, 2012 12:28 PM
To: Glavas, George
Cc: Tan, Min
Subject: RE: Ethan Murphy v Lajaunie

George,
Should you discuss the below with Robert Ferrari?

PL

2

-----Original Message-----
From: Glavas, George [mailto:George.Gavalas@hubinternational.com]
Sent: Tuesday, August 28, 2012 12:21 PM
To: P.Lajaunie
Cc: Tan, Min
Subject: RE: Ethan Murphy v Lajaunie

Phillippe,

The policy is a duty to defend policy. Which means that the carrier has the right to assign counsel if it is a claim under the policy.

I am concerned that we will not be able to trigger coverage under the employment practices policy until we have a copy of the complaint. The carrier evaluates coverage based on the allegations in the complaint. The summons does not provide the causes of action the plaintiff is suing for. Accordingly, the carrier may treat this matter as a potential claim and may not pay for the defense until the policy is triggered.

I recommend your counsel get an extension for a few weeks. Until then we should hear from the carrier on whether they will treat the matter as a claim and pay for the defense.

Feel free to call me if you have any questions.

Sincerely,

George T. Glavas, J.D.
Specialty Claims Director

HUB International Northeast
1065 Avenue of the Americas
New York, NY 10018
phone: 212-338-2217
george.glavas@hubinternational.com

-----Original Message-----
From: P.Lajaunie [mailto:pl@veeqgroup.com]
Sent: Tuesday, August 28, 2012 11:50 AM
To: Tan, Min
Cc: Glavas, George; Robert Ferrari
Subject: RE: Ethan Murphy v Lajaunie

We haven't it received yet. Robert is proposing to move to dismiss immediately and let them serve a complaint later. George, what are your thoughts about the most helpful response?

PL

-----Original Message-----
From: Tan, Min [mailto:Min.Tan@hubinternational.com]
Sent: Tuesday, August 28, 2012 11:43 AM
To: P.Lajaunie
Cc: Glavas, George; Robert Ferrari
Subject: RE: Ethan Murphy v Lajaunie

Thanks PL, Robert sent me the attached notice last week. I need a copy of the actual complaint that spells out the actual violation. Thanks!

-----Original Message-----
From: P.Lajaunie [mailto:pl@veeqgroup.com]
Sent: Tuesday, August 28, 2012 11:29 AM

3

To: Tan, Min
Cc: Glavas, George; Robert Ferrari
Subject: FW: Ethan Murphy v Lajaunie


Pl.

-----Original Message-----
From: Robert V. Ferrari [mailto:rvf@rvferrari.com]
Sent: Wednesday, August 22, 2012 3:17 PM
To: min.tan@hubinternational.com
Cc: P.Lajaunie
Subject: Ethan Murphy v Lajaunie

Min,

Attached is summons with notice served at the restaurant owned by 15 John Corp involving the alleged violation of the New York Labor laws by your insured.

I understand that Mr. Lajaunie and his restaurants may be covered under an Employment Practices policy issued by your company. Please advise of the coverages and whether the insurance company will take over the defense of this action.

Thank you.

Robert V. Ferrari


Robert V. Ferrari
630 Third Ave., 16th Floor
New York, NY 10017
P: 212-972-7040
F: 212-922-1939
E: rvf@rvferrari.com
-----Original Message-----
From: ROBERT V. FERRARI [mailto:jfax@rvferrari.com]
Sent: Tuesday, November 20, 2012 10:53 AM
To: rvf@rvferrari.com
Subject: IMAGE from Internet FAX

An image data in PDF format has been attached to this email.

4

# Exhibit H

Case: 1:16-cv-09952 Document #: 104-3 Filed: 01/14/19 Page 69 of 120 PageID #:1217
Case 1:13-cv-06503-RJS-SN Document 221 Filed 05/31/16 Page 1 of 3
Case 1:13-cv-06503-RJS Document 220 Filed 05/31/16 Page 1 of 3

**KAUFMAN DOLOWICH VOLUCK**
ATTORNEYS AT LAW

Jeffery A. Meyer, Esq.
jmeyer@kdvlaw.com

**MEMO ENDORSED**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/31/16

Kaufman Dolowich & Voluck, LLP
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797

Telephone: 516.681.1100
Facsimile: 516.681.1101

www.kdvlaw.com

May 31, 2016

**VIA ECF**
The Honorable Richard J. Sullivan
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

IT IS HEREBY ORDERED that Plaintiffs shall file a response, no later than June 3, 2016, indicating their position on Defendants' contemplated motion to withdraw as counsel and to stay the parties' discovery deadlines.

SO ORDERED
Dated: 5/31/16                    RICHARD J. SULLIVAN
                                  U.S.D.J.

Re:    *Murphy et al. v. LaJaunie et al.*
       *Case Number: 13 CV 6503 (RJS)*

Dear Judge Sullivan:

We represent the Defendants in the above referenced matter. We write, in accordance with Local Civil Rule 1.4, to request a pre-motion conference in anticipation of our motion to withdraw as counsel as a result of Defendants' failure to pay legal fees associated with the defense of this matter.

Local Civil Rule 1.4 permits the Court to relieve an attorney as counsel "upon a showing by affidavit, or otherwise, of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar, and whether or not the attorney is asserting a retaining or charging lien."

When considering whether to grant a motion to be relieved as counsel, Courts analyze two factors: (1) the reasons for withdrawal and; (2) the impact of the withdrawal on the timing of the proceeding. *Battino v. Cornelia Fifth Ave., LLC*, No. 09 C 04113, 2013 WL 4779635, at *1 (S.D.N.Y. June 26, 2013).

An attorney suffers an irreparable injury where he is forced to represent a client against his will to his own financial detriment. Accordingly, Courts have long recognized that a client's continued failure to pay legal fees constitutes a "satisfactory reason" for withdrawal under Local Civil Rule 1.4. *See Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, 464 F.Supp.2d 164 (E.D.N.Y. 2006); *Federal Home Loan Mortgage Corp. v. 41–50 78th St. Corp.*, No. 92–cv–5692, 1997 WL 177862 (E.D.N.Y. April 4, 1997); *HCC, Inc. v. R H & M Machine Co.*, No. 96–cv–4920, 1998 WL 411313, at *1 (S.D.N.Y. July 20, 1998) ("It is well-settled that non-payment of fees is a valid basis for granting counsel's motion to withdraw."); *Kolacek v. Gemexco Trading, Inc.*, No. 90–cv–5760, 1992 WL 14991, at *1 (S.D.N.Y. Jan.23, 1992) ("A client's refusal to pay his

Case: 1:16-cv-09952 Document #: 104-3 Filed: 01/14/19 Page 70 of 120 PageID #:1217
Case 1:13-cv-06503-RJS-SN   Document 221   Filed 05/31/16   Page 2 of 3
Case 1:13-cv-06503-RJS   Document 220   Filed 05/31/16   Page 2 of 3

Hon. Richard J. Sullivan
May 25, 2016
Page 2 of 3

attorney is also a sufficient reason for permitting the attorney to withdraw."); *Hallmark Capital Corp. v. Red Rose Collection, Inc.*, No. 96–cv–2839, 1997 WL 661146, at *2 (S.D.N.Y. Oct. 21, 1997) (same).

Here, to date, Defendants' owe outstanding fees of over $100,000 to our firm in connection with the defense of this matter.[1] Defendants have not made any payments toward our outstanding litigation invoices for several months. We have discussed this issue with our clients many times, to no avail. In addition to the financial injury our firm has already suffered, if we are compelled to continue to represent Defendants, we will spend significant time associated with the completion of class discovery, motion practice, trial preparation, trial, and any post-trial practice. As these tasks will take up the time of myself, my associate, and support staff, the continued financial injury that our firm will suffer will be considerable.

In making this application, we are mindful of the fact that the Court must weigh the impact of withdrawal on the progress of the action. We are also mindful of the decisions of various courts denying motions to withdraw made on the eve of trial. *See e.g. Bruce Lee Enterprises, LLC.* v. A.V.E.L.A., No. 10-CV-2333, 2014 WL 1087934 (S.D.N.Y. Mar. 19, 2014) (denying motion to withdraw filed one month before trial). The withdrawal of an attorney disrupts the prosecution of an action regardless of when it occurs. Moreover, the trial in this matter is not days, weeks, or even a month away. Indeed, class discovery is not yet complete, class notices have not been sent out, pre-trial filings are not due for months, and trial is not scheduled to commence until mid-September. Accordingly, in light of the considerable prejudice our firm will suffer if we must continue to represent Defendants without payment, the current procedural posture of this case does not require that Defendants' motion be denied. *See Kariman v. Time Equities, Inc.*, No. 10 CV 3773, 2011 WL 1900092 (S.D.N.Y. May 11, 2011) (motion to withdraw granted even though trial was "several months" away). Indeed, with an appropriate stay of proceedings, a new attorney should be able to become familiar with this matter and proceed with the representation of Defendants.

In addition, to minimize any impact on the prosecution of this matter, we will not seek a retaining lien. Although we fully intend to collect our outstanding fees from Defendants, we will make our file fully available to subsequent counsel.

We have informed Defendants of our intention to file this motion. Philipe Lajaunie, the individual Defendant, understands that he may proceed *pro se*, but must obtain counsel to represents the various corporate Defendants if our motion is granted. Likewise, Mr. Lajaunie understands that he must attend any hearing that may be scheduled as a result of this motion. Mr. Lajaunie has advised us that he is available to attend a hearing on any day prior to June 20, 2016. He will be travelling out of the country from June 21st to July 5th.

---

[1] If requested, we will submit our outstanding invoices to the Court for *in camera* review.

Case: 1:16-cv-09952 Document #: 104-3 Filed: 01/14/19 Page 71 of 120 PageID #:1217
Case 1:13-cv-06503-RJS-SN   Document 221   Filed 05/31/16   Page 3 of 3
Case 1:13-cv-06503-RJS   Document 220   Filed 05/31/16   Page 3 of 3

Hon. Richard J. Sullivan
May 31, 2016
Page 3 of 3


Therefore, in accordance with the foregoing, we respectfully request that the Court enter an Order relieving our firm as counsel for all Defendants and staying this matter for 30 days to afford Defendants an opportunity to find new counsel.  In addition, we respectfully request that the Court temporarily stay all class discovery deadlines until a hearing on this motion can be held.

Thank you for your consideration of the foregoing.

Respectfully submitted,
Kaufman Dolowich & Voluck, LLP

Jeffery A. Meyer, Esq.

CC:    All Counsel, Via ECF
       Defendants c/o Philipe Lajaunie, by email.

4822-8173-6498, v. 1

# Exhibit I

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____

KAUFMAN DOLOWICH & VOLUCK LLP

                              Plaintiff,

        -against-

FIRST ADMIN, INC. AND PHILIP LAJAUNIE

                              Defendant.

_____

Index No.:
Date Filed:

**SUMMONS**

Plaintiff designates
New York County
as the Place of Trial

The basis of venue is
the Defendant's residence
or place of business

To the above-named defendant:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the
service of this summons, exclusive of the date of service (or within thirty (30) days after
the service is complete if this summons is not personally delivered to you within the State
of New York); and in case of your failure to appear or answer, judgment will be taken
against you by default for the relief requested in the complaint.

Dated: White Plains, NY
        June 1, 2017

                              THE STUTTMAN LAW GROUP, P.C.
                              Attorney for the Plaintiff
                              44 South Broadway, Suite 402
                              White Plains, NY 10601
                              (914) 948-8392

Defendant address:
411 Park Avenue South
New York, NY 10016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x   Index no.
KAUFMAN DOLOWICH & VOLUCK, LLP                                           Date filed:

                                    Plaintiff

                                                        VERIFIED
                                                        COMPLAINT

            -- against --

FIRST ADMIN, INC. AND PHILIP LAJAUNIE,

                                            Defendants.
-------------------------------------------------------------------x

        Plaintiff, KAUFMAN DOLOWICH & VOLUCK, LLP, by its attorneys, THE

STUTTMAN LAW GROUP, P.C., as and for its verified complaint against the

defendants, FIRST ADMIN, INC. AND PHILIP LAJAUNIE, alleges as follows:

                    AS AND FOR A FIRST CAUSE OF ACTION

        1.      At all relevant times hereinafter mentioned, KAUFMAN DOLOWICH &

VOLUCK, LLP, was and is a domestic registered limited liability partnership organized

for the practice of law with an office for the transaction of business located at 135

Crossways Park Drive, Suite 201, Woodbury, New York 11797

        2.      Upon information and belief, and at all relevant times hereinafter

mentioned, the defendant, FIRST ADMIN, INC., was and is a foreign or domestic

corporation with an office for the transaction of business located at 411 Park Avenue

South, New York, NY 10016.

        3.      Upon information and belief, and at all relevant times hereinafter

mentioned, the defendant, PHILIP LAJAUNIE, was and is an individual with a residence

or an office for the transaction of business located at 411 Park Avenue South, New York,

NY 10016.

4.      Prior to October 1, 2016, the Defendants retained plaintiff to perform certain professional legal services on their behalf and agreed to pay plaintiff for its services, the fee to be at plaintiff's prevailing hourly rates at the time services were rendered.  Defendants also agreed to reimburse plaintiff for all disbursements expended and incurred by plaintiff on its behalf.

5.      Thereafter, on or about prior to October 1, 2016, plaintiff, at the insistence and request of the Defendants, did render advice, consultations and other professional legal services to Defendants and did expend certain disbursements and incurred certain expenses on behalf of Defendants.

6.      As of the date herein, there remains an outstanding balance due and owing from the Defendants to the Plaintiff for said services and expenses in the sum of $137,371.81.

7.      As of the date hereof, the Defendants have failed to pay any portion of the sum of $137,371.81, although duly demanded.

8.      Pursuant to Part 137 of the Rules of the Chief Administrative Judge, the plaintiff is not required to provide notice of right to elect arbitration pursuant to the Attorney Fee Dispute Resolution Program, as the amount in dispute exceeds $50,000.00.

9.      By reason of the foregoing, plaintiff is entitled to a judgment against the Defendants in the sum of $137,371.81 together with interest.

<u>AS AND FOR A SECOND CAUSE</u>

10.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "9" above as though set forth at length herein.

11.     The unpaid services rendered, disbursements expended and charges incurred by plaintiff on behalf of the Defendants is in the fair and reasonable value of $137,371.81.

12.     As of the date hereof, the Defendants have failed to pay any portion of the sum of $137,371.81, although duly demanded.

13.     By reason of the foregoing, plaintiff is entitled to a judgment against the Defendants in the sum of $137,371.81 together with interest.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>

14.     The plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" thru "13" of this complaint as if fully set forth at length herein.

15.     Plaintiff, during its representation of the Defendants, has issued regular invoices to the defendants, indicating that the defendants were indebted to the plaintiff in the sum of $137,371.81.

16.     The defendants accepted and retained the invoices without objecting to them.

17.     By reason of the foregoing, an account in the sum of $137,371.81 was stated by and between the plaintiff and the defendants.

18.     As of the date hereof, no part of the account has been paid by the defendants although duly demanded.

19.     By reason of the foregoing, the plaintiff is entitled to judgment against the defendants in the sum of $137,371.81 together with interest.

WHEREFORE, plaintiff, KAUFMAN DOLOWICH & VOLUCK, LLP, demands

judgment against the Defendants, FIRST ADMIN, INC. and PHILIP LAJAUNIE, as

follows:

1.    On plaintiff's first, second and third causes of action, judgment in the sum

of $137,371.81 plus interest; and

2.    The costs and disbursements of this action.

3.    Such other and further relief as the Court deems just and proper.

Dated: White Plains, New York
       June 1, 2017

                            THE STUTTMAN LAW GROUP, P.C.
                            Attorneys for Plaintiff
                            44 South Broadway, Suite 402
                            White Plains, New York 10601
                            (914) 948-8392

# VERIFICATION

STATE OF _____M_____ )
                        )  ss:
COUNTY OF __Nassau__    )


I, __Joseph Fortunato__ , being duly sworn depose and say:

I am the ____CFO____ of KAUFMAN DOLOWICH & VOLUCK, LLP , a

corporation and a party to the within action; I have read the foregoing Summons and

Verified Complaint and know the contents thereof; and the same is true to my own

knowledge, except as to the matters therein stated to be alleged upon information and

belief, and as to those matters I believe it to be true. This verification is made by me

because the above party is a limited liability partnership and I am an officer thereof.

_Joseph Fortunato_

Sworn to before me this
_1_ day of _June_   2017.


SEAN HNETINKA
Notary Public, State of New York
No. 01HN6208772
Qualified in Nassau County
Commission Expires July 13, 2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------X INDEX NO.:
KAUFMAN DOLOWICH & VOLUCK LLP

                         Plaintiff,              CERTIFICATION
                                                 PURSUANT TO
              -against-                          SEC. 130-1.1-a

FIRST ADMIN, INC. AND
PHILIP LAJAUNIE
                         Defendant.
-------------------------------------------------------X

      DENNIS D. MURPHY, an attorney duly admitted to practice law in the courts of the
State of New York, and the attorney for the Plaintiff herein hereby certifies the following,
pursuant to Section 130-1.1-a of the Rules of the Chief Administrator (22NYCRR):

      That to the best of my knowledge, information and belief, formed after reasonable
inquiry under the circumstances, that the presentation of the following documents, pleadings,
motion or other papers filed with the Court or served upon my adversary are non-frivolous as
such term is defined in subsection (c) of section 130-1.1 of the Rules of the Chief Administrator.

          SUMMONS AND VERIFIED COMPLAINT

                                    _____
                                     DENNIS D. MURPHY

Dated: White Plains, New York
June 6, 2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
INDEX NO.:

_____

KAUFMAN DOLOWICH & VOLUCK LLP

                                                    Plaintiff,

                    -against-

FIRST ADMIN, INC. AND
PHILIP LAJAUNIE

                                                    Defendant.

_____

SUMMONS AND VERIFIED COMPLAINT

_____


THE STUTTMAN LAW GROUP, P.C.
Attorney for the Plaintiff
44 South Broadway, Suite 402
White Plains, NY 10601
(914) 948-8392

# Exhibit J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------- x     Index No. 653154/2017
KAUFMAN DOLOWICH & VOLUCK, LLP,                    :

     **Plaintiff,**                              :

                                       :     **STIPULATION OF**
 -against-                                        :     **DISCONTINUANCE WITH**
                                       :     **PREJUDICE**
FIRST ADMIN INC. AND PHILIP LAJAUNIE,              :

     **Defendants.**                          :
------------------------------------------------------------- x

   **IT IS HEREBY STIPULATED AND AGREED** by and between the undersigned, the

attorneys for the respective parties herein, that no party herein is an infant or incompetent person

for whom a committee has been appointed or conservateee, and no person or entity not a party

has an interest in the subject matter of the action.

   **IT IS FURTHER STIPULATED AND AGREED** that the above entitled action (with

any and all claims), against defendants **FIRST ADMIN INC.** and **PHILIP LAJAUNIE,** is

hereby discontinued *with prejudice*, without assessment of costs and/or disbursements against

any party.

   **IT IS FURTHER STIPULATED AND AGREED** that the counterclaims asserted in

the above entitled action against plaintiff **KAUFMAN DOLOWICH & VOLUCK, LLP,** are

hereby discontinued *with prejudice*, without assessment of costs and/or disbursements against

any party.

   **IT IS FURTHER STIPULATED AND AGREED** that signatures submitted by e-mail

or facsimile shall be deemed originals for the purpose of this Stipulation. This Stipulation may be

filed without further notice with the clerk of the court.

Dated: New York, New York
July 18, 2018

THE STUTTMAN LAW GROUP, PC

By: _____
Joel Stuttman, Esq.
Dennis Murphy, Esq.
*Attorneys for Plaintiff*
709 Westchester Avenue, Suite 300
White Plains, NY 10604
Tel: (914) 948-8392

PHILIP LAJAUNIE

By: _____
Philip Lajaunie
*Defendant Pro Se*
970 W. Broadway, #84
P.O. Box 30000
Jackson, WY 83002
(917) 771-0727

FIRST ADMIN INC

By: _____
Philip Lajaunie
*Defendant Pro Se*
970 W. Broadway, #84
P.O. Box 30000
Jackson, WY 83002
(917) 771-0727

FURMAN KORNFELD & BRENNAN LLP

By: _____
Jason Kayne, Esq.
*Attorneys for Plaintiff with respect to*
*Counterclaims*
61 Broadway, 26th Floor
New York, New York 10006
Tele: (212) 867-4100

# Exhibit K

 **REWARDS NETWORK**     Merchant Application Form

For Current RN Clients:

Account #

NEW to Rewards Network? Please fill out this complete application.

Existing clients need only fill out white fields.

## Business Information

| Legal Name | Public (DBA) Name | State of Formation |
|---|---|---|
| Le Boucherie, Inc. | Les Halles | NY |

Type of Entity (Select One):
☒ Corporation ☐ Limited Partnership ☐ Limited Liability Company ☐ General Partnership ☐ Sole Proprietorship

| Physical Address | City | State | Zip Code |
|---|---|---|---|
| 411 Park Avenue South | New York | NY | 10016 |

| Telephone Number | Date Business Started | # days open/week | Gross Annual Sales |
|---|---|---|---|
| (212) 531-5100 | 05/25/1990 | 7 days/wk | $6,200,000 |

| Landlord Name | Landlord Phone | Federal Tax ID |
|---|---|---|
| 2727 Realty LLC | (212) 683-4300 | 13-3527212 |

| Property Status | Monthly Mortgage/Lease Payment | Are you current on your mortgage/lease | Lease Expiration/Mortgage Maturity Date |
|---|---|---|---|
| ☐ Own ☒ Lease | $ 45,000 | ☒ Yes ☐ No | 11/30/2045 |

Please provide the same information for additional locations, if any, complete 'Additional Location' page for each.

## Principal Owner Information

| Owner Name | Title | SSN | Date of Birth |
|---|---|---|---|
| Philip Lajaunie | President | ███████ | ███████ |

| Home Address | City | State | Zip Code |
|---|---|---|---|
| 411 Park Avenue South | New York | NY | 10016 |

| Home Phone | Accurate Phone / Cell Phone | % of Ownership | Length of Ownership |
|---|---|---|---|
| 212-531-5100 | 917-771-1693 | 100% | 25 Years 10 Months |

| Driver's License or State ID. Please provide State and Number |
|---|
| # 110101470 (NY only) |

Please provide the same information for additional officers, if any, complete 'Additional Owner' page for each

## Other Information

| Visa / MasterCard Processor Name | Visa/MasterCard Merchant Account Number | Help Desk Phone |
|---|---|---|
| GRAVITY PAYMENTS | ███████████ | 877-388-5906 |

| Discover Accepted | AMEX Accepted | AMEX (or Diner) Merchant Number | Average Monthly CC Volume | Average Ticket Size |
|---|---|---|---|---|
| ☒ Yes ☐ No | ☒ Yes ☐ No | | $10,000 | 100 |

| Intended Use of Funds | Open Cash Advance | Current Cash Advance Company (Non-RN) | Current Balance | Projected Payoff Date |
|---|---|---|---|---|
| KITCHEN RENOVATION | ☐ Yes ☒ No | N/A | N/A | N/A |

| Requested Cash | Restaurant Equipment | Business currently offered for sale | Cuisine Type | # Seats |
|---|---|---|---|---|
| 100,000 | ☐ Owned ☒ Leased | ☐ Yes ☒ No | FRENCH | 190 |

If any outstanding tax liens, suits or judgments, please explain status below:

N/A

The undersigned represents and acknowledges that he/she is the Principal Owner of the referenced Merchant, as indicated above, he/she is an officer of the referenced Merchant or, otherwise, has authority to sign this Application on behalf of the Merchant, the information provided herein is true and complete, the information is given for the purpose of inducing Rewards Network Establishment Services Inc. ("RN") to enter into an Agreement with the referenced Merchant, and this application does not constitute a binding commitment by RN to enter into an agreement, or any obligations of RN shall be set forth only in a final agreement executed by the parties.

By signing below, each Signatory expressly authorizes Rewards Network (which include, but the purpose of this paragraph, Rewards Network's successors, assigns, agents and service providers) to obtain consumer reports about the Signatory in connection with the Agreement and any dealings between Rewards Network and Signatory. Any such reports may contain personal information about the Signatory, including, but not limited to: public record information and information about Signatory's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, criminal history, citizenship status or business activity. If adverse action is taken, based in whole or in part on the information contained in the consumer report, Signatory will be provided with the name, address, and telephone number of the consumer reporting agency as well as a summary of Signatory's rights under the Fair Credit Reporting Act. Signatory voluntarily and knowingly authorizes and requests any consumer reporting agency engaged by Rewards Network to furnish the above mentioned information to Rewards Network. Signatory understands that the above mentioned information may be obtained from a variety of sources, including, but not limited to, public records, vendors credit bureaus and financial institutions.

**SIGNATORY, in His/Her Representative and Individual Capacities**

| Signature | Print Name | Date |
|---|---|---|
| _[signature]_ | Philip Lajaunie | 3/2/2016 |

©2015 Rewards Network Establishment Services Inc.                    11-15 - MOR

# Exhibit L

Case 1:16-cv-09963 Document #: 086 Filed 04/24/19 Page 87 of 120 PageID #:4217    1

Rewards Network Establishment Services Inc
2 North Riverside Plaza, Suite 200
Chicago, IL 60606


W/O LES HALLES                          YOUR ACCOUNT#  :    129627
                                        STATEMENT DATE : 11/06/2016
15 JOHN ST                              ACCT. EXECUTIVE:
NEW YORK,NY 10038-4007                  Craig Thompson
                                        E-mail:
                                        thompsonc@rewardsnetwork.com

PREMIER RESTAURANT FUNDING

--------------------------------------------------------------------------------
Total Purchased Receivables        03/15/16                        $768,000.00
--------------------------------------------------------------------------------

Purchased Receivables Balance as of 11/01/16          [+]      $648,791.85
Purchased Receivables Redeemed                        [-]            $.00
Purchased Receivables Balance as of 11/06/16          [=]      $648,791.85

Rewards Network Establishment Services Inc
2 North Riverside Plaza, Suite 200
Chicago, IL 60606


W/O LES HALLES

15 JOHN ST
NEW YORK,NY 10038-4007

YOUR ACCOUNT#   :    129628
STATEMENT DATE : 11/06/2016
ACCT. EXECUTIVE:
Craig Thompson
E-mail:
thompsonc@rewardsnetwork.com

Total amount past due is: $13,082.84
Your bank has rejected our attempt to collect funds.
Please call us at 800-422-5155 to resolve this issue.

All Customer Credit & Debit Card Transactions:

| Dine<br>Date | Credit&Debit Card<br>Transactions | RN<br>Purchased Receivables |
|---|---|---|
| 10/31 | 3,016.96 | .00 |
| 11/01 | 5,769.28 | .00 |
| 11/02 | 7,597.63 | .00 |
| 11/03 | 6,054.96 | .00 |
| **TOTALS** | **$22,438.83** | **$.00** |

If you have any questions about your statements or balance, please phone
Rewards Network Client Services: 1-800-422-5155
or E-MAIL: clientservices@rewardsnetwork.com

Rewards Network Establishment Services Inc
2 North Riverside Plaza, Suite 200
Chicago, IL 60606


W/O LES HALLES                          YOUR ACCOUNT#  :    129627

15 JOHN ST                              ACCT. EXECUTIVE: Craig Thompson
NEW YORK,NY 10038-4007                  E-mail:
                                        thompsonc@rewardsnetwork.com


Balance as of 03/18/16                                  [+]           .00
Merchant RTR Activity:
     03/15 Purchase of Credits                          [+]    768,000.00

STMNT Merchant      DDA#      BANKED FAX#        BILLED
-----------------------------------------------------------------------
03/22 129627 LES HAL *****4069   03/24 000-0000  1,629.01 [-]    1,629.01
03/23 129627 LES HAL *****4069   03/25 000-0000    941.71 [-]      941.71
03/24 129627 LES HAL *****4069   03/28 000-0000    946.24 [-]      946.24
03/25 129627 LES HAL *****4069   03/29 000-0000  1,116.57 [-]    1,116.57
03/27 129627 LES HAL *****4069   03/29 000-0000      9.10 [-]        9.10
03/25 129628 LES HAL ******1860  03/29 000-0000    887.11 [-]      887.11
03/27 129628 LES HAL ******1860  03/29 000-0000  2,239.36 [-]    2,239.36
03/29 129628 LES HAL ******1860  03/31 000-0000  2,210.97 [-]    2,210.97
03/30 129628 LES HAL ******1860  04/01 000-0000    851.65 [-]      851.65
03/31 129628 LES HAL ******1860  04/04 000-0000    772.04 [-]      772.04
04/01 129628 LES HAL ******1860  04/05 000-0000  1,077.25 [-]    1,077.25
04/03 129628 LES HAL ******1860  04/05 000-0000  2,333.09 [-]    2,333.09
04/05 129628 LES HAL ******1860  04/07 000-0000    506.53 [-]      506.53
04/06 129628 LES HAL ******1860  04/08 000-0000  1,909.63 [-]    1,909.63
04/07 129628 LES HAL ******1860  04/11 000-0000    888.18 [-]      888.18
04/08 129628 LES HAL ******1860  04/12 000-0000    887.29 [-]      887.29
04/17 129628 LES HAL ******2466  04/19 000-0000    819.22 [-]      819.22
04/18 129628 LES HAL ******2466  04/20 000-0000    464.80 [-]      464.80
04/19 129628 LES HAL ******2466  04/21 000-0000  2,146.85 [-]    2,146.85
04/20 129628 LES HAL ******2466  04/22 000-0000    759.33 [-]      759.33
04/21 129628 LES HAL ******2466  04/25 000-0000    811.07 [-]      811.07
04/22 129628 LES HAL ******2466  04/26 000-0000  1,085.00 [-]    1,085.00
04/24 129628 LES HAL ******2466  04/26 000-0000  2,202.88 [-]    2,202.88
04/26 129628 LES HAL ******2466  04/28 000-0000  2,089.91 [-]    2,089.91
04/27 129628 LES HAL ******2466  04/29 000-0000    870.13 [-]      870.13
04/28 129628 LES HAL ******2466  05/02 000-0000    935.93 [-]      935.93
04/29 129628 LES HAL ******2466  05/03 000-0000  1,097.17 [-]    1,097.17
05/01 129628 LES HAL ******2466  05/03 000-0000  2,190.37 [-]    2,190.37
05/02 129628 LES HAL ******2466  05/04 000-0000  1,094.15 [-]    1,094.15
05/04 129628 LES HAL ******2466  05/06 000-0000  1,854.75 [-]    1,854.75
05/05 129628 LES HAL ******2466  05/09 000-0000    770.80 [-]      770.80
05/06 129628 LES HAL ******2466  05/10 000-0000  1,105.64 [-]    1,105.64
05/08 129628 LES HAL ******2466  05/10 000-0000  2,824.82 [-]    2,824.82
05/10 129628 LES HAL ******2466  05/12 000-0000  2,602.12 [-]    2,602.12
05/11 129628 LES HAL ******2466  05/13 000-0000  1,300.15 [-]    1,300.15
05/12 129628 LES HAL ******2466  05/16 000-0000    857.91 [-]      857.91
05/13 129628 LES HAL ******2466  05/17 000-0000  1,156.96 [-]    1,156.96
05/15 129628 LES HAL ******2466  05/17 000-0000  2,044.48 [-]    2,044.48
                        *- CONTINUED -*

```
05/17 129628 LES HAL ******2466   05/19 000-0000    2,226.61 [-]        2,226.61
05/18 129628 LES HAL ******2466   05/20 000-0000      646.69 [-]          646.69
05/19 129628 LES HAL ******2466   05/23 000-0000      900.13 [-]          900.13
05/20 129628 LES HAL ******2466   05/24 000-0000    1,225.26 [-]        1,225.26
05/22 129628 LES HAL ******2466   05/24 000-0000    2,377.32 [-]        2,377.32
05/24 129628 LES HAL ******2466   05/26 000-0000    2,153.31 [-]        2,153.31
05/25 129628 LES HAL ******2466   05/27 000-0000      594.25 [-]          594.25
05/26 129628 LES HAL ******2466   05/30 000-0000      713.77 [-]          713.77
05/27 129628 LES HAL ******2466   05/31 000-0000      883.32 [-]          883.32
05/29 129628 LES HAL ******2466   05/31 000-0000    2,004.53 [-]        2,004.53
05/31 129628 LES HAL ******2466   06/02 000-0000    1,795.10 [-]        1,795.10
06/01 129628 LES HAL ******2466   06/03 000-0000      543.31 [-]          543.31
06/02 129628 LES HAL ******2466   06/06 000-0000      460.06 [-]          460.06
06/03 129628 LES HAL ******2466   06/07 000-0000      555.20 [-]          555.20
06/05 129628 LES HAL ******2466   06/07 000-0000    1,791.97 [-]        1,791.97
06/07 129628 LES HAL ******2466   06/09 000-0000    1,810.84 [-]        1,785.84
06/08 129628 LES HAL ******2466   06/10 000-0000      701.41 [-]          701.41
06/09 129628 LES HAL ******2466   06/13 000-0000      868.69 [-]          868.69
06/10 129628 LES HAL ******2466   06/14 000-0000    1,034.42 [-]        1,034.42
06/12 129628 LES HAL ******2466   06/14 000-0000    2,217.06 [-]        2,217.06
06/14 129628 LES HAL ******2466   06/16 000-0000    1,726.39 [-]        1,726.39
06/15 129628 LES HAL ******2466   06/17 000-0000      525.12 [-]          500.12
06/16 129628 LES HAL ******2466   06/20 000-0000      831.42 [-]          831.42
06/17 129628 LES HAL ******2466   06/21 000-0000    1,026.42 [-]        1,026.42
06/19 129628 LES HAL ******2466   06/21 000-0000    2,119.45 [-]        2,119.45
06/21 129628 LES HAL ******2466   06/23 000-0000    1,449.38 [-]        1,424.38
06/22 129628 LES HAL ******2466   06/24 000-0000      655.08 [-]          630.08
06/23 129628 LES HAL ******2466   06/27 000-0000      945.44 [-]          945.44
06/24 129628 LES HAL ******2466   06/28 000-0000      647.57 [-]          647.57
06/26 129628 LES HAL ******2466   06/28 000-0000    1,776.95 [-]        1,776.95
06/28 129628 LES HAL ******2466   06/30 000-0000    1,456.91 [-]        1,456.91
06/29 129628 LES HAL ******2466   07/01 000-0000      997.27 [-]          972.27
06/30 129628 LES HAL ******2466   07/04 000-0000      872.97 [-]          872.97
07/15 129628 LES HAL ******0922   07/19 000-0000        7.78 [-]            7.78
07/17 129628 LES HAL ******0922   07/19 000-0000    1,492.59 [-]        1,492.59
07/19 129628 LES HAL ******0922   07/21 000-0000    1,269.50 [-]        1,269.50
07/20 129628 LES HAL ******0922   07/22 000-0000      537.26 [-]          537.26
07/21 129628 LES HAL ******0922   07/25 000-0000      586.10 [-]          586.10
07/22 129628 LES HAL ******0922   07/26 000-0000      592.02 [-]          567.02
07/24 129628 LES HAL ******0922   07/26 000-0000    2,069.70 [-]        2,069.70
07/26 129628 LES HAL ******0922   07/28 000-0000    1,440.55 [-]        1,415.55
07/27 129628 LES HAL ******0922   07/29 000-0000      524.81 [-]          524.81
07/28 129628 LES HAL ******0922   08/01 000-0000      657.80 [-]          657.80
07/29 129628 LES HAL ******0922   08/02 000-0000      880.68 [-]          830.68
07/31 129628 LES HAL ******0922   08/02 000-0000      873.64 [-]          873.64
08/05 129628 LES HAL ******0922   08/09 000-0000      815.04 [-]          815.04
08/07 129628 LES HAL ******0922   08/09 000-0000    1,781.72 [-]        1,781.72
08/09 129628 LES HAL ******0922   08/11 000-0000      819.62 [-]          819.62
08/10 129628 LES HAL ******0922   08/12 000-0000    1,228.14 [-]        1,228.14
08/11 129628 LES HAL ******0922   08/15 000-0000      656.92 [-]          656.92
08/12 129628 LES HAL ******0922   08/16 000-0000      953.08 [-]          928.08
08/14 129628 LES HAL ******0922   08/16 000-0000    2,175.33 [-]        2,175.33
08/16 129628 LES HAL ******0922   08/18 000-0000    1,687.29 [-]        1,662.29
08/17 129628 LES HAL ******0922   08/19 000-0000      416.39 [-]          366.39
                            *- CONTINUED -*
```

```
08/18 129628 LES HAL ******0922   08/22 000-0000      650.37 [-]      650.37
08/19 129628 LES HAL ******0922   08/23 000-0000      803.58 [-]      803.58
08/21 129628 LES HAL ******0922   08/23 000-0000    1,787.50 [-]    1,737.50
08/23 129628 LES HAL ******0922   08/25 000-0000    1,412.12 [-]    1,412.12
08/24 129628 LES HAL ******0922   08/26 000-0000      334.38 [-]      334.38
10/27 129628 LES HAL ******0849   10/31 000-0000      382.60 [-]      382.60
10/28 129628 LES HAL ******0849   11/01 000-0000      466.01 [-]      466.01
10/30 129628 LES HAL ******0849   11/01 000-0000      842.63 [-]      842.63
11/01 129628 LES HAL ******0849   11/03 000-0000      614.21 [-]      614.21
```

```
-----------------------------------------------------------------------------
                                        Total:    119,583.15      119,208.15
```

**Ending Balance as of 11/06/16**                                    [=]     648,791.85

| Dined Day | Card | Check Amount$$ | Take Rate% | New/ Rep Take$$ | Net To Merchant$$ | Member City St | Zip |
|-----------|------|---------------|------------|-----------------|-------------------|----------------|-----|
| **STATEMENT DATE:03/22/2016** | | | | | | | |
| Dining Activity | | | | | | | |
| 03/19 Sat | | 22,726.35 | 7.0 | 1,590.84 | 21,135.51 | TOTAL,CC | SALES |
| 03/20 Sun | | 545.25 | 7.0 | 38.17 | 507.08 | TOTAL,CC | SALES |
| **Totals** | | 23,271.60 | | 1,629.01* | 21,642.59 | | |

| | | | | | | | |
|-----------|------|---------------|------------|-----------------|-------------------|----------------|-----|
| **STATEMENT DATE:03/23/2016** | | | | | | | |
| Dining Activity | | | | | | | |
| 03/20 Sun | | 13,453.03 | 7.0 | 941.71 | 12,511.32 | TOTAL,CC | SALES |
| **Totals** | | 13,453.03 | | 941.71* | 12,511.32 | | |

| | | | | | | | |
|-----------|------|---------------|------------|-----------------|-------------------|----------------|-----|
| **STATEMENT DATE:03/24/2016** | | | | | | | |
| Dining Activity | | | | | | | |
| 03/21 Mon | | 13,517.71 | 7.0 | 946.24 | 12,571.47 | TOTAL,CC | SALES |
| **Totals** | | 13,517.71 | | 946.24* | 12,571.47 | | |

| | | | | | | | |
|-----------|------|---------------|------------|-----------------|-------------------|----------------|-----|
| **STATEMENT DATE:03/25/2016** | | | | | | | |
| Dining Activity | | | | | | | |
| 03/22 Tue | | 15,951.05 | 7.0 | 1,116.57 | 14,834.48 | TOTAL,CC | SALES |
| **Totals** | | 15,951.05 | | 1,116.57* | 14,834.48 | | |

| | | | | | | | |
|-----------|------|---------------|------------|-----------------|-------------------|----------------|-----|
| **STATEMENT DATE:03/27/2016** | | | | | | | |
| Dining Activity | | | | | | | |
| 03/23 Wed | | 130.00 | 7.0 | 9.10 | 120.90 | TOTAL,CC | SALES |
| **Totals** | | 130.00 | | 9.10* | 120.90 | | |

```
------------------------------
Merchant    129628 W/O LES HALLES
------------------------------
```

|                      | Check          | Take  | New/      |          | Net To       | Member     |      |
| Dined Day      Card  | Amount$$ Rate% Rep | Take$$ |  | Merchant$$ City St |     | Zip  |
| STATEMENT DATE:03/25/2016 | | | | | | | |

**Dining Activity**

| Dined Day | Check Amount$$ | Take Rate% | New/Rep Take$$ | Net To Merchant$$ | Member City St | Zip |
|-----------|---------------|-----------|----------------|-------------------|----------------|-----|
| 03/22 Tue | 12,672.99 | 7.0 | 887.11 | 11,785.88 TOTAL,CC | | SALES |
| Totals | 12,672.99 | | 887.11* | 11,785.88 | | |

STATEMENT DATE:03/27/2016

**Dining Activity**

| Dined Day | Check Amount$$ | Take Rate% | New/Rep Take$$ | Net To Merchant$$ | Member City St | Zip |
|-----------|---------------|-----------|----------------|-------------------|----------------|-----|
| 03/23 Wed | 15,788.47 | 7.0 | 1,105.19 | 14,683.28 TOTAL,CC | | SALES |
| 03/24 Thu | 214.58 | 7.0 | 15.02 | 199.56 TOTAL,CC | | SALES |
| 03/24 Thu | 15,987.80 | 7.0 | 1,119.15 | 14,868.65 TOTAL,CC | | SALES |
| Totals | 31,990.85 | | 2,239.36* | 29,751.49 | | |

STATEMENT DATE:03/29/2016

**Dining Activity**

| Dined Day | Check Amount$$ | Take Rate% | New/Rep Take$$ | Net To Merchant$$ | Member City St | Zip |
|-----------|---------------|-----------|----------------|-------------------|----------------|-----|
| 03/25 Fri | 17,910.04 | 7.0 | 1,253.70 | 16,656.34 TOTAL,CC | | SALES |
| 03/26 Sat | 13,367.70 | 7.0 | 935.74 | 12,431.96 TOTAL,CC | | SALES |
| 03/27 Sun | 307.55 | 7.0 | 21.53 | 286.02 TOTAL,CC | | SALES |
| Totals | 31,585.29 | | 2,210.97* | 29,374.32 | | |

STATEMENT DATE:03/30/2016

**Dining Activity**

| Dined Day | Check Amount$$ | Take Rate% | New/Rep Take$$ | Net To Merchant$$ | Member City St | Zip |
|-----------|---------------|-----------|----------------|-------------------|----------------|-----|
| 03/27 Sun | 12,157.09 | 7.0 | 851.00 | 11,306.09 TOTAL,CC | | SALES |
| 03/28 Mon | 9.25 | 7.0 | .65 | 8.60 TOTAL,CC | | SALES |
| Totals | 12,166.34 | | 851.65* | 11,314.69 | | |

*- CONTINUED -*

STATEMENT DATE:03/31/2016

Dining Activity
03/28 Mon          10,769.81    7.0       753.89     10,015.92 TOTAL,CC         SALES
03/29 Tue             259.22    7.0        18.15        241.07 TOTAL,CC         SALES

Totals             11,029.03              772.04*     10,256.99


STATEMENT DATE:04/01/2016

Dining Activity
03/29 Tue          15,389.22    7.0     1,077.25     14,311.97 TOTAL,CC         SALES

Totals             15,389.22            1,077.25*     14,311.97


STATEMENT DATE:04/03/2016

Dining Activity
03/30 Wed          18,488.60    7.0     1,294.20     17,194.40 TOTAL,CC         SALES
03/31 Thu              34.30    7.0         2.40         31.90 TOTAL,CC         SALES
03/31 Thu          14,558.49    7.0     1,019.09     13,539.40 TOTAL,CC         SALES
04/01 Fri             248.57    7.0        17.40        231.17 TOTAL,CC         SALES

Totals             33,329.96            2,333.09*     30,996.87


STATEMENT DATE:04/05/2016

Dining Activity
04/01 Fri           4,859.97    7.0       340.20      4,519.77 TOTAL,CC         SALES
04/02 Sat           2,376.13    7.0       166.33      2,209.80 TOTAL,CC         SALES

Totals              7,236.10              506.53*      6,729.57


STATEMENT DATE:04/06/2016

Dining Activity
04/01 Fri          10,603.27    7.0       742.23      9,861.04 TOTAL,CC         SALES
04/02 Sat           8,089.40    7.0       566.26      7,523.14 TOTAL,CC         SALES
04/03 Sun           8,587.70    7.0       601.14      7,986.56 TOTAL,CC         SALES

Totals             27,280.37            1,909.63*     25,370.74

                                 *- CONTINUED -*

STATEMENT DATE:04/07/2016

Dining Activity
04/04 Mon         12,688.25    7.0      888.18       11,800.07 TOTAL,CC         SALES

Totals            12,688.25             888.18*      11,800.07


STATEMENT DATE:04/08/2016

Dining Activity
04/05 Tue         12,675.61    7.0      887.29       11,788.32 TOTAL,CC         SALES

Totals            12,675.61             887.29*      11,788.32


STATEMENT DATE:04/17/2016

Dining Activity
04/14 Thu            498.51    7.0       34.90          463.61 TOTAL,CC         SALES
04/14 Thu         10,760.18    7.0      753.21       10,006.97 TOTAL,CC         SALES
04/15 Fri            444.45    7.0       31.11          413.34 TOTAL,CC         SALES

Totals            11,703.14             819.22*      10,883.92


STATEMENT DATE:04/18/2016

Dining Activity
04/14 Thu          6,640.07    7.0      464.80        6,175.27 TOTAL,CC         SALES

Totals             6,640.07             464.80*       6,175.27


STATEMENT DATE:04/19/2016

Dining Activity
04/15 Fri         18,280.94    7.0    1,279.67       17,001.27 TOTAL,CC         SALES
04/16 Sat         12,229.46    7.0      856.06       11,373.40 TOTAL,CC         SALES
04/17 Sun            158.92    7.0       11.12          147.80 TOTAL,CC         SALES

                           *- CONTINUED -*

**Totals**              30,669.32                2,146.85*    28,522.47

**STATEMENT DATE:04/20/2016**

Dining Activity
04/17 Sun            10,441.53    7.0        730.91      9,710.62 TOTAL,CC        **SALES**
04/18 Mon              405.96    7.0         28.42        377.54 TOTAL,CC        **SALES**
**Totals**              10,847.49                759.33*    10,088.16

**STATEMENT DATE:04/21/2016**

Dining Activity
04/18 Mon            11,380.66    7.0        796.65     10,584.01 TOTAL,CC        **SALES**
04/19 Tue              205.94    7.0         14.42        191.52 TOTAL,CC        **SALES**
**Totals**              11,586.60                811.07*    10,775.53

**STATEMENT DATE:04/22/2016**

Dining Activity
04/19 Tue            15,500.01    7.0      1,085.00     14,415.01 TOTAL,CC        **SALES**
**Totals**              15,500.01              1,085.00*    14,415.01

**STATEMENT DATE:04/24/2016**

Dining Activity
04/20 Wed            18,567.48    7.0      1,299.72     17,267.76 TOTAL,CC        **SALES**
04/21 Thu            12,902.27    7.0        903.16     11,999.11 TOTAL,CC        **SALES**
**Totals**              31,469.75              2,202.88*    29,266.87

**STATEMENT DATE:04/26/2016**

Dining Activity
04/22 Fri            18,500.61    7.0      1,295.04     17,205.57 TOTAL,CC        **SALES**
04/23 Sat            11,355.33    7.0        794.87     10,560.46 TOTAL,CC        **SALES**

*- CONTINUED -*

| Totals | 29,855.94 | | 2,089.91* | 27,766.03 |
|--------|-----------|--|-----------|-----------|

## STATEMENT DATE:04/27/2016

Dining Activity

| 04/24 Sun | 12,320.39 | 7.0 | 862.43 | 11,457.96 TOTAL,CC | SALES |
|-----------|-----------|-----|--------|--------------------|-------|
| 04/25 Mon | 110.06 | 7.0 | 7.70 | 102.36 TOTAL,CC | SALES |
| Totals | 12,430.45 | | 870.13* | 11,560.32 | |

## STATEMENT DATE:04/28/2016

Dining Activity

| 04/25 Mon | 13,370.44 | 7.0 | 935.93 | 12,434.51 TOTAL,CC | SALES |
|-----------|-----------|-----|---------|--------------------|-------|
| Totals | 13,370.44 | | 935.93* | 12,434.51 | |

## STATEMENT DATE:04/29/2016

Dining Activity

| 04/26 Tue | 15,673.92 | 7.0 | 1,097.17 | 14,576.75 TOTAL,CC | SALES |
|-----------|-----------|-----|-----------|--------------------|-------|
| Totals | 15,673.92 | | 1,097.17* | 14,576.75 | |

## STATEMENT DATE:05/01/2016

Dining Activity

| 04/27 Wed | 16,227.90 | 7.0 | 1,135.95 | 15,091.95 TOTAL,CC | SALES |
|-----------|-----------|-----|-----------|--------------------|-------|
| 04/28 Thu | 74.24 | 7.0 | 5.20 | 69.04 TOTAL,CC | SALES |
| 04/28 Thu | 14,932.95 | 7.0 | 1,045.31 | 13,887.64 TOTAL,CC | SALES |
| 04/29 Fri | 55.90 | 7.0 | 3.91 | 51.99 TOTAL,CC | SALES |
| Totals | 31,290.99 | | 2,190.37* | 29,100.62 | |

## STATEMENT DATE:05/02/2016

Dining Activity

*- CONTINUED -*

| 04/29 Fri | 15,630.76 | 7.0 | 1,094.15 | 14,536.61 TOTAL,CC | SALES |
|-----------|-----------|-----|----------|--------------------|-------|
| Totals    | 15,630.76 |     | 1,094.15* | 14,536.61 |  |

STATEMENT DATE:05/04/2016

Dining Activity

| 04/30 Sat | 14,579.43 | 7.0 | 1,020.56 | 13,558.87 TOTAL,CC | SALES |
|-----------|-----------|-----|----------|--------------------|-------|
| 05/01 Sun | 11,917.06 | 7.0 | 834.19 | 11,082.87 TOTAL,CC | SALES |
| Totals    | 26,496.49 |     | 1,854.75* | 24,641.74 |  |

STATEMENT DATE:05/05/2016

Dining Activity

| 05/02 Mon | 11,011.48 | 7.0 | 770.80 | 10,240.68 TOTAL,CC | SALES |
|-----------|-----------|-----|--------|--------------------|-------|
| Totals    | 11,011.48 |     | 770.80* | 10,240.68 |  |

STATEMENT DATE:05/06/2016

Dining Activity

| 05/03 Tue | 15,451.19 | 7.0 | 1,081.58 | 14,369.61 TOTAL,CC | SALES |
|-----------|-----------|-----|----------|--------------------|-------|
| 05/04 Wed | 343.77 | 7.0 | 24.06 | 319.71 TOTAL,CC | SALES |
| Totals    | 15,794.96 |     | 1,105.64* | 14,689.32 |  |

STATEMENT DATE:05/08/2016

Dining Activity

| 05/04 Wed | 21,405.19 | 7.0 | 1,498.36 | 19,906.83 TOTAL,CC | SALES |
|-----------|-----------|-----|----------|--------------------|-------|
| 05/05 Thu | 18,865.42 | 7.0 | 1,320.58 | 17,544.84 TOTAL,CC | SALES |
| 05/06 Fri | 83.96 | 7.0 | 5.88 | 78.08 TOTAL,CC | SALES |
| Totals    | 40,354.57 |     | 2,824.82* | 37,529.75 |  |

STATEMENT DATE:05/10/2016

Dining Activity

*- CONTINUED -*

```
05/06 Fri           22,598.32    7.0    1,581.88     21,016.44 TOTAL,CC        SALES
05/07 Sat           14,395.10    7.0    1,007.66     13,387.44 TOTAL,CC        SALES
05/08 Sun              179.70    7.0       12.58        167.12 TOTAL,CC        SALES

Totals              37,173.12            2,602.12*    34,571.00
```

STATEMENT DATE:05/11/2016

```
Dining Activity
05/08 Sun           18,573.64    7.0    1,300.15     17,273.49 TOTAL,CC        SALES

Totals              18,573.64            1,300.15*    17,273.49
```

STATEMENT DATE:05/12/2016

```
Dining Activity
05/09 Mon           12,255.87    7.0      857.91     11,397.96 TOTAL,CC        SALES

Totals              12,255.87              857.91*    11,397.96
```

STATEMENT DATE:05/13/2016

```
Dining Activity
05/10 Tue           16,165.78    7.0    1,131.60     15,034.18 TOTAL,CC        SALES
05/11 Wed              362.30    7.0       25.36        336.94 TOTAL,CC        SALES

Totals              16,528.08            1,156.96*    15,371.12
```

STATEMENT DATE:05/15/2016

```
Dining Activity
05/11 Wed           14,833.04    7.0    1,038.31     13,794.73 TOTAL,CC        SALES
05/12 Thu                9.80    7.0         .69          9.11 TOTAL,CC        SALES
05/12 Thu           14,270.86    7.0      998.96     13,271.90 TOTAL,CC        SALES
05/13 Fri               93.11    7.0        6.52         86.59 TOTAL,CC        SALES

Totals              29,206.81            2,044.48*    27,162.33
```

*- CONTINUED -*

STATEMENT DATE:05/17/2016

Dining Activity
| 05/13 Fri | 17,878.96 | 7.0 | 1,251.53 | 16,627.43 TOTAL,CC | SALES |
| 05/14 Sat | 13,929.72 | 7.0 | 975.08 | 12,954.64 TOTAL,CC | SALES |
| Totals | 31,808.68 | | 2,226.61* | 29,582.07 | |

STATEMENT DATE:05/18/2016

Dining Activity
| 05/15 Sun | 9,238.43 | 7.0 | 646.69 | 8,591.74 TOTAL,CC | SALES |
| Totals | 9,238.43 | | 646.69* | 8,591.74 | |

STATEMENT DATE:05/19/2016

Dining Activity
| 05/16 Mon | 12,859.00 | 7.0 | 900.13 | 11,958.87 TOTAL,CC | SALES |
| Totals | 12,859.00 | | 900.13* | 11,958.87 | |

STATEMENT DATE:05/20/2016

Dining Activity
| 05/17 Tue | 17,353.53 | 7.0 | 1,214.75 | 16,138.78 TOTAL,CC | SALES |
| 05/18 Wed | 150.21 | 7.0 | 10.51 | 139.70 TOTAL,CC | SALES |
| Totals | 17,503.74 | | 1,225.26* | 16,278.48 | |

STATEMENT DATE:05/22/2016

Dining Activity
| 05/18 Wed | 17,490.00 | 7.0 | 1,224.30 | 16,265.70 TOTAL,CC | SALES |
| 05/19 Thu | 16,471.68 | 7.0 | 1,153.02 | 15,318.66 TOTAL,CC | SALES |
| Totals | 33,961.68 | | 2,377.32* | 31,584.36 | |

*- CONTINUED -*

STATEMENT DATE:05/24/2016

Dining Activity
| 05/20 Fri | 18,448.55 | 7.0 | 1,291.40 | 17,157.15 TOTAL,CC | SALES |
| 05/21 Sat | 12,312.98 | 7.0 | 861.91 | 11,451.07 TOTAL,CC | SALES |
| Totals | 30,761.53 | | 2,153.31* | 28,608.22 | |

STATEMENT DATE:05/25/2016

Dining Activity
| 05/22 Sun | 8,304.08 | 7.0 | 581.29 | 7,722.79 TOTAL,CC | SALES |
| 05/23 Mon | 185.15 | 7.0 | 12.96 | 172.19 TOTAL,CC | SALES |
| Totals | 8,489.23 | | 594.25* | 7,894.98 | |

STATEMENT DATE:05/26/2016

Dining Activity
| 05/23 Mon | 10,196.77 | 7.0 | 713.77 | 9,483.00 TOTAL,CC | SALES |
| Totals | 10,196.77 | | 713.77* | 9,483.00 | |

STATEMENT DATE:05/27/2016

Dining Activity
| 05/24 Tue | 12,618.92 | 7.0 | 883.32 | 11,735.60 TOTAL,CC | SALES |
| Totals | 12,618.92 | | 883.32* | 11,735.60 | |

STATEMENT DATE:05/29/2016

Dining Activity
| 05/25 Wed | 14,713.90 | 7.0 | 1,029.97 | 13,683.93 TOTAL,CC | SALES |
| 05/26 Thu | 13,743.19 | 7.0 | 962.02 | 12,781.17 TOTAL,CC | SALES |
| 05/27 Fri | 179.16 | 7.0 | 12.54 | 166.62 TOTAL,CC | SALES |
| Totals | 28,636.25 | | 2,004.53* | 26,631.72 | |

*- CONTINUED -*

STATEMENT DATE:05/31/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 05/27 Fri | 13,625.52 | 7.0 | 953.79 | 12,671.73 TOTAL,CC | | SALES |
| 05/28 Sat | 12,018.68 | 7.0 | 841.31 | 11,177.37 TOTAL,CC | | SALES |
| Totals | 25,644.20 | | 1,795.10* | 23,849.10 | | |

STATEMENT DATE:06/01/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 05/29 Sun | 7,674.37 | 7.0 | 537.21 | 7,137.16 TOTAL,CC | | SALES |
| 05/30 Mon | 87.15 | 7.0 | 6.10 | 81.05 TOTAL,CC | | SALES |
| Totals | 7,761.52 | | 543.31* | 7,218.21 | | |

STATEMENT DATE:06/02/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 05/30 Mon | 6,572.27 | 7.0 | 460.06 | 6,112.21 TOTAL,CC | SALES |
| Totals | 6,572.27 | | 460.06* | 6,112.21 | |

STATEMENT DATE:06/03/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 05/31 Tue | 7,931.45 | 7.0 | 555.20 | 7,376.25 TOTAL,CC | SALES |
| Totals | 7,931.45 | | 555.20* | 7,376.25 | |

STATEMENT DATE:06/05/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 06/01 Wed | 11,505.68 | 7.0 | 805.40 | 10,700.28 TOTAL,CC | | SALES |
| 06/02 Thu | 14,093.82 | 7.0 | 986.57 | 13,107.25 TOTAL,CC | | SALES |
| Totals | 25,599.50 | | 1,791.97* | 23,807.53 | | |

*- CONTINUED -*

STATEMENT DATE:06/07/2016

Dining Activity
| | | | | | | |
|---|---|---|---|---|---|---|
| 06/03 Fri | 15,506.77 | 7.0 | 1,085.47 | 14,421.30 TOTAL,CC | | SALES |
| 06/04 Sat | 10,005.35 | 7.0 | 700.37 | 9,304.98 TOTAL,CC | | SALES |
| Totals | 25,512.12 | | 1,785.84* | 23,726.28 | | |

STATEMENT DATE:06/08/2016

Dining Activity
| | | | | | | |
|---|---|---|---|---|---|---|
| 06/05 Sun | 9,960.32 | 7.0 | 697.22 | 9,263.10 TOTAL,CC | | SALES |
| 06/06 Mon | 59.81 | 7.0 | 4.19 | 55.62 TOTAL,CC | | SALES |
| Totals | 10,020.13 | | 701.41* | 9,318.72 | | |

STATEMENT DATE:06/09/2016

Dining Activity
| | | | | | |
|---|---|---|---|---|---|
| 06/06 Mon | 12,409.90 | 7.0 | 868.69 | 11,541.21 TOTAL,CC | SALES |
| Totals | 12,409.90 | | 868.69* | 11,541.21 | |

STATEMENT DATE:06/10/2016

Dining Activity
| | | | | | |
|---|---|---|---|---|---|
| 06/07 Tue | 14,777.46 | 7.0 | 1,034.42 | 13,743.04 TOTAL,CC | SALES |
| Totals | 14,777.46 | | 1,034.42* | 13,743.04 | |

STATEMENT DATE:06/12/2016

Dining Activity
| | | | | | | |
|---|---|---|---|---|---|---|
| 06/08 Wed | 15,413.39 | 7.0 | 1,078.94 | 14,334.45 TOTAL,CC | | SALES |
| 06/09 Thu | 16,098.01 | 7.0 | 1,126.86 | 14,971.15 TOTAL,CC | | SALES |
| 06/10 Fri | 160.81 | 7.0 | 11.26 | 149.55 TOTAL,CC | | SALES |
| Totals | 31,672.21 | | 2,217.06* | 29,455.15 | | |

*- CONTINUED -*

STATEMENT DATE:06/14/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 06/10 Fri | 13,372.00 | 7.0 | 936.04 | 12,435.96 TOTAL,CC | SALES |
| 06/11 Sat | 10,994.64 | 7.0 | 769.62 | 10,225.02 TOTAL,CC | SALES |
| 06/12 Sun | 296.11 | 7.0 | 20.73 | 275.38 TOTAL,CC | SALES |
| Totals | 24,662.75 | | 1,726.39* | 22,936.36 | |

STATEMENT DATE:06/15/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 06/12 Sun | 7,144.54 | 7.0 | 500.12 | 6,644.42 TOTAL,CC | SALES |
| Totals | 7,144.54 | | 500.12* | 6,644.42 | |

STATEMENT DATE:06/16/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 06/13 Mon | 11,877.44 | 7.0 | 831.42 | 11,046.02 TOTAL,CC | SALES |
| Totals | 11,877.44 | | 831.42* | 11,046.02 | |

STATEMENT DATE:06/17/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 06/14 Tue | 14,663.20 | 7.0 | 1,026.42 | 13,636.78 TOTAL,CC | SALES |
| Totals | 14,663.20 | | 1,026.42* | 13,636.78 | |

STATEMENT DATE:06/19/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 06/15 Wed | 17,182.25 | 7.0 | 1,202.76 | 15,979.49 TOTAL,CC | SALES |
| 06/16 Thu | 13,095.50 | 7.0 | 916.69 | 12,178.81 TOTAL,CC | SALES |
| Totals | 30,277.75 | | 2,119.45* | 28,158.30 | |

*- CONTINUED -*

STATEMENT DATE:06/21/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 06/17 Fri | 10,660.17 | 7.0 | 746.21 | 9,913.96 | TOTAL,CC | SALES |
| 06/18 Sat | 9,520.69 | 7.0 | 666.45 | 8,854.24 | TOTAL,CC | SALES |
| 06/19 Sun | 167.40 | 7.0 | 11.72 | 155.68 | TOTAL,CC | SALES |
| **Totals** | **20,348.26** | | **1,424.38*** | **18,923.88** | | |

STATEMENT DATE:06/22/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 06/19 Sun | 9,001.19 | 7.0 | 630.08 | 8,371.11 | TOTAL,CC | SALES |
| **Totals** | **9,001.19** | | **630.08*** | **8,371.11** | | |

STATEMENT DATE:06/23/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 06/20 Mon | 8,091.08 | 7.0 | 566.38 | 7,524.70 | TOTAL,CC | SALES |
| 06/21 Tue | 5,415.15 | 7.0 | 379.06 | 5,036.09 | TOTAL,CC | SALES |
| **Totals** | **13,506.23** | | **945.44*** | **12,560.79** | | |

STATEMENT DATE:06/24/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 06/21 Tue | 9,218.76 | 7.0 | 645.31 | 8,573.45 | TOTAL,CC | SALES |
| 06/22 Wed | 32.22 | 7.0 | 2.26 | 29.96 | TOTAL,CC | SALES |
| **Totals** | **9,250.98** | | **647.57*** | **8,603.41** | | |

STATEMENT DATE:06/26/2016

| Dining Activity | | | | | | |
|---|---|---|---|---|---|---|
| 06/22 Wed | 12,734.96 | 7.0 | 891.45 | 11,843.51 | TOTAL,CC | SALES |
| 06/23 Thu | 11,581.36 | 7.0 | 810.70 | 10,770.66 | TOTAL,CC | SALES |
| 06/24 Fri | 1,068.51 | 7.0 | 74.80 | 993.71 | TOTAL,CC | SALES |

*- CONTINUED -*

| Totals | 25,384.83 | | 1,776.95* | 23,607.88 | |
|---|---|---|---|---|---|

**STATEMENT DATE:06/28/2016**

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 06/24 Fri | 10,987.99 | 7.0 | 769.16 | 10,218.83 TOTAL,CC | SALES |
| 06/25 Sat | 9,825.04 | 7.0 | 687.75 | 9,137.29 TOTAL,CC | SALES |
| Totals | 20,813.03 | | 1,456.91* | 19,356.12 | |

**STATEMENT DATE:06/29/2016**

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 06/24 Fri | 2,420.32 | 7.0 | 169.42 | 2,250.90 TOTAL,CC | SALES |
| 06/26 Sun | 8,091.89 | 7.0 | 566.43 | 7,525.46 TOTAL,CC | SALES |
| 06/27 Mon | 3,377.49 | 7.0 | 236.42 | 3,141.07 TOTAL,CC | SALES |
| Totals | 13,889.70 | | 972.27* | 12,917.43 | |

**STATEMENT DATE:06/30/2016**

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 06/27 Mon | 12,471.01 | 7.0 | 872.97 | 11,598.04 TOTAL,CC | SALES |
| Totals | 12,471.01 | | 872.97* | 11,598.04 | |

**STATEMENT DATE:07/15/2016**

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 07/13 Wed | 111.17 | 7.0 | 7.78 | 103.39 TOTAL,CC | SALES |
| Totals | 111.17 | | 7.78* | 103.39 | |

**STATEMENT DATE:07/17/2016**

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 07/13 Wed | 12,008.46 | 7.0 | 840.59 | 11,167.87 TOTAL,CC | SALES |
| 07/14 Thu | 9,314.33 | 7.0 | 652.00 | 8,662.33 TOTAL,CC | SALES |

*- CONTINUED -*

| Totals | 21,322.79 | | 1,492.59* | 19,830.20 | |
|---|---|---|---|---|---|

STATEMENT DATE:07/19/2016

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 07/15 Fri | 10,269.29 | 7.0 | 718.85 | 9,550.44 TOTAL,CC | SALES |
| 07/16 Sat | 7,737.10 | 7.0 | 541.60 | 7,195.50 TOTAL,CC | SALES |
| 07/17 Sun | 129.32 | 7.0 | 9.05 | 120.27 TOTAL,CC | SALES |
| Totals | 18,135.71 | | 1,269.50* | 16,866.21 | |

STATEMENT DATE:07/20/2016

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 07/17 Sun | 7,587.97 | 7.0 | 531.16 | 7,056.81 TOTAL,CC | SALES |
| 07/18 Mon | 87.10 | 7.0 | 6.10 | 81.00 TOTAL,CC | SALES |
| Totals | 7,675.07 | | 537.26* | 7,137.81 | |

STATEMENT DATE:07/21/2016

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 07/18 Mon | 8,372.85 | 7.0 | 586.10 | 7,786.75 TOTAL,CC | SALES |
| Totals | 8,372.85 | | 586.10* | 7,786.75 | |

STATEMENT DATE:07/22/2016

**Dining Activity**

| | | | | | |
|---|---|---|---|---|---|
| 07/19 Tue | 8,100.27 | 7.0 | 567.02 | 7,533.25 TOTAL,CC | SALES |
| Totals | 8,100.27 | | 567.02* | 7,533.25 | |

STATEMENT DATE:07/24/2016

**Dining Activity**

*- CONTINUED -*

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/20 Wed | 16,611.54 | 7.0 | 1,162.81 | 15,448.73 TOTAL,CC | | SALES |
| 07/21 Thu | 12,742.48 | 7.0 | 891.97 | 11,850.51 TOTAL,CC | | SALES |
| 07/22 Fri | 213.14 | 7.0 | 14.92 | 198.22 TOTAL,CC | | SALES |
| **Totals** | **29,567.16** | | **2,069.70\*** | **27,497.46** | | |

**STATEMENT DATE:07/26/2016**

Dining Activity

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/22 Fri | 11,978.49 | 7.0 | 838.49 | 11,140.00 TOTAL,CC | | SALES |
| 07/23 Sat | 8,243.65 | 7.0 | 577.06 | 7,666.59 TOTAL,CC | | SALES |
| **Totals** | **20,222.14** | | **1,415.55\*** | **18,806.59** | | |

**STATEMENT DATE:07/27/2016**

Dining Activity

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/24 Sun | 7,497.22 | 7.0 | 524.81 | 6,972.41 TOTAL,CC | | SALES |
| **Totals** | **7,497.22** | | **524.81\*** | **6,972.41** | | |

**STATEMENT DATE:07/28/2016**

Dining Activity

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/25 Mon | 9,397.21 | 7.0 | 657.80 | 8,739.41 TOTAL,CC | | SALES |
| **Totals** | **9,397.21** | | **657.80\*** | **8,739.41** | | |

**STATEMENT DATE:07/29/2016**

Dining Activity

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/26 Tue | 11,866.88 | 7.0 | 830.68 | 11,036.20 TOTAL,CC | | SALES |
| **Totals** | **11,866.88** | | **830.68\*** | **11,036.20** | | |

**STATEMENT DATE:07/31/2016**

Dining Activity

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/27 Wed | 12,480.60 | 7.0 | 873.64 | 11,606.96 TOTAL,CC | | SALES |

*- CONTINUED -*

| Totals | 12,480.60 | | 873.64* | 11,606.96 | |
|---|---|---|---|---|---|

STATEMENT DATE:08/05/2016

Dining Activity

| 08/02 Tue | 11,643.44 | 7.0 | 815.04 | 10,828.40 | TOTAL,CC | SALES |
|---|---|---|---|---|---|---|
| Totals | 11,643.44 | | 815.04* | 10,828.40 | | |

STATEMENT DATE:08/07/2016

Dining Activity

| 08/03 Wed | 12,485.65 | 7.0 | 874.00 | 11,611.65 | TOTAL,CC | SALES |
|---|---|---|---|---|---|---|
| 08/04 Thu | 12,967.39 | 7.0 | 907.72 | 12,059.67 | TOTAL,CC | SALES |
| Totals | 25,453.04 | | 1,781.72* | 23,671.32 | | |

STATEMENT DATE:08/09/2016

Dining Activity

| 08/05 Fri | 11,708.85 | 7.0 | 819.62 | 10,889.23 | TOTAL,CC | SALES |
|---|---|---|---|---|---|---|
| Totals | 11,708.85 | | 819.62* | 10,889.23 | | |

STATEMENT DATE:08/10/2016

Dining Activity

| 08/06 Sat | 9,712.60 | 7.0 | 679.88 | 9,032.72 | TOTAL,CC | SALES |
|---|---|---|---|---|---|---|
| 08/07 Sun | 7,832.28 | 7.0 | 548.26 | 7,284.02 | TOTAL,CC | SALES |
| Totals | 17,544.88 | | 1,228.14* | 16,316.74 | | |

STATEMENT DATE:08/11/2016

Dining Activity

| 08/08 Mon | 9,384.64 | 7.0 | 656.92 | 8,727.72 | TOTAL,CC | SALES |
|---|---|---|---|---|---|---|

*- CONTINUED -*

| Totals | 9,384.64 | | 656.92* | 8,727.72 | |
|---|---|---|---|---|---|

STATEMENT DATE:08/12/2016

Dining Activity
| 08/09 Tue | 13,258.35 | 7.0 | 928.08 | 12,330.27 TOTAL,CC | SALES |
|---|---|---|---|---|---|
| Totals | 13,258.35 | | 928.08* | 12,330.27 | |

STATEMENT DATE:08/14/2016

Dining Activity
| 08/10 Wed | 16,924.76 | 7.0 | 1,184.73 | 15,740.03 TOTAL,CC | SALES |
|---|---|---|---|---|---|
| 08/11 Thu | 14,151.49 | 7.0 | 990.60 | 13,160.89 TOTAL,CC | SALES |
| Totals | 31,076.25 | | 2,175.33* | 28,900.92 | |

STATEMENT DATE:08/16/2016

Dining Activity
| 08/12 Fri | 12,690.23 | 7.0 | 888.32 | 11,801.91 TOTAL,CC | SALES |
|---|---|---|---|---|---|
| 08/13 Sat | 11,056.72 | 7.0 | 773.97 | 10,282.75 TOTAL,CC | SALES |
| Totals | 23,746.95 | | 1,662.29* | 22,084.66 | |

STATEMENT DATE:08/17/2016

Dining Activity
| 08/14 Sun | 5,234.12 | 7.0 | 366.39 | 4,867.73 TOTAL,CC | SALES |
|---|---|---|---|---|---|
| Totals | 5,234.12 | | 366.39* | 4,867.73 | |

STATEMENT DATE:08/18/2016

Dining Activity
| 08/15 Mon | 9,291.02 | 7.0 | 650.37 | 8,640.65 TOTAL,CC | SALES |
|---|---|---|---|---|---|
| Totals | 9,291.02 | | 650.37* | 8,640.65 | |

*- CONTINUED -*

STATEMENT DATE:08/19/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 08/16 Tue | 11,479.65 | 7.0 | 803.58 | 10,676.07 TOTAL,CC | SALES |
| Totals | 11,479.65 | | 803.58* | 10,676.07 | |

STATEMENT DATE:08/21/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 08/17 Wed | 12,502.67 | 7.0 | 875.19 | 11,627.48 TOTAL,CC | SALES |
| 08/18 Thu | 12,318.67 | 7.0 | 862.31 | 11,456.36 TOTAL,CC | SALES |
| Totals | 24,821.34 | | 1,737.50* | 23,083.84 | |

STATEMENT DATE:08/23/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 08/19 Fri | 11,363.35 | 7.0 | 795.43 | 10,567.92 TOTAL,CC | SALES |
| 08/20 Sat | 8,809.89 | 7.0 | 616.69 | 8,193.20 TOTAL,CC | SALES |
| Totals | 20,173.24 | | 1,412.12* | 18,761.12 | |

STATEMENT DATE:08/24/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 08/21 Sun | 4,776.81 | 7.0 | 334.38 | 4,442.43 TOTAL,CC | SALES |
| Totals | 4,776.81 | | 334.38* | 4,442.43 | |

STATEMENT DATE:10/27/2016

| Dining Activity | | | | | |
|---|---|---|---|---|---|
| 10/24 Mon | 5,465.72 | 7.0 | 382.60 | 5,083.12 TOTAL,CC | SALES |
| Totals | 5,465.72 | | 382.60* | 5,083.12 | |

*- CONTINUED -*

STATEMENT DATE:10/28/2016

| Dining Activity |          |     |          |          |           |        |
|-----------------|----------|-----|----------|----------|-----------|--------|
| 10/25 Tue       | 6,657.25 | 7.0 | 466.01   | 6,191.24 | TOTAL,CC  | SALES  |
| Totals          | 6,657.25 |     | 466.01*  | 6,191.24 |           |        |

STATEMENT DATE:10/30/2016

| Dining Activity |           |     |          |           |           |        |
|-----------------|-----------|-----|----------|-----------|-----------|--------|
| 10/26 Wed       | 6,720.58  | 7.0 | 470.44   | 6,250.14  | TOTAL,CC  | SALES  |
| 10/27 Thu       | 5,316.98  | 7.0 | 372.19   | 4,944.79  | TOTAL,CC  | SALES  |
| Totals          | 12,037.56 |     | 842.63*  | 11,194.93 |           |        |

STATEMENT DATE:11/01/2016

| Dining Activity |          |     |          |          |           |        |
|-----------------|----------|-----|----------|----------|-----------|--------|
| 10/28 Fri       | 8,774.39 | 7.0 | 614.21   | 8,160.18 | TOTAL,CC  | SALES  |
| Totals          | 8,774.39 |     | 614.21*  | 8,160.18 |           |        |

# Exhibit M

Case: 1:16-cv-09952 Document #: 104-3 Filed: 01/14/19 Page 114 of 120 PageID #:2217
Case: 1:16-cv-09952 Document #: 80 Filed: 01/09/19 Page 33 of 133 PageID #:503

| Transaction | Amount | Date Paid | Date Post | Collector | Reference # |
|---|---|---|---|---|---|
| Check | (699.08) | 03-13-2017 | 03-13-2017 | DeCicco, Kathy | |
| Check | (652.64) | 03-20-2017 | 03-21-2017 | DeCicco, Kathy | |
| Check | (867.99) | 03-27-2017 | 03-27-2017 | DeCicco, Kathy | |
| Check | (867.99) | 03-30-2017 | 03-30-2017 | DeCicco, Kathy | |
| Returned Check | 867.99 | 03-27-2017 | 03-30-2017 | DeCicco, Kathy | |
| Check | (1,011.18) | 04-04-2017 | 04-04-2017 | DeCicco, Kathy | |
| Check | (1,072.11) | 04-11-2017 | 04-11-2017 | DeCicco, Kathy | |
| Check | (1,368.06) | 04-17-2017 | 04-17-2017 | DeCicco, Kathy | |
| Check | (1,257.58) | 04-24-2017 | 04-24-2017 | DeCicco, Kathy | |
| Check | (1,169.41) | 05-01-2017 | 05-01-2017 | DeCicco, Kathy | |
| Check | (893.21) | 05-08-2017 | 05-08-2017 | DeCicco, Kathy | |
| Check | (1,116.75) | 05-16-2017 | 05-16-2017 | DeCicco, Kathy | |
| Check | (1,116.75) | 05-22-2017 | 05-22-2017 | DeCicco, Kathy | |
| Check | (1,133.47) | 05-31-2017 | 05-31-2017 | DeCicco, Kathy | |
| Check | (793.36) | 06-05-2017 | 06-05-2017 | DeCicco, Kathy | |
| Check | (978.56) | 06-12-2017 | 06-12-2017 | DeCicco, Kathy | |
| Check | (893.72) | 06-19-2017 | 06-19-2017 | DeCicco, Kathy | |
| Check | (1,106.39) | 06-26-2017 | 06-26-2017 | DeCicco, Kathy | |
| Check | (836.06) | 07-05-2017 | 07-05-2017 | DeCicco, Kathy | |
| Check | (560.89) | 07-10-2017 | 07-10-2017 | DeCicco, Kathy | |
| Check | (865.55) | 07-17-2017 | 07-17-2017 | DeCicco, Kathy | |
| Check | (1,045.84) | 07-25-2017 | 07-25-2017 | DeCicco, Kathy | |
| Check | (1,047.76) | 07-31-2017 | 07-31-2017 | DeCicco, Kathy | |
| Check | (740.02) | 08-04-2017 | 08-04-2017 | DeCicco, Kathy | |
| Returned Check | 740.02 | 08-04-2017 | 08-09-2017 | DeCicco, Kathy | |

| Whose Number | Number | Contacted | Attempted | Dials | Action | Result |
|---|---|---|---|---|---|---|
| Phillip Lajaunie | 917-771-0727 | 01/01/1901 | 01/01/1901 | 0 | Home | Never Tried |
| Restaurant | 212-571-2100 | 01/01/1901 | 01/01/1901 | 0 | Restaurant | Never Tried |

| Budget | Net | PostDates |
|---|---|---|
| | | |

Case: 1:16-cv-09952 Document #: 104-3 Filed: 01/14/19 Page 115 of 120 PageID #:1217
Case: 1:18-cv-09952 Document #: 80 Filed: 03/06/19 Page 33 of 133 PageID #:503

**Debtor Overview Report**

| Note Date | Time | Last Name | Note Text |
|-----------|------|-----------|-----------|
| | | | |

| Transaction | Amount | Date Paid | Date Post | Collector | Reference # |
|-------------|--------|-----------|-----------|-----------|-------------|
| Assigned by Client | 13,082.84 | 09-01-2016 | 09-01-2016 | System, | NewBiz |
| Check | (798.44) | 11-21-2016 | 11-21-2016 | DeCicco, Kathy | |
| Check | (954.04) | 11-30-2016 | 11-30-2016 | DeCicco, Kathy | |
| Check | (517.94) | 12-05-2016 | 12-05-2016 | DeCicco, Kathy | |
| Check | (1,094.34) | 12-12-2016 | 12-12-2016 | DeCicco, Kathy | |
| Check | (1,233.35) | 12-21-2016 | 12-21-2016 | DeCicco, Kathy | |
| Check | (1,192.11) | 12-27-2016 | 12-27-2016 | DeCicco, Kathy | |
| Check | (787.59) | 01-03-2017 | 01-03-2017 | DeCicco, Kathy | |
| Check | (727.07) | 01-09-2017 | 01-09-2017 | DeCicco, Kathy | |
| Check | (731.80) | 01-16-2017 | 01-16-2017 | DeCicco, Kathy | |
| Check | (657.58) | 01-23-2017 | 01-23-2017 | DeCicco, Kathy | |
| Check | (444.58) | 01-30-2017 | 01-30-2017 | DeCicco, Kathy | |
| Check | (703.80) | 02-06-2017 | 02-06-2017 | DeCicco, Kathy | |
| Check | (734.05) | 02-21-2017 | 02-21-2017 | DeCicco, Kathy | |
| Check | (628.71) | 02-27-2017 | 02-27-2017 | DeCicco, Kathy | |
| Check | (636.15) | 03-06-2017 | 03-06-2017 | DeCicco, Kathy | |
| Check | (100.06) | 03-13-2017 | 03-13-2017 | DeCicco, Kathy | |
| Check | (608.31) | 02-13-2017 | 07-10-2018 | DeCicco, Kathy | |
| Check | (532.92) | 11-14-2016 | 07-10-2018 | DeCicco, Kathy | |

| Whose Number | Number | Contacted | Attempted | Dials | Action | Result |
|--------------|--------|-----------|-----------|-------|--------|--------|
| Phillip Lajaunie | 917-771-0727 | 10/18/2016 | 10/18/2016 | 1 | Home | NO ANSWER |
| Restaurant & Yoko Iizuka (c | 212-285-8585 | 01/01/1901 | 10/18/2016 | 1 | Restaurant | LEFT MESSAGE |
| Yoko Iizuka - Dtd | 646-831-6978 | 10/18/2016 | 10/18/2016 | 1 | Contact | LEFT VOICE MAIL MES |

| Budget | Net | PostDates |
|--------|-----|-----------|
| | | |

# Exhibit N

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

IN RE:                                             Case No. 16-12453 (MEW)
                                                   Chapter 11 Reorganization

15 JOHN CORP.,
a/k/a LES HALLES,
a/k/a FIRST ADMIN INC.,

                                    Debtor.

-------------------------------------------------------------X

## ORDER CONVERTING CHAPTER 11 CASE
## TO A CASE UNDER CHAPTER 7

Upon the Order of this Court dated August 8, 2017 scheduling a Status Conference for

August 16, 2017 (ECF No. 127) and directing the Debtor to show cause why this Chapter 11 case

should not be converted to a case under Chapter 7 of the Bankruptcy Code and upon hearings

before this Court attended by the Debtor, by its attorney, Leo Fox, Esq., and Phillipe Lajaunie, the

Debtor's President, on August 29, 2017, October 10, 2017 and November 6, 2017, for the reasons

stated on the record at the November 6, 2017 hearing (the "Hearing") it is

**ORDERED,** that this case commenced under Chapter 11 of the Bankruptcy Code be and

hereby is converted to a case under Chapter 7 pursuant to 11 U.S.C. § 1112(b)(4); and it is further

*ORDERED*, that the Debtor shall cooperate with the Chapter 7 trustee to assist the trustee in learning the Debtor's current financial condition and shall, pursuant to Rule 1019(5) of the Federal Rules of Bankruptcy Procedure, file (i) a schedule of unpaid debts incurred after the commencement of the Chapter 11 case within 14 days of the date of this Order and (ii) a final report within 30 days of the date of this Order.

Dated:   New York, New York
         November 6, 2017

                              **s/Michael E. Wiles**
                              Honorable Michael E. Wiles
                              United States Bankruptcy Judge

Exhibit O

Case 1-16-cv-09058-Document #: 104 Filed 01/14/19 Page 120 of 120 PageID #:1217
16-12453-mew   Doc 2150   Filed 01/19/18   Entered 01/19/18   Page 1 of 1
Decree   Pg 1 of 1

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK
**One Bowling Green**
**New York, NY 10004–1408**

---

IN RE: 15 John Corp.                          CASE NO.: 16–12453–mew

 aka   Les Halles
 aka   First Admin. Inc.

Social Security/Taxpayer ID/Employer ID/Other Nos.:          CHAPTER:  7
13–4082234

---

# ORDER OF FINAL DECREE

The estate of the above named debtor has been fully administered.

IT IS ORDERED THAT:

Albert Togut is discharged as trustee of the estate and the chapter 7 case of the above named debtor(s) is closed.

Dated: January 19, 2018

                                    Michael E. Wiles, Bankruptcy Judge